**No. 23-1826**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

COTTER CORP., N.S.L.,

*Plaintiff-Appellant*,

v.

UNITED STATES,

*Defendant-Appellee*.

Appeal from the United States Court of Federal Claims
in Case No. 1:22-cv-00414-DAT
(Hon. David A. Tapp, Judge)

---

**PRINCIPAL BRIEF FOR PLAINTIFF-APPELLANT**

Alejandro L. Sarria
Principal Attorney
Jason N. Workmaster
Connor Farrell
MILLER & CHEVALIER CHARTERED
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5893
Fax: (202) 626-5801
asarria@milchev.com
jworkmaster@milchev.com
cfarrell@milchev.com

Jennifer Steeve
RILEY SAFER HOLMES
& CANCILA LLP
100 Spectrum Center Dr.,
Suite 650
Irvine, CA 92618
Tel: (949) 359-5515
Fax: (949) 359-5501
jsteeve@rshc-law.com

Attorneys for *Plaintiff-Appellant*
Cotter Corporation (N.S.L.)

June 27, 2023

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant, Cotter Corporation (N.S.L.), certifies the following:

1. The full name of every party I represent is Cotter Corporation (N.S.L).

2. The name of the real party in interest I represent is Cotter Corporation (N.S.L.).

3. Cotter Corporation (N.S.L.)'s parent corporation is General Atomics Uranium, LLC, which owns 10 percent or more of Cotter Corporation (N.S.L.)'s stock.

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and appeared for the entity in the lower tribunal or are expected to appear for the entity in this court, are Adam P. Feinberg (Member, Miller & Chevalier Chartered); Alexandra S. Prime (Associate, Miller & Chevalier Chartered).

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ vii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. RELEVANT FACTS ........ 3

A. Statutory Framework: The Price-Anderson Act ........ 3

B. The Manhattan Project and the St. Louis Sites ........ 8

C. The Indemnification Agreement ........ 9

D. The *McClurg* Litigation ........ 11

II. PROCEDURAL HISTORY ........ 13

A. Cotter's COFC Complaint ........ 13

B. The March 2023 Decision ........ 14

SUMMARY OF THE ARGUMENT ........ 15

ARGUMENT ........ 16

I. The Standard of Review is De Novo. ........ 16

II. Cotter Is Entitled to Price-Anderson Act Indemnification Because It Incurred Public Liability for a Domestic Nuclear Incident and That Liability Has a Causal or Logical Connection to the Nuclear Risks Created by Mallinckrodt's Work on the Manhattan Project Contract. ........ 17

A. Price-Anderson Act Indemnification Protects a Broad Class of Persons with Public Liability for a Domestic Nuclear Incident. ........ 17

B. Cotter's Complaint Plausibly Alleged Entitlement to Price-Anderson Act Indemnification. ........ 21

III. COFC Misread and Misapplied the Act and Indemnification Agreement in Holding That Cotter Is Ineligible for Indemnity .......... 26

A. Neither the Act nor the Indemnification Agreement Required Cotter to Show That It Performed Activities Under or in Support of the Work on the Mallinckrodt Contract .......... 26

B. Cotter's Public Liability Is Not "Too Far Downstream" from the Contractual Activity Under the Manhattan Project Contract .......... 33

C. The Purpose and History of the Act Confirm That, in a Domestic Nuclear Incident, Indemnity Is Not Limited to Persons Who Perform Activities Under or in Support of a Contract Covered by the Act .......... 39

IV. COFC's Misreading of the Price-Anderson Act Infected its Analysis of Cotter's Contractual Indemnification Claim .......... 42

A. Cotter Had Standing to Pursue its Contractual Indemnification Claim. 42

B. Cotter Stated a Plausible Claim for Contractual Indemnification. .......... 46

CONCLUSION .......... 52

ADDENDUM

CERTIFICATE OF COMPLIANCE

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraham v. Rockwell Int'l Corp.*,
326 F.3d 1242 (Fed. Cir. 2003) .......... 27

*Azima v. RAK Inv. Auth.*,
926 F.3d 870 (D.C. Cir. 2019) .......... 23, 25

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) .......... 38, 43

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
241 F.3d 123 (2d Cir. 2001) (Sotomayor, J.) .......... 23

*Corley v. United States*,
556 U.S. 303 (2009) .......... 27

*In re Cotter Corp. (N.S.L.)*,
22 F.4th 788 (8th Cir. 2022) .......... 7, 22

*Dainippon Screen Mfg. Co. v. CFMT, Inc.*,
142 F.3d 1266 (Fed. Cir. 1998) .......... 35

*Dobyns v. United States*,
91 Fed. Cl. 412 (2010) .......... 48

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) .......... 3, 17, 41

*El Paso Nat. Gas Co. v. Neztsosie*,
526 U.S. 473 (1999), 1998 WL 858533 .......... 19

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 29

*G4S Tech. LLC v. United States*,
114 Fed. Cl. 662 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015) .......... 43

*J.G.B. Enters., Inc. v. United States*,
497 F.3d 1259 (Fed. Cir. 2007) .......... 49

*LaBonte v. United States*,
43 F.4th 1357 (Fed. Cir. 2022) ........ 16

*Maine Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ........ 30

*N.Y. & Presbyterian Hosp. v. United States*,
881 F.3d 877 (Fed. Cir. 2018) ........ 39

*Rack Room Shoes v. United States*,
718 F.3d 1370 (Fed. Cir. 2013) ........ 16

*RAMCOR Servs. Group, Inc. v. U.S.*,
185 F.3d 1286 (Fed. Cir. 1999) ........ 25

*San Antonio Hous. Auth. v. United States*,
143 Fed. Cl. 425 (2019) ........ 47, 48

*Schneider Moving & Storage Co. v. Robbins*,
466 U.S. 364 (1984) ........ 45, 49

*Shell Oil Co. v. United States*,
751 F.3d 1282 (Fed. Cir. 2014) ........ 16

**Statutes**

28 U.S.C. § 1295(a)(3) ........ 2

42 U.S.C. § 2014(hh) ........ 12

42 U.S.C. § 2014(t) (2005) ........ 7

42 U.S.C. § 2210(d) ........ 19

Price-Anderson Act ........ *passim*

Tucker Act, 28 U.S.C. § 1491(a)(1) ........ 2

**Other Authorities**

*Connection*, Black's Law Dictionary (4th ed. 1951) ........ 25

Fed. R. Civ. P. 12 ........ 2, 43

*In connection with*, Garner's Dictionary of Legal Usage (3d ed 2011) ........ 26

*Liability*, Black's Law Dictionary (11th ed. 2019)............................................................ 27

## STATEMENT OF RELATED CASES

Counsel for Appellant is unaware of any other appeal stemming from this action that was previously before this Court or any other appellate court, and is unaware of any related cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

The Price-Anderson Act ("Act") requires the United States to indemnify "any . . . person" for "any legal liability" resulting from any domestic "nuclear incident," as long as the liability has either a causal or logical connection to work on a federal contract that extends the Act's indemnity protections. Appx816-819. Members of the public sued Appellant Cotter Corporation (N.S.L.) ("Cotter") under the Act, alleging personal injury from a nuclear incident near St. Louis, Missouri. That alleged nuclear incident involved radioactive material originally produced for the Manhattan Project under a contract extending the Act's indemnity protections. The suit against Cotter settled, and Cotter sought indemnity from the United States in the Court of Federal Claims. The government prevailed on a motion to dismiss for failure to state a claim and lack of standing.

The chief question presented here is whether Cotter sufficiently alleged a claim for Price-Anderson Act indemnification. Cotter's allegations unquestionably meet the Act's standard because Cotter's liability is based on a domestic nuclear incident involving radioactive material that was produced under a government contract providing for Price-Anderson indemnity. Despite this, the Court of Federal Claims ruled that Cotter was "too far downstream" from the underlying contract to be eligible for liability protection. The court erred as a matter of law because its holding conflicts with the plain language and purpose of the Act and the contract's indemnity provision. The order dismissing Cotter's claims should be reversed.

## JURISDICTIONAL STATEMENT

The Court of Federal Claims had jurisdiction over this action under the Tucker Act, 28 U.S.C. § 1491(a)(1). The court issued its memorandum opinion and order dismissing the complaint and entered judgment on March 3, 2023. Cotter timely appealed on April 25, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

This appeal presents three legal issues:

1. Whether the Court of Federal Claims erred in dismissing Cotter's statutory claim for Price-Anderson Act indemnification under Fed. R. Civ. P. 12(b)(6) despite Cotter alleging that it is a "person indemnified" meeting all the Act's criteria for indemnification.

2. Whether the Court of Federal Claims erred in dismissing Cotter's contractual claim for Price-Anderson Act indemnification under Fed. R. Civ. P. 12(b)(1) despite Cotter alleging that it is part of a class of "persons indemnified" clearly intended to benefit from the Price-Anderson indemnification agreement executed under the Manhattan Project contract.

3. Whether the Court of Federal Claims erred in dismissing Cotter's contractual claim for Price-Anderson Act indemnification under Fed. R. Civ. P. 12(b)(6) despite Cotter alleging that the United States did not meet its contractual obligation to indemnify Cotter.

## STATEMENT OF THE CASE

## I. RELEVANT FACTS

### A. Statutory Framework: The Price-Anderson Act

Congress passed the Price-Anderson Act ("Act") in 1957 to (1) "protect the public" and (2) "encourage the development of the atomic energy industry." Appx816-819. The Act accomplishes this dual purpose by authorizing the United States to make "funds available for a portion of the damages suffered by the public from nuclear incidents" and by "limit[ing] the liability of those persons liable for such losses." *Id.*

In its original form, the Act applied only to nuclear incidents occurring within the United States. Appx816 (§ 11(o)). The Act capped the aggregate liability for a single incident to the amount of private insurance available at the time. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 64–65 (1978). It also designated up to $500 million for government indemnification of "persons indemnified" to cover damages that exceeded the amount of available insurance. *Id.* at 65, 90–91.

The Act implemented these protections by authorizing the Atomic Energy Commission ("AEC") to enter into indemnification agreements under government contracts that introduced the risk of "public liability" for a major "nuclear incident" in the United States. Appx817 (§ 170(d)). Under the Act, Section 170(d) defines the scope and key terms of such indemnification agreements, which in turn provide for indemnification of the contractor and other "persons indemnified" against

"public liability arising out of or in connection with the contractual activity." *Id.*; *see also* Appx1008-1009.

The Act also permitted indemnification agreements to include additional terms that the AEC "deem[ed] appropriate to carry out the purposes" of Section 170. *See* Appx818 (§ 170(h)). For instance, for work involving "source material"—the type of nuclear material at issue here—the Act allowed the AEC, at its discretion, to require that its contractor contribute private "financial protection" to help cover potential public liability claims (e.g., private insurance). Appx817 (§ 170(d)). The Act requires the government to indemnify all "the persons indemnified" against public liability claims exceeding any such protection. *Id.*

Thus, to qualify for Price-Anderson Act protections, a claimant must show that (1) the government has executed an indemnification agreement under a federal contract involving the risk of public liability for a domestic nuclear incident, (2) it is a "person indemnified," (3) it has or may have "public liability" that "aris[es] out of or result[s] from a 'nuclear incident,'" and (4) its public liability "aris[es] out of or in connection with the contractual activity" that created the risk for a nuclear incident in the United States. Appx816-817 (§§ 11, 170(d)); *see also* Appx780-788.

From its inception, the Act defined "person indemnified" to include not only "the person with whom an indemnity agreement is executed," but also "any other person who may be liable for public liability." Appx816 (§ 11(r)). That broad definition was written to "protect[] the public" by ensuring federal funds are available

to cover public liability in case a third party, rather than "the person with whom the indemnity agreement is executed," causes a nuclear incident. Appx880. For example, the indemnity applies even "where some unusual incident, such as negligence in maintaining an airplane motor, should cause an airplane to crash into a reactor and thereby cause damage to the public." *See id.* Under the Act, "the public is protected and the airplane company can also take advantage of the indemnification." *Id.*

In other words, the Act's liability protection "applies to strangers . . . and would apply in the case of every nuclear incident and would protect each and every person who might have liability regardless of that person's relationship with [an indemnified contractor]." Appx1160. That includes "not only the party directly engaged in the activity that results in the nuclear incident but any other person as well," which accomplishes the Act's goal of "channeling [public] liability" to the government and guaranteeing "omnibus coverage" for Americans injured in any domestic nuclear incident. Appx1185.

Congress reiterated the broad scope of these protections when it amended the Act in 1962 to extend government indemnification for certain nuclear incidents occurring outside the United States ("1962 Amendments"). Appx901 (§ 11(o)). Among other changes, the 1962 Amendments modified the definition of "person indemnified" to distinguish between persons who face public liability following a nuclear incident "within the United States" and persons with liability in an incident "outside the United States." *Id.* (§ 11(r)). For nuclear incidents in the United States,

"person indemnified" continued to include "the person with whom an indemnity agreement is executed and *any other person* who may be liable for public liability," without further qualification. *Id.* (emphasis added).

As to incidents outside the United States, the 1962 Amendments adopted a narrower definition of "person indemnified." *Id.* That version covers "the person with whom an indemnity agreement is executed and any other person who may be liable for public liability *by reason of his activities* under any contract . . . to which [Section 170(d)] indemnification . . . has been extended or under any subcontract, purchase order or other agreement, of any tier, under any such contract." *Id.* (emphasis added). In a 1962 report, the Senate Joint Committee on Atomic Energy explained the reason for the intentional distinction between "persons indemnified" inside and outside the United States:

> Price-Anderson indemnity coverage has . . . from its inception extended to any person who may be liable for public liability. This coverage was intentionally broad since the primary purpose of the legislation was to protect the public . . . [and] has been preserved [in the original definition of "person indemnified"] with respect to incidents occurring within the United States . . . . This reason, however, does not underlie the extension of Price-Anderson indemnity to incidents outside the United States. The principal purpose of this extended coverage is to protect AEC contractors and subcontractors. Therefore, coverage in [the amended portion of the "person indemnified" definition] has been limited to the contractor himself, or to any other person who may be liable for public liability provided that the other person's liability results from his activities under a subcontract, purchase order, or other agreement of any tier under the basic contract.

Appx910.

The Act's contrasting definitions of "person indemnified" remain substantively unchanged since the 1962 Amendments. *See* 42 U.S.C. § 2014(t) (2005). Those terms show that, when a nuclear incident occurs *outside* the United States, the Act limits protection to persons who perform activities under or in support of a contract covered by a Section 170(d) indemnification agreement. Appx901 (§ 11(r)). But that limitation does not apply to persons with public liability for a nuclear incident *within* the United States. *Id.* All that is needed in a domestic nuclear incident is liability logically connected to a contract containing the indemnity provision. Appx817 (§ 170(d)); Appx1017.

Congress also used broad, flexible language to define the other key terms appearing in Section 170(d) and its implementing indemnification agreements. "Person" includes "*any* [] corporation" or "other entity." Appx824 (§ 2014(q)) (emphasis added). "Public liability" means "*any legal liability* [to members of the public] arising out of or resulting from a nuclear incident." Appx816 (§ 11(u)) (emphasis added). And "nuclear incident" is defined as "*any occurrence* within the United States causing bodily injury, sickness, disease, or death . . . arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* (§ 11(o)) (emphasis added); *In re Cotter Corp., (N.S.L.)*, 22 F.4th 788, 793–94 (8th Cir. 2022) (holding that the definition of "nuclear incident" is "facially quite broad") (citation omitted).[1]

[1] Here, it is uncontested that a domestic "nuclear incident" was at issue in the underlying litigation and that the suit was an action for "public liability."

B. <u>The Manhattan Project and the St. Louis Sites</u>

During World War II, the government began importing and processing uranium for the Manhattan Project in downtown St. Louis City, Missouri. Appx25 (¶¶ 12–14). Mallinckrodt LLC ("Mallinckrodt") processed the uranium under a government contract with the AEC ("Contract"). *Id.* (¶ 14); *see also* Appx39-815. This contractual activity produced large quantities of excess radioactive materials that then had to be handled and stored domestically. Appx25 (¶ 14).

The United States initially owned the excess radioactive materials produced by Mallinckrodt's work and stored the materials at a facility in downtown St. Louis. *Id.* Starting in the mid-1940s, the government and Mallinckrodt moved the excess materials to the "St. Louis Airport Site" near Lambert International Airport, accumulating several thousand tons there by the late 1950s. *Id.* (¶15).

In June 1960, the government began a multi-year effort to market and sell the excess radioactive materials to commercial nuclear companies who could process and store the materials. Appx26-27 (¶¶ 16–21). After several failed attempts, the government completed a negotiated sale in February 1966 and issued the buyer an AEC license to move the materials to storage sites in Hazelwood, Missouri, including a site known as "Latty Avenue." Appx27 (¶ 21).

Appellant Cotter acquired some of the excess nuclear materials at Latty Avenue starting in early June 1967, while work on the AEC-Mallinckrodt Contract was ongoing, and purchased more in 1969. *Id.* (¶22); Appx814-815. Between 1969 and 1974, Cotter

held an AEC source material license authorizing the company to possess, use, and transport the materials. Appx27 (¶¶ 22–24). Cotter ended operations at Latty Avenue by 1973. Appx27-28 (¶ 24). At Cotter's request, the government terminated the company's license in 1974 after AEC inspection of Latty Avenue. *Id.*

C. The Indemnification Agreement

In August 1962, at the same time the AEC was attempting to sell the legacy nuclear materials to companies like Cotter, the AEC and Mallinckrodt modified the Contract to incorporate a Section 170(d) indemnification agreement ("Agreement" or "Indemnification Agreement"). Appx28 (¶ 25); Appx780-785. The purpose of this Agreement was to adopt "provisions relative to the indemnification of the Contractor [Mallinckrodt] *and others* with respect to public liability resulting from certain nuclear incidents," as provided in the Act. Appx28 (¶ 25) (emphasis added); Appx780.

The Indemnification Agreement incorporates the indemnity standard and defined terms used in Section 170(d). Appx28-29 (¶¶ 27–29); Appx780-782 (¶¶ 1.a, 3.a–b). That is, the Agreement indemnifies Mallinckrodt and "other persons indemnified" against any claim for "public liability which (i) arises out of or in connection with the contractual activity; and (ii) arises out of or results from," *inter alia*, "a nuclear incident which involves . . . material . . . produced or delivered" under the Contract. Appx28-29

(¶¶ 27–29); Appx781-782 (¶¶ 3.a-b) (indemnifying "claims for public liability" and the "reasonable costs" of investigating, defending, and settling such claims).[2]

The AEC did not require Mallinckrodt to "provide or maintain . . . any form of financial protection to cover public liability," so government indemnification applies to all public liability claims covered by the Agreement. Appx29 (¶ 30); Appx781 (¶ 2). The government's obligations under the Agreement remain in force today, notwithstanding "the completion" of the AEC-Mallinckrodt Contract. Appx30 (¶ 34); Appx783 (¶ 6). The Agreement also is not "affected by any failure" of Mallinckrodt "to fulfill any of its obligations" under the Contract. Appx30 (¶ 33); Appx783 (¶ 6). And the Agreement may be modified only by "mutual written agreement" of the parties. Appx783 (¶ 7).

Upon learning of a public liability action in which it "will probably be required to make indemnity payments," the government must "collaborate with [Mallinckrodt] and *any other persons indemnified* in the settlement or defense of any claim." Appx30 (¶ 32) (emphasis added); Appx782-783 (¶ 4.a). In so doing, the government has the right to require "prior approval" of any settlement it may be required to indemnify. Appx30 (¶

---

2 The Agreement covers nuclear incidents involving "material . . . produced or delivered under" the Contract, "provided such [an] incident is not covered by any other indemnity agreement entered into by the Commission pursuant to Section 170 of the Act." Appx782 (¶ 3.b(ii)(4)). Here, the Indemnification Agreement between the AEC and Mallinckrodt is the only applicable Price-Anderson indemnification agreement.

32); Appx782-783 (¶ 4.a). Alternatively, the government can "take charge of [the] action, and settle or defend" the suit. Appx29 (¶ 32); Appx782-783 (¶ 4.a).

In December 1962, the AEC and Mallinckrodt modified the Agreement to adopt the changes made by the Act's 1962 Amendments. Appx786. This modification adopted the updated definition of "person indemnified," which, in a nuclear incident only *outside* the United States, limits indemnity to "other person[s]" who perform activities under or in support of the Contract. Appx901 (§ 11(r)); Appx786.

In 1977, the Department of Energy ("DOE") assumed the government's obligations under the Indemnification Agreement. Appx30 (¶ 35). As such, DOE has a contractual duty to "collaborate with" Mallinckrodt and "*any other persons indemnified* in the settlement or defense of any [public liability] claim" covered by the Agreement. *Id.* (¶ 32) (emphasis added); Appx782-783 (¶ 4.a).

D. The *McClurg* Litigation

Beginning in 2012, more than five hundred plaintiffs sued Mallinckrodt, Cotter, and others under the Price-Anderson Act and Missouri state law, alleging personal injury or wrongful death from exposure to the excess radioactive materials originally produced by Mallinckrodt under the Contract, including those materials handled by Cotter ("*McClurg*"). Appx30-31 (¶¶ 36–37). DOE was notified of the *McClurg* case no later than March 2012. Appx31 (¶ 38).

In March 2013, the district court dismissed the plaintiffs' state law claims on federal preemption grounds and allowed those claims to be repleaded under the Act as

a single "public liability action." Appx31 (¶ 39).[3] In an amended complaint, plaintiffs again claimed injury from the radioactive source material first generated by Mallinckrodt and allegedly released by Cotter in St. Louis County. Appx31-32 (¶¶ 41-42). The plaintiffs pleaded one cause of action under the Act and asserted that the release of the legacy nuclear materials was a "nuclear incident" for which Mallinckrodt, Cotter, and the other defendants were liable for "public liability." Appx32 (¶ 43).

Recognizing the government was "a possible indemnitor," the district court in February 2018 ordered DOE to send an authorized representative to an upcoming settlement conference. Appx33 (¶ 46). DOE declined to participate, asserting in a letter to the court that the government's indemnity obligations, if any, were limited to "DOE contractors" with whom DOE has a "contractual relationship" and that its "usual practice" is to stay out of settlement discussions involving "private parties and a DOE contractor." Appx1374-1375.

Cotter and the *McClurg* plaintiffs agreed to settle the public liability claims against Cotter in September 2018. Appx33 (¶ 48). The district court approved the settlement agreement and determined the amount was "fair and reasonable." *Id.*

---

[3] "Public liability action" is "any suit asserting public liability." 42 U.S.C. § 2014(hh).

## II. PROCEDURAL HISTORY

### A. Cotter's COFC Complaint

In April 2022, Cotter filed suit against the government at the U.S. Court of Federal Claims ("COFC") for the costs of defending and settling *McClurg*. Appx22. The Complaint included two counts—Count I (Statutory Indemnity) and Count II (Contractual Indemnity)—supported by factual allegations showing that Cotter is entitled to Price-Anderson indemnification. In short, the Complaint alleged that Cotter is a person indemnified with public liability that arises out of or in connection with Mallinckrodt's contractual activity and which results from a nuclear incident in the United States involving radioactive material produced under the Contract. Appx25-36 (¶¶ 12–74).

The government moved to dismiss the Complaint. First, it argued that Cotter failed to state a claim for Price-Anderson indemnification because Cotter did not perform activities under or with a "nexus" to the contractual activity on the AEC-Mallinckrodt Contract. *See* Def.'s Mot. to Dismiss at 18–22, 25–28, ECF No. 16. The United States also claimed it had disavowed all liability for nuclear incidents involving the excess radioactive materials when it sold those materials to a private entity. *Id.* at 11–13, 30–33.

Second, the government argued that Cotter lacked standing to bring a contractual indemnity claim under the Indemnification Agreement because Cotter was not an intended beneficiary of that Agreement. *Id.* at 33–36. The government argued further

that Cotter failed to state a claim for breach of the Agreement because Cotter had not presented its indemnity claim to DOE before filing suit. *Id.* at 36–37.

B. The March 2023 Decision

On March 3, 2023, COFC granted the government's motion to dismiss for failure to state a claim and lack of standing. Appx4, Appx17. The court based its holding on four principal findings.

*First*, interpreting Section 170(d) and the corresponding provisions of the Indemnification Agreement, the court ruled that Price-Anderson indemnification is limited to persons who perform activities under or with a causal "nexus" to activity on a government contract benefiting the United States. Appx10-13. In creating this causal nexus test, the court focused on: (1) whether Cotter had a contractual relationship with Mallinckrodt or the AEC, and (2) whether Cotter performed activities under or with a causal connection to the work on Mallinckrodt's Contract with the AEC. *See id.*

*Second*, applying its causal nexus test, the court concluded that Cotter's activities with the legacy nuclear material were "too far 'downstream' from Mallinckrodt" to plausibly entitle Cotter to relief. Appx13. The court reached this conclusion based on three factors: (1) the lack of contractual "privity" between Cotter and Mallinckrodt; (2) the supposed end of Mallinckrodt's Contract "in 1966"; and (3) the absence of government "title" or "possession" over the excess materials involved in the nuclear incident that led to *McClurg*. *See id.*

*Third*, the court ruled that Cotter lacked standing to seek indemnification under the Indemnification Agreement because it found Cotter is not "within the class [of persons] clearly intended to be benefited" by the Agreement. Appx14-16.

*Fourth*, the court dismissed on the alternative ground that Cotter failed to state a claim for breach of the Agreement because Cotter did not allege that it presented its indemnity claim to the government before filing suit. Appx16-17.

## SUMMARY OF THE ARGUMENT

The Price-Anderson Act and its implementing indemnity agreements extend protection to any person with public liability arising out of or in connection with work on a federal contract that creates the risk for a nuclear incident in the United States.

COFC erred as a matter of law when it concluded that Price-Anderson indemnity is limited to persons who perform activities under or with some causal nexus to a contract benefiting the government. That is not the standard established in the Act or the Indemnification Agreement. The correct standard looks to the connection between an entity's liability and the contractual activity that introduced the risk of such liability. And that connection need not be a causal one; a mere logical connection between the liability and the risks occasioned by the contract suffices. Cotter's legal liability in *McClurg* plainly meets the applicable standard because that liability arises from a domestic nuclear incident involving the same nuclear materials produced by Mallinckrodt under its contract with the AEC.

COFC compounded those errors when, in applying its unduly restrictive test, the court relied on factors that conflict with the Act and Indemnification Agreement. Contrary to COFC's interpretation, Cotter was not required to show that it was in privity of contract with Mallinckrodt; that it worked with the nuclear material while Mallinckrodt's contractual activity was ongoing; or that the United States owned the material when the alleged nuclear incident occurred. This Court should reverse and order COFC to reinstate Cotter's indemnification claims against the United States.

## ARGUMENT

### I. The Standard of Review is De Novo.

The central question on appeal is whether the court properly interpreted the Price-Anderson Act and the Indemnification Agreement when it determined that Cotter is ineligible for indemnification. That question is reviewed de novo. *LaBonte v. United States*, 43 F.4th 1357, 1367 (Fed. Cir. 2022) ("We review a dismissal for failure to state a claim upon which relief can be granted by the Court of Federal Claims de novo. We also review statutory interpretation by the Court of Federal Claims de novo.") (citations omitted); *Shell Oil Co. v. United States*, 751 F.3d 1282, 1290 (Fed. Cir. 2014) ("This court reviews the Court of Federal Claims' contract interpretation de novo."); *Rack Room Shoes v. United States*, 718 F.3d 1370, 1374 (Fed. Cir. 2013) ("Standing is a question of law which we review de novo.").

## II. Cotter Is Entitled to Price-Anderson Act Indemnification Because It Incurred Public Liability for a Domestic Nuclear Incident and That Liability Has a Causal or Logical Connection to the Nuclear Risks Created by Mallinckrodt's Work on the Manhattan Project Contract.

### A. Price-Anderson Act Indemnification Protects a Broad Class of Persons with Public Liability for a Domestic Nuclear Incident.

The Price-Anderson Act defines how members of the public may hold private companies liable for their role in a nuclear incident and limits the liability of such companies through a system of private insurance and government indemnification. *See Duke Power Co.*, 438 U.S. at 63–67. As passed in 1957, Section 170(d) of the Act established government indemnification:

> [T]he Commission is authorized . . . to enter into agreements of indemnification with its contractors for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, in the amount of $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident.

Appx817; *see also* Appx1008-1009.[4]

---

[4] The Act also provided for direct indemnification of AEC licensees and other persons indemnified under Sections 170(a)–(c). Appx816-817 (§ 170(a)–(c)). Those provisions authorized indemnification agreements only if the licensee was required to maintain financial protection (e.g., private insurance). Appx816-817 (§ 170(a)). Cotter was not required to maintain financial protection under its AEC

The meaning of Section 170(d) and the parallel language used in Price-Anderson Act indemnity agreements is clear and unambiguous. The first sentence in Section 170(d) is a grant of discretionary authority to the government to enter into indemnification agreements under government contracts that introduce the risk of public liability for a nuclear incident in the United States. Appx817 (§ 170(d)). The second sentence, which begins with "[i]n such agreements of indemnification," identifies the contents of such agreements and defines the scope of the United States' indemnity obligations to "the persons indemnified." *Id.* Those indemnity obligations apply to claims against "persons indemnified" for "public liability arising out of or in connection with the contractual activity," which refers back to the contractual activity that gave rise to the risk for potential public liability. *Id.*

Together, these interlocking provisions plainly authorize the United States to enter into contractual indemnification agreements in which the government promises to indemnify not only the contractor—but also anyone else fitting the definition of "person indemnified"—for "public liability arising out of or in connection with the contractual activity." *Id.*; Appx1008-1009. In other words, while an indemnification agreement with some relevant "person" (i.e., a contractor) was a threshold condition of

license, Appx27 (¶ 22), so the provisions at Sections 170(a)–(c) do not apply here. Notwithstanding, Cotter is still eligible for indemnification under Section 170(d) and the AEC-Mallinckrodt Indemnification Agreement. Appx1206 ("If . . . the [AEC] decided not to provide for Price-Anderson [Act] coverage in the license, the DOE Price-Anderson indemnification would apply to the incident.").

the original Act, the existence of such an agreement triggers the government's indemnity obligations to all "the persons indemnified" in the agreement. *See* Appx817; Appx1008-1009.[5] As the United States has recognized, "[u]nder any reasonable definition . . . the term [person indemnified] does not embrace contexts in which *no one* has an indemnification agreement with the government. The term itself, and its use elsewhere in the Act, presuppose the existence of some relevant person appropriately identified as 'the person with whom an indemnity agreement is executed.'" Brief for the United States as Amicus Curiae Supporting Reversal, *El Paso Nat. Gas Co. v. Neztsosie,* 526 U.S. 473 (1999) (No. 98-6), 1998 WL 858533, at *28 n. 16 (emphasis in original).

Thus, by its terms, Section 170(d) broadly embraces "*any* [] person" (person indemnified) with "*any* legal liability" to the public (public liability) for "*any* [nuclear] occurrence within the United States" (nuclear incident), as long as their liability has either a causal (arising out of) *or* logical (in connection with) connection to a nuclear hazard created by the original contract work. Appx816-817 (§§ 11(r), 11(u), 170(d)); Appx901 (§ 11(o)) (emphasis added). That controlling standard is highly adaptable to the types of "unusual incident[s]" covered by the Act for two reasons: (1) it does not condition indemnification based on the specific activities or identity of the person who causes a nuclear incident, and (2) it imposes no qualification on the

5 Today, Price-Anderson indemnification agreements are mandatory in DOE contracts that involve the risk of public liability. *See* 42 U.S.C. § 2210(d).

specific time, place, or manner in which a domestic nuclear incident must occur to trigger the indemnity. Appx880; Appx817 (§170(d)).[6]

Congress knew how to impose such conditions on Price-Anderson indemnification because, as noted above, it did so for nuclear incidents outside the United States. The Act's extraterritorial definitions of "person indemnified" and "nuclear incident" explicitly limit the kinds of activities, persons, and incidents to which the indemnity applies. For example, outside the United States, the Act only indemnifies the contractor and "other person[s]" who face public liability "*by reason of his activities* under any contract . . . to which indemnification under the provisions of section 170d has been extended or under any subcontract, purchase order or other agreement, of any tier, under any such contract . . . ." *See* Appx901 (§11(r)) (emphasis added).

Similarly, under the Act's 1962 Amendments, a "nuclear incident" outside the United States was only covered "*if such occurrence involves* a facility or device owned by, and used by or under contract with, the United States." *Id.* (§ 11(o)); (emphasis added). And, in 1975, Congress limited the Act's extraterritorial coverage to nuclear incidents only "*if such occurrence involves* [radioactive] material owned by, and used by or under contract with, the United States." Appx1178 (§ 11(q)) (emphasis added).

[6] Apart from requiring that one's public liability have a causal or logical connection to nuclear risks stemming from the underlying contractual activity, Section 170(d) incorporates other important limiting principles. For example, Section 170(d) originally did not cover public liability for certain workers' compensation claims or claims arising out of an act of war. *See* Appx816 (§ 11(o), (u)). Those limitations are not at issue here.

These extraterritorial limitations confirm that—in a domestic nuclear incident like the one at issue in *McClurg*—Price-Anderson indemnity is *not* restricted to persons who perform *activities* under or with a *causal* connection to activity on a government contract.

B. Cotter's Complaint Plausibly Alleged Entitlement to Price-Anderson Act Indemnification.

As shown above, an entity like Cotter qualifies for Price-Anderson Act indemnification where (1) the United States has entered into an indemnification agreement under a government contract involving the risk of public liability for a domestic nuclear incident; (2) the entity is a "corporation" or "other entity" (person) "who may be liable for public liability" (person indemnified); (3) the entity's public liability "aris[es] out of or result[s]" from an "occurrence within the United States causing bodily injury, sickness, disease, or death . . . arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material" (domestic nuclear incident); and (4) the entity's public liability "aris[es] out of or in connection with the contractual activity" that gave rise to the risk of public liability for a nuclear incident in the United States. *See supra* Section I.A; Appx816-817 (§§ 11, 170(d)); Appx901 (§ 11(r)); Appx1008-1009.

Cotter's Complaint should not have been dismissed because it plausibly alleged each essential element of a Price-Anderson indemnification claim. The first element is met because, as Cotter alleged, the United States exercised its discretionary authority under Section 170(d) to enter into a Price-Anderson indemnification agreement with

Mallinckrodt. Appx28 (¶¶ 25–27). That Agreement remains in place today. Appx30 (¶ 34). And having entered this Agreement, the government has a legal obligation to indemnify the "persons indemnified" in the Agreement. Appx28-29 (¶ 28).

Cotter is one of those persons. As alleged, Cotter is a "person" because it is a "corporation" and it is a "person indemnified" because it was sued for public liability in *McClurg*. Appx24, Appx34 (¶¶ 10, 55–56); Appx824 (§ 2014(q)); Appx23-24, Appx28-30, Appx34 (¶¶ 5, 7–8, 25–35, 56–57); Appx901 (§ 11(r)). The *McClurg* plaintiffs claimed monetary damages from Cotter for alleged personal injuries and wrongful death caused by the release of legacy Manhattan Project source material in the United States. Appx9-32, Appx35-36 (¶¶ 36, 42–43, 58, 72). As such, Cotter faced "public liability" resulting from a domestic "nuclear incident." Appx816 (§ 11(u), (o)); *see also In re Cotter Corp, (N.S.L.)*, 22 F.4th at 791, 793–94. And that "nuclear incident . . . involve[d]" the same excess radioactive "material" originally "produced or delivered" by Mallinckrodt under its Contract with the AEC. Appx782 (¶ 3.b(ii)(4)).

The final piece of the puzzle is also present: Cotter alleged that its "public liability aris[es] out or in connection with the contractual activity" because that liability has a causal or logical connection to the nuclear risks occasioned by Mallinckrodt's work for the AEC. Appx817 (§ 170(d)). Neither the Act nor the Indemnification Agreement define the disjunctive phrase "arising out of or in connection with." *Id.* But the ordinary meaning of those terms, together with their placement in Section 170(d) and the Agreement, shows that there must be some *causal or logical* connection between a

person's public *liability* and the contractual activity that introduced the risk for such liability. *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (Sotomayor, J.) ("The phrase 'arising out' of is usually interpreted as 'indicat[ing] a causal connection."); *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 877–78 (D.C. Cir. 2019) (holding that "'in connection with' . . . sweeps more broadly than 'arising out of'" because it requires "some 'logical or causal connection'") (quoting *Coregis Ins. Co.*, 241 F.3d at 128–29 and *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.)).

Cotter's allegations regarding its liability in *McClurg* satisfy this standard. Mallinckrodt and Cotter were both participants, with different roles, in the atomic energy industry that the Act was designed to promote. As with any domestic activity involving unusually hazardous material, the nuclear industry's viability and public safety depend on companies that produce nuclear material (like Mallinckrodt) and those that handle, process, and store such material (like Cotter) over its extended life. *See* Appx880.

The United States contracted with Mallinckrodt knowing that its uranium processing would generate excess radioactive material requiring storage and handling going forward. Appx25 (¶¶ 13–15). By generating the excess radioactive material, Mallinckrodt's contractual activity created the risk that a nuclear incident would cause injury to the American public and result in legal liability. That risk was enduring because the legacy materials had an extended half-life and needed to be stored somewhere in

the United States. The government understood the nature of this risk when it marketed the material to potential buyers, Appx26 (¶ 16), and when it executed the Indemnification Agreement expressly covering nuclear incidents involving that material, Appx28 (¶ 25).

That Agreement was written to survive the "completion, termination or expiration" of the Contract. Appx30 (¶ 34). And to this day, the Agreement covers the risk of legal liability for a nuclear incident involving the "material . . . produced or delivered" under the Contract. *See* Appx28-30 (¶¶ 28–29, 34). The government then placed the material into the domestic economy and with it the very nuclear risk the United States had anticipated in the Agreement. That lasting risk did not vanish in 1966 when the government sold the legacy material, and the AEC continued to regulate the material as a result. *See* Appx27 (¶¶ 21–22).

Cotter first acquired some of this legacy material in mid-1967, while Mallinckrodt was still performing under the Contract, and Cotter worked with the material at Latty Avenue under the AEC's oversight until 1973. Appx27-28 (¶¶ 22–24); Appx807-815. The long-term nuclear risks seeded by Mallinckrodt's activity ultimately materialized, and Cotter was sued for its role in a nuclear incident involving that very legacy material, in the same public liability action as Mallinckrodt—the contractor who originally produced the material for the federal government. Appx25-28, Appx30-32 (¶¶ 12–24, 36–43).

Accepted as true, these factual allegations are clearly sufficient to show that Cotter's public liability has a causal or logical connection to the contractual activity that created the risk of a domestic nuclear incident. Without Mallinckrodt's uranium-processing for the AEC, there would be no excess radioactive material and hence no risk of liability for a domestic nuclear incident involving that material. And without Cotter's ownership and handling of that same material, Cotter would have no "public liability" for the nuclear incident.

The connection between Cotter's public liability and Mallinckrodt's contractual activity is thus inextricable—both as a matter of cause and logic. The broad phrase "arising out of" amply embraces this connection. The connection is even stronger than the connections Congress and the United States have recognized as deserving of Price-Anderson indemnification: for example, between an airline's liability for negligent aircraft maintenance and activities at a nuclear reactor, and between a company's liability for working in proximity to legacy nuclear material and the activities that first produced the legacy material. *See* Appx880; Appx1236.

And even if that connection somehow falls outside "arising out of," it is covered by the more sweeping phrase "in connection with" because Cotter's liability surely has "*some logical*" connection to the lasting nuclear risks created by Mallinckrodt's work. *See Azima*, 926 F.3d at 877–78 (emphasis added); *see also RAMCOR Servs. Group, Inc. v. U.S.*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (observing that the "phrase 'in connection with' is very sweeping in scope"); *Connection*, Black's Law Dictionary (4th ed. 1951)

(defining "connection" as "[t]he state of being connected . . . by dependence or relation"); *In connection with*, Garner's Dictionary of Legal Usage (3d ed 2011) ("[I]n connection with" is "invariably a vague, loose connective").

## III. COFC Misread and Misapplied the Act and Indemnification Agreement in Holding That Cotter Is Ineligible for Indemnity.

### A. Neither the Act nor the Indemnification Agreement Required Cotter to Show That It Performed Activities Under or in Support of the Work on the Mallinckrodt Contract.

COFC's decision should be reversed because it contradicts the plain language of the Act and the Indemnification Agreement.

*First,* it is uncontested that Section 170(d) and its implementing agreements protect "persons indemnified" against "public liability," provided that, *inter alia*, such "public liability aris[es] out of or in connection with the contractual activity." Appx817 (§ 170(d)); Appx11-12. COFC principally erred by conflating the disjunctive terms "arising out of" and "in connection with." COFC interpreted "in connection with" to require a *causal* nexus between Cotter's *activities* and Mallinckrodt's activity on the underlying Contract. *See* Appx13 (holding that Cotter's activities "handling [the] material . . . did not 'originate from'[7] from Mallinckrodt's contractual activity" and presented "an insufficient causal sequence to trigger indemnification obligations").

---

[7] The court's use of "originating from" appears to be a reference to "arising out of," given its observation that the related term "arise" means "to originate from a source." Appx12.

That is wrong. While the limiting phrase "arising out of" typically does require a showing of causal connection, the *alternative* limiting phrase "in connection with" merely requires a logical connection, as COFC acknowledged elsewhere. *See* Appx12 (noting that "connection" includes a "causal *or logical* relation or sequence") (emphasis added). By focusing only on causal connection, and not accounting for the broader phrase "in connection with," the court violated the "basic interpretative canon[]" that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *See Corley v. United States,* 556 U.S. 303, 314 (2009); *see also Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242, 1254 (Fed. Cir. 2003) (same for contractual interpretation).

Moreover, contrary to COFC's interpretation, the relevant connection is not between Cotter's *activities* and the activities performed by Mallinckrodt. That gets the test backwards. Rather, the connection must be between the claimant's "public *liability*" and the contractual activity that first created the risk of such liability. *See* Appx817 (§ 170(d)) (emphasis added). Further, because "public liability" covers "*any legal liability*" for a nuclear incident, Section 170(d) asks only *whether* Cotter has public liability—not why—and invites no consideration of Cotter's specific activities. Appx816-817 (§§ 11(u), 170(d)) (emphasis added); *see also Liability*, Black's Law Dictionary (11th ed. 2019) ("The quality, state, or condition of being legally obligated or accountable"). This interpretation is again reinforced by the Act's 1962 Amendments, which *do* call for

scrutiny of a potential indemnitee's activities—but only as to nuclear incidents *outside* the United States. *See supra* Section II.B; Appx901 (§ 11(r)).

Consequently, by focusing on Cotter's activities—instead of the fact that Cotter faced legal liability for a domestic nuclear incident—COFC misread Section 170(d), circumvented the broad definition of "public liability," and imposed limitations akin to those in the extraterritorial definition of "person indemnified." Appx816-817 (§§ 11(u), 170(d); Appx901 (§ 11(r)). Those errors make for an overly narrow test that conflicts with the plain meaning of the Act and Indemnification Agreement. Here, there can be no question that Cotter's liability in *McClurg*, resulting from a nuclear incident involving the radioactive materials produced by Mallinckrodt, constitutes "public liability" with some causal or logical connection to the contractual activity that produced those materials. That should be the beginning and end of the analysis.

*Second*, in formulating its test, the court misconstrued the introductory sentence of Section 170(d), which in 1957 authorized the government to execute indemnification agreements under contracts involving the risk of public liability for a domestic nuclear incident. Appx10-13. From this sentence, the court inferred that Section 170(d) "limit[s] government liability by emphasizing a relationship with the government itself or an indemnified contractor." Appx10. It added that the "statutory language itself explicitly underscores the importance of a contractual relationship." Appx11; *see also* Appx12.

That is not correct. As explained above, the first sentence of Section 170(d) made Price-Anderson indemnity contingent on the existence of a contractual indemnification

agreement with some relevant person (i.e., a contractor). When that contingency is met—as it is here by the Indemnification Agreement—the United States has an obligation to indemnify all "the persons indemnified" under the terms included "[i]n such agreements," as provided in the second sentence of Section 170(d). Appx817 (§ 170(d)).

Stated another way, once the government executes a Section 170(d) indemnification agreement with a contractor, the agreement extends protection to "*any other person*" with public liability covered thereunder—even if such "other person" has no contractual relationship with the government or the indemnified contractor. Appx816-817 (§§ 170(d), 11(r)) (emphasis added). That interpretation makes sense because the indemnification "is not meant to be limited solely to those who may be found liable due to their contractual relationship[s]," but instead reaches "any person who might be found liable, regardless of the contractual relation." Appx880.

Thus, by purporting to "limit government liability" based on the contractual relationships of "other" persons like Cotter, the court's narrow nexus test conflicts with the plain language of the Act itself. *Compare* Appx10-11 *with* Appx816-817 (§§ 170(d), 11(r)). That is not a reasonable way to interpret the Act or the indemnification agreements implementing its mandate. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The Act's 1962 Amendments further dispel any notion that a party's eligibility for indemnification should be assessed based on its contractual relationships.

That is because, in creating a new extraterritorial definition of "person indemnified," those amendments *did* limit the indemnity to "other person[s]" who perform work under or in support of a contract with the government or an indemnified contractor. *See supra* Section II.B; Appx901 (§ 11(r)). Congress chose not to impose a similar limitation for domestic nuclear incidents like the one at issue in *McClurg*. *See* Appx901 (§ 11(r)); Appx909-911; *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (holding that courts should not adopt interpretations that "render[] superfluous another portion of that same law").

*Finally*, to complete its nexus test, COFC turned to the next sentence in Section 170(d), which, *inter alia*, allows the United States to require that an indemnified contractor contribute private "financial protection" to help cover public liability claims against "persons indemnified in connection with such contract." Appx11. According to the court, the language referencing financial protection "indicates that contractors (and other eligible parties) who may seek indemnification are subject to specific requirements—here, financial protection or insurance." *Id.* The court found that such language "again indicates some required nexus to contract activity as well as to financial protections required by the AEC" and serves to "qualify the government's obligation to indemnify." *Id.*

This was another misstep. For starters, Section 170(d) says the government "may" require financial protection from "its contractor," but that the government "shall" indemnify the "persons indemnified," which includes the contractor *and* any

other person with legal liability for a domestic nuclear incident. Appx817 (§ 170(d)). When Congress uses different words in a statute, those words must be accorded different meanings. Thus, while a contractor's right to indemnity may depend on whether it followed a government directive to contribute financial protection, the indemnity rights of other "persons indemnified" are not so limited. *See id.* This again makes sense because the United States can impose contractual obligations only on its contractors, but Congress can confer benefits on anyone. COFC failed to recognize this important distinction.

Similarly, Section 170(d) merely authorizes the government to require financial protection from its contractor. *Id.* ("the Commission *may* require . . . financial protection") (emphasis added). So, contrary to COFC's reading, the existence or nonexistence of financial protection is neither a "specific requirement[]" of indemnification under Section 170(d), nor does it "qualify the government's obligation to indemnify" under Section 170(d) agreements, Appx11. Indeed, the AEC did not require "any financial protection" from Mallinckrodt here, despite explicitly indemnifying Mallinckrodt in the Indemnity Agreement. Appx781 (¶¶ 2, 3). Therefore, financial protection clearly cannot be a requirement of indemnity.[8]

[8] In its discussion of the Contract, COFC overlooked that the AEC did not require Mallinckrodt to obtain financial protection (i.e., insurance) for purposes of Price-Anderson indemnification. Appx6 (summarizing Supplemental Agreement Modification No. 124). The court instead focused on a 1952 Contract modification, executed five years before the original Act, which required Mallinckrodt to maintain insurance for occupational injuries sustained by its employees. *See id.* (citing

Rather, when the government executes a Section 170(d) indemnification agreement, it promises to indemnify "all persons indemnified" under the agreement, whether or not it also requires financial protection from "its contractor." Appx817 (§ 170(d)). In contrast, financial protection *is* a mandatory precondition of indemnity under certain AEC licenses governed by Section 170(a). *See* Appx816-817 (§ 170(a)). As a result, the court should not have interpreted financial protection as a limiting factor under Section 170(d).

COFC also overlooked that, under the original Act, private nuclear insurance was written to "parallel" government indemnification and also "run for the benefit of *any other person* who may be liable" for public liability. *See* Appx880 (emphasis added). Thus, by viewing financial protection as a constraint on Cotter's eligibility for Section 170(d) indemnity, Appx11, COFC not only departed from the Act's plain text, but it also misunderstood the statute's overarching liability-protection scheme. That scheme provides "omnibus coverage" by "channeling" public liability claims against "*any person*" to one ultimate source of funds—i.e., the applicable indemnification agreement, which may or may not also require a contribution of private financial

Supplemental Agreement Modification No. 81 at 494-95 at Art. III-E(1)–(2)). It is unclear why the court highlighted this 1952 modification, given the specifically applicable language in Supplemental Agreement Modification No. 124, the fact that *McClurg* did not involve alleged injuries to Mallinckrodt employees, and the allegations in the Complaint. *See* Appx781 (¶ 2); *see also* Appx29-32 (¶¶ 30, 36–43) (alleging that the AEC did not require Mallinckrodt to obtain financial protection and describing the plaintiff's allegations in *McClurg*).

protection from the government's contractor. *See* Appx1185 (emphasis added); Appx1229 ("Economic channeling results from the broad definition of 'persons indemnified' to include any person that may be legally liable for a nuclear incident.").[9]

B. Cotter's Public Liability Is Not "Too Far Downstream" from the Contractual Activity Under the Manhattan Project Contract.

Applying its unduly restrictive nexus test, COFC compounded the errors in its opinion by relying on three additional factors that also conflict with plain language of the Act and Indemnification Agreement. Together, all of these errors led the court to its ultimate holding that Cotter "was too far 'downstream'" from Mallinckrodt to be eligible for Price-Anderson Act indemnification. Appx13. That holding constitutes reversible error.

*First,* in deeming Cotter ineligible for indemnification, the court observed that Cotter was "not in privity of contract with Mallinckrodt." *See id.* The absence of contractual privity, however, is not disqualifying in cases involving public liability for a domestic nuclear incident. As discussed above, "person indemnified" includes "any [] person" with public liability for a domestic nuclear incident, whether or not they have privity of contract. Appx817 (§ 170(d)). And such a person can no doubt face

[9] COFC criticized Cotter's interpretation because it supposedly ignores "the 'financial protection required' under the agreements that qualify the government's obligation to indemnify" and the phrase "in connection with such contract," used in Section 170(d). Appx11. As shown above, however, Cotter's interpretation aligns with what is actually required under the plain text of the Act and the Indemnification Agreement.

"public liability" for risks stemming from an indemnified contractor's work, without being in privity. For instance, it seems unlikely that an "airplane company" would be in privity of contract with the operator of a nuclear reactor, yet Congress deemed such a company eligible for indemnity. *See* Appx880. Similarly, the United States has concluded that purely commercial entities, not in privity with an indemnified contractor, also qualify for protection against public liability involving "legacy [nuclear] material." *See* Appx1236.

For those reasons, Congress expressly rejected an AEC proposal to limit the original Price-Anderson Act protections "to those in privity" with an indemnified contractor. *See* Appx880. And Congress reiterated that view in the 1962 Amendments by adopting an alternate definition of "person indemnified" that *does* restrict the indemnity to entities in the government contracting chain—but only for those with public liability resulting from a nuclear incident abroad. *See* Appx901 (§ 11(r)); Appx910-911. As such, privity of contract should not have factored into the court's decision here.

*Second*, COFC found that Cotter is ineligible for indemnification because (1) the AEC-Mallinckrodt Contract supposedly "ended in 1966," and with it "the benefit to the government's nuclear program," and (2) Cotter supposedly "only became linked to the material in 1969 after it had changed hands several times." Appx13. These findings were also in error.

To start, the court got the facts wrong. The Contract did not "end[] in 1966 when the government transferred the material's title" to a private entity. *See id.* "[T]he performance of the contract work" was ongoing until at least June 30, 1967, as the copy of the Contract provided to and cited by the court clearly shows. *See* Appx807-815. In addition, Cotter initially purchased some of the legacy nuclear material at Latty Avenue on June 9, 1967—*before* the Contract ended—and well before 1969, the date the court used when applying its erroneous nexus test. *See* Appx1114. So it is not correct that "Cotter only became linked to the material in 1969," Appx13, as was clear from both the Complaint and other documents before the court. *See* Appx27 (¶ 22); Appx1114-1127.

These clear factual errors were central to the court's holding that Cotter was "too far 'downstream'" to plausibly state a claim for Price-Anderson indemnification. *See* Appx13 ("The question then becomes, is it plausible to infer the United States is liable for damages related to activity *after the conclusion of the Mallinckrodt contract and once Cotter was responsible for the material.*") (emphasis added). Accordingly, those errors provide an independent basis for reversing the court's judgment. *See, e.g.*, *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1270 (Fed. Cir. 1998) (reversing district court order dismissing claim where the order was premised on clearly erroneous findings on "subordinate questions of fact").

Putting those factual errors aside, the court should not have considered the end date of Mallinckrodt's Contract as a potentially disqualifying factor at all. Nowhere does

the Act limit the right to indemnity based on the end date of the contract that prompts the government to execute an indemnification agreement. Nor does the Act condition indemnification based on when a domestic "nuclear incident" occurs or when "public liability" arises. *See* Appx901 (§ 11(o)); Appx816 (§ 11(u)). This also makes sense because the Act's pledge of public compensation would be exceedingly limited if government indemnification responded only when long-term nuclear risks materialize during a particular contract's period of performance.

Consistent with the Act, the Indemnification Agreement states that the government's indemnity obligations survive "*the completion, termination or expiration*" of the Contract. *See* Appx783 (¶ 6) (emphasis added). The Agreement also expressly covers nuclear incidents involving the "material . . . produced or delivered" under the Contract—without any temporal condition on when such an incident occurs. *See* Appx782 (¶ 3.b(ii)(4)). Those contractual terms are significant because, when the United States executed the Indemnification Agreement in August 1962, it knew that the legacy nuclear material would have to be managed domestically, at continuing risk to the American public, for years to come. *See* Appx26-27 (¶¶ 16–20). The court's analysis failed to account for these factors.

*Third*, the court was influenced by the transfer of "title" and "possession" over the legacy nuclear material when the government sold that material into the domestic stream of commerce. Appx13. On this point, COFC considered certain sale documents that show Cotter first acquired a portion of the legacy material in June 1967 from a

creditor of the entity that had originally purchased it from the AEC in February 1966. Appx13-14. The court deemed those documents "relevant to the chain of title for the radioactive material" when applying its causal nexus test. Appx14.

Contrary to the court's premise, however, the government's indemnity obligations do not hinge on whether the United States has title or possession to the radioactive material involved in a domestic nuclear incident. That condition simply does not appear anywhere in the original Act or the Indemnification Agreement. Those extend protection for "*any* [nuclear] occurrence within the United States" involving "source, special nuclear, or byproduct material," irrespective of who owns or possesses the material. *See* Appx901 (§ 11(o)) (emphasis added); Appx807-815. Congress eventually did limit the indemnity based on government ownership and possession of the material involved in a "nuclear incident"—but again applied that limitation only to nuclear incidents *outside* the United States, not to domestic nuclear incidents like the one in *McClurg*. Appx1178 (§ 11(q)) (emphasis added). The court erred by imposing a similar condition here.[10]

The result is the same even if the government tried to "disavow[]" all legal responsibility when it sold the legacy material in 1966. Appx13-14. As explained above,

---

[10] Cotter's briefing explained why the court should not rely on such factors to determine Cotter's eligibility for Price-Anderson indemnity. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 12–19, 22–27, ECF No. 17; Pl.'s Sur-reply in Opp'n to Def.'s Mot. to Dismiss at 2–3, ECF No. 19; Minute Order Denying Mot. to File Sur-reply (Oct. 12, 2022). COFC erred in failing to fully consider these arguments and also abused its discretion in denying Cotter's motion for leave to file a surreply.

the original Act imposes an obligation on the government, enforceable by statute and contract, to indemnify persons who are protected from public liability under the terms of a Section 170(d) indemnification agreement. Appx817 (§ 170(d)); Appx807-815. The government cannot disavow those obligations by simply contracting them away, as the court itself acknowledged. Appx14 (citing *Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1365 (Fed. Cir. 2010)). So, even assuming that was the United States' intention when it included generic disclaimers in the 1966 sales agreement, neither those disclaimers, nor any other term of the sales agreement can impact Cotter's eligibility for Price-Anderson indemnification. *See id.*[11]

That result makes particularly good sense here, where the AEC executed the Indemnification Agreement at the same time it was marketing the material to commercial companies, Appx26, Appx28 (¶¶ 16–17, 25), and where there is no evidence the AEC *even attempted* to modify the scope or terms of that Agreement before or after completing the sale, Appx783 (¶ 7). Therefore, on the question of whether government title and possession qualify Cotter's right to indemnification, the plain language of the Act and Indemnification Agreement controls. *See, e.g.*, *Columbus Reg'l*

[11] The court's opinion mentions the "as is" clause in the AEC's 1966 sale agreement. Appx14. On its face, that clause disclaimed warranties as to the potential value, safety, and use of the material, but does not mention (let alone disavow) the government's obligations under the Act or Agreement. Appx1107 (¶ 3). To the contrary, the sale agreement reflects the United States' continuing interest in regulating the excess radioactive materials after the 1966 sale. *See id.* (¶ 4) (requiring buyer to obtain an AEC source material license "prior to taking possession of the material sold hereunder").

*Hosp. v. United States*, 990 F.3d 1330, 1345 (Fed. Cir. 2021) ("[W]hen [a] contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.") (quoting *Roedler v. Dep't of Energy*, 225 F.3d 1347, 1352 (Fed. Cir. 2001)).

At bottom, COFC erred as a matter of law by ruling that Cotter was "too far 'downstream'" from Mallinckrodt to be eligible for Price-Anderson Act indemnification. The court's judgment was predicated on a misapplication of an unduly narrow nexus test that conflicts with the plain meaning of the Act and Indemnification Agreement. The judgment should therefore be reversed.

### C. The Purpose and History of the Act Confirm That, in a Domestic Nuclear Incident, Indemnity Is Not Limited to Persons Who Perform Activities Under or in Support of a Contract Covered by the Act.

COFC's holding also conflicts with the Price-Anderson Act's purpose and history, which further reinforce what is obvious from the Act's statutory text. *See N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 887 (Fed. Cir. 2018) ("Courts also may rely on legislative history to inform their interpretation of statutes.").

When Congress passed the Act in 1957, it understood that processing specific nuclear material for the national defense (e.g., uranium for the Manhattan Project) would also produce excess radioactive material that would have to be handled and stored for years to come. *See* Appx880. Congress also appreciated the liability risks inherent in working with such excess material, along with the potential for catastrophic harm to the American public if such material were accidentally released into the

environment. *Id.* (noting that Price-Anderson indemnity would extend to a company "transporting spent fuel elements . . . whether through negligence or otherwise, [could] have an accident which would spill the radioactive materials into a stream . . .").

With all this considered, Congress provided expansive liability protections to "persons indemnified" for two explicit reasons. *First*, Congress wanted to guarantee compensation for victims of any domestic nuclear incident. *See* Appx816 (subsection i); Appx878 ("The primary concern of the Federal Government is with the protection to the people who might suffer damages from the new atomic energy industry."). *Second*, Congress sought to attract support not only from companies that produce nuclear material for the government, but also from companies that handle, move, and process such material after the government's initial needs are met. Appx880 (noting the Act "afford[s] protection to the public and [a] carrier" moving material for processing).

That dual purpose would be compromised, however, if the Act's protections applied only when a domestic nuclear incident results from *certain* activities by *certain* persons in *certain* domestic locations within a *certain* timeframe. After all, the half-life of such radioactive materials is not limited to a span of five to ten years. Yet that is precisely what COFC did here when it determined Cotter's eligibility for Price-Anderson indemnity based on Cotter's contractual relationships and the nature and timing of its activities with the Manhattan Project nuclear material.

Adopting the COFC's narrow conditions risks leaving the public without remedy if, for example, a "downstream" storage and disposal company becomes insolvent

under the threat of liability for an incident involving legacy material first produced for the government. *See Duke Power Co.*, 438 U.S. at 90–91 (noting that the Act's guaranteed compensation "substitute[s] for the uncertain recovery of damages" from defendants "whose resources might well be exhausted at an early stage"). With such limitations in place, the Act would also offer little incentive for companies to process or transport legacy nuclear material because those "activities," while essential to public and environmental safety, could be deemed "too remote"—as the COFC held here—from the contractual activity that originally placed the material in the United States.

That is the opposite of what Congress aims to accomplish in the Act. Over the last six decades, Congress has made clear that neither the specific activities nor the identity of a person are relevant to determining if they are eligible for indemnification in a domestic nuclear incident. *See, e.g.*, Appx880; Appx910. For example, Congress has explicitly recognized that the indemnification "applies to strangers" to a federal contract and "would apply in the case of every nuclear incident and would protect each and every person who might have liability regardless of that person's relationship with [an indemnified contractor]." Appx1160.

Congress has also observed that "the 1957 Act provided that any person who might be held liable for public liability resulting from a nuclear incident, including not only the party directly engaged in the activity that results in the nuclear incident but any other person as well, was to be indemnified under the Price-Anderson system—the so-called 'channeling of liability' or 'omnibus coverage' provisions of the Act."

Appx1185. These statements show that Congress has always anticipated parties like Cotter who do not directly support a government contract, but are nonetheless critical in disposing legacy nuclear materials like those produced by Mallinckrodt for the Manhattan Project.

DOE has also shared this settled understanding over the years. As noted above, in a 1999 report to Congress, DOE analyzed whether a commercial company would be eligible for indemnification while operating on government property "in proximity to nuclear material that is a legacy from prior contractual activity conducted for DOE." Appx1236. It concluded that, "[i]f a nuclear incident results from such legacy material, then the commercial activity would be included within the omnibus coverage of the DOE indemnification that related to the contractual activity that resulted in the legacy material." *Id.* Cotter's work with legacy nuclear material under the AEC's supervision is far more direct than merely being in "proximity" to such material. *See id.*

## IV. COFC's Misreading of the Price-Anderson Act Infected its Analysis of Cotter's Contractual Indemnification Claim.

### A. Cotter Had Standing to Pursue its Contractual Indemnification Claim.

COFC next held that Cotter lacked standing to bring a contractual indemnification claim as an intended beneficiary of the Indemnification Agreement. The court dismissed that claim for lack of subject matter jurisdiction. Appx14-16. In so doing, COFC applied the wrong standard of review and repeated the errors it made in misconstruing the Act.

To have standing to bring a contract indemnity claim, Cotter was only required to plead a non-frivolous allegation that it belongs to a class of persons who are clearly intended to benefit directly from the Indemnification Agreement. *See Columbus Reg'l Hosp.*, 990 F.3d at 1341–42, 1345–46; *G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015). The court did not apply that standard, however. Instead, it disposed of Cotter's contract-based claim on the merits, finding that "Cotter does not fall within the class 'clearly intended to be benefited' by the [Act's] indemnification under Section 170(d)." *See* Appx16. Thus, the court erred in dismissing Cotter's claim for lack of subject matter jurisdiction under Rule 12(b)(1).

COFC's holding is also wrong on the merits. Price-Anderson indemnification agreements incorporate the scope and key terms of the Act itself. *See* Appx817 (§ 170(d)); *see also* Appx12 (acknowledging that Section 170(d) and implementing indemnity agreements contain "mirrored indemnification obligations"). Consistent with Section 170(d), the Indemnification Agreement here expressly covers "other persons indemnified" who have "public liability which (i) arises out of or in connection with the contractual activity; and (ii) arises out of or results from," *inter alia*, "a nuclear incident which involves . . . material . . . produced or delivered" under the Contract. Appx28-29 (¶¶ 27–29); Appx781-782 (¶¶ 3.a–b).

Thus, the Agreement was clearly intended to benefit the class of persons who meet those parallel statutory and contractual criteria. Further, the benefit to this class is direct because persons so indemnified are entitled to a defense or compensation from

the government in public liability actions like *McClurg*. *See* Appx781 (¶ 3.a(ii)). The Indemnification Agreement is analogous in this respect to the statutory agreement at issue in *Columbus Regional Hospital*, 990 F.3d at 1345–46. There, the Court vacated COFC's dismissal of a third-party beneficiary claim brought by a regional hospital under a federal-state assistance agreement incorporating the terms of the Stafford Act. *See id.* It held that the hospital was part of a "class clearly intended to be benefited" directly from the assistance agreement because the hospital alleged that it was a covered unit of a "local government," as defined in the Stafford Act. *See id.*

Cotter similarly belongs to the class of entities clearly intended to benefit from the Indemnification Agreement. As explained above, Cotter alleged that it fits the applicable statutory definition of "person indemnified" and it incurred public liability that (i) has a causal and logical connection to Mallinckrodt's uranium processing, and (ii) resulted from a nuclear incident involving the same radioactive material produced and delivered on the Contract. *See supra* Section III. Accordingly, Cotter's Complaint stated a non-frivolous claim for contractual indemnity, contrary to the court's holding.[12]

COFC identified three reasons for its decision, but those reasons merely repeated errors the court made earlier. *First*, the court was persuaded by the government's

---

[12] The court found that "Cotter fail[ed] to engage with specific language in the Mallinckrodt contract and [supplemental agreements]" and instead relied "on terms like 'persons indemnified' and 'arising out of' and 'in connection with' in the [Act]." Appx16. Not so. Cotter directly addressed the language in the Indemnification Agreement, which, as explained above, cites and incorporates the terms of the Act itself. Pl.'s Opp'n to Def.'s Mot. to Dismiss at 25–26, ECF No. 17.

argument that Cotter was "'a downstream purchaser of the radioactive material' and thus subject to the 'express disavowal of [g]overnment responsibility for the material.'" Appx16. But, as explained, the government cannot contract away its Price-Anderson obligations because doing so would defeat the Act's purpose of protecting the public and encouraging the private nuclear industry. And even assuming it could, there is no evidence the United States ever attempted to modify the Indemnification Agreement to reflect this purported "disavowal of the government responsibility." *See id.*

Without more, it was improper for COFC to infer that the government had in fact cut off its liability to the entire class of beneficiaries to which Cotter belongs. *See, e.g.*, *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 372–73 (1984) (declining to infer that parties to a collective bargaining agreement had agreed to require arbitration of certain third-party claims, where there was no evidence the parties had even attempted to adopt such requirements in the relevant contractual agreements).

*Second*, it is irrelevant that "Cotter's activities did not benefit the government contract with Mallinckrodt," even if true. Appx16. Again, there is no language in either the Act or Agreement that limits protection to "other persons indemnified" based on whether they perform activities benefiting a contract. *See* Appx817 (§ 170(d)). It is true that the original Act authorized the AEC to enter into indemnification agreements under contracts awarded "for the benefit of the United States." *See id.* However, such contracts were merely the vessel by which the government promised to protect not just the contractor, but also "*any other person*" with public liability covered under an indemnity

agreement—no matter if their activities benefit the contract. That is clear from the face of the Indemnification Agreement. Appx780-783 (¶¶ 1.a, 3.a, 4.a). It was improper for COFC to narrow the class of beneficiaries under the Agreement based on nonexistent criteria. Appx16.

*Finally*, the court had no basis for agreeing that Cotter "was not a 'person[] indemnified' for purposes of public liability." *See id.* The Indemnification Agreement incorporates and uses the definition of "person indemnified" adopted in the Act's 1962 Amendments. *See* Appx780-788. Cotter is clearly a "person indemnified" covered by the Agreement because it is a "person" with "legal liability" resulting from the domestic nuclear incident at issue in *McClurg*. *See supra* Section III; Appx91 (§ 11(r)).

Because COFC made multiple errors of law in dismissing Cotter's contract indemnity claim for lack of standing and subject matter jurisdiction, that portion of the court's decision should be reversed too.

B. Cotter Stated a Plausible Claim for Contractual Indemnification.

The court also dismissed Cotter's contract indemnity claim on the alternative ground that it failed to state a claim for breach of contract because Cotter did not allege that it had provided notice to the United States before filing suit. Appx16-17. This also constituted reversible error: yet again, the court imposed a requirement on Cotter that the Indemnification Agreement does not.

To state a claim for breach of contract, Cotter was required to make "factual allegations sufficient to support the conclusion that there has been a breach of

the identified contractual duty." *See San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 470 (2019) (quoting *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)). Cotter's Complaint plainly satisfied this standard.

Cotter alleged that the United States had a contractual duty, under the Indemnification Agreement, to indemnify "other persons indemnified" who have "public liability that '(i) arises out of or in connection with the contractual activity' and '(ii) arises out of or results from,' *inter alia*, '(4) a nuclear incident which involves . . . material . . . produced or delivered under [the Contract]." Appx28-29 (¶¶ 28–29). Cotter also alleged that it was such a "person indemnified" and so entitled to indemnification under the Agreement. *See* Appx36 (¶¶ 66, 71).

In addition, the Complaint made clear that the United States has an affirmative duty to "collaborate" with Mallinckrodt and "*any other persons indemnified*" in the settlement or defense of any public liability claim for which the government "will probably be required to make indemnity payments." *See* Appx29-30 (¶¶ 31–32) (emphasis added) (referencing Appx782-783 (¶ 4.a)). It also made clear that the United States breached its contractual duties to persons like Cotter when, in a March 2018 letter to the presiding judge in *McClurg*, the government refused to participate in upcoming settlement discussions, despite being a "possible indemnitor." *See* Appx33 (¶¶ 46–47).

The United States' March 2018 letter breached the Indemnification Agreement in two ways. *First*, the government asserted in the letter that its indemnity obligations in *McClurg*, if any, were limited to "DOE contractor[s]" because such obligations could

only "be as a result of a contractual relationship with a party to this litigation." Appx1374-1375. *Second*, the government stated that its "usual practice is to decline to participate directly in discussions between private parties and a DOE contractor regarding the possible settlement of tort claims, even though such a settlement ultimately may result in some obligation on DOE to indemnify its contractor." Appx1374.

Thus, in *McClurg*, the United States did not merely overlook its indemnity obligations to "other persons indemnified" like Cotter; it openly denied that the government had any obligations whatsoever to any person other than (potentially) Mallinckrodt. The Indemnification Agreement expressly says otherwise. *Compare* Appx1374-1375 *with* Appx28-29, Appx36 (¶¶ 28–29, 66, 71) and Appx781-782 (¶¶ 3.a–b). In addition, the government declined to collaborate with Mallinckrodt and Cotter in the settlement of *McClurg* because it claimed that is its usual practice. In so doing, the United States failed to follow the Agreement's only litmus test for deciding if the government should participate: whether it would "probably be required to make indemnity payments." *Compare* Appx1374 *with* Appx29-30 (¶¶ 31–32) and Appx782-783 (¶ 4.a).

Accepted as true, these factual allegations were more than sufficient to show that the United States breached a contractual duty to indemnify and collaborate with Cotter in the defense and settlement of *McClurg*. *See San Antonio Hous. Auth.*, 143 Fed. Cl. at 470; *Dobyns v. United States*, 91 Fed. Cl. 412, 422–30 (2010) (holding that, under COFC

Rule 8, a complaint for breach of contract must only include "enough factual detail to put defendant on notice as to the basic nature of the claims raised").

Nevertheless, COFC dismissed Cotter's contract claim because it concluded that Cotter was bound by the same duty as Mallinckrodt to present its claim to the United States before seeking judicial relief. According to the court, the Complaint failed to allege that Cotter met that purported duty. Appx16-17. This constitutes reversible error because the Indemnification Agreement did not require intended beneficiaries like Cotter to provide pre-suit notice of their claims.

While a third-party beneficiary is generally subject to the same contractual conditions as a named party to a contract, that rule is inapplicable where "the language of the contract, or the circumstances under which it was executed, establish that the parties have provided that the right of the beneficiary is not to be affected by any defenses that the promisor might have against the promisee." *Schneider Moving & Storage Co.*, 466 U.S. at 370–71, 371 n.11 (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 466–70 (1960)). The plain language of the contract is especially important where a third party asserts a right to a direct benefit owed under the agreement, not merely a right derived from the promisee. *See generally J.G.B. Enters., Inc. v. United States*, 497 F.3d 1259, 1261–62 (Fed. Cir. 2007) (citing Restatement (Second) of Contracts § 309 cmt. c ("[T]he beneficiary's right is direct, not merely derivative, and . . . [its] right against the promisor is not subject to claims and defenses of the promisee against the beneficiary *unless the contract so provides*.")) (emphasis added).

Here, Mallinckrodt was required to notify the AEC of any "any action . . . filed against [Mallinckrodt] arising out of the performance of [the Contract]" and of "any claim against [Mallinckrodt]" that may be compensable under the Contract. Appx711-712. Mallinckrodt also had to furnish "pertinent papers" to the government with respect to any such action or claim. *See* Appx712. Read together with the Indemnification Agreement, these notification provisions indicate that *Mallinckrodt* had a duty to notify the United States of any public liability action implicating the government's indemnity obligations. *See* Appx782-783 (¶¶ 4.a–b).

But the Contract does not require such notice from the Agreement's other intended beneficiaries, such as Cotter (i.e., the "other persons indemnified"). Instead, the Contract's notification provisions apply expressly to actions and claims "*against* [Mallinckrodt]" only. *See* Appx711-712 (emphasis added). The Agreement also makes clear that third-party claims for indemnity are *not* subject to pre-litigation review and decision by a government contracting officer. That is because the Agreement's protections are not "limited in any way" by the administrative exhaustion requirements contained in the Contract's "Disputes" clause. Appx783-784 (¶ 8); Appx724 (Article XXVIII-Disputes).

In addition, the Indemnification Agreement imposes an affirmative duty on the United States to "collaborate" with Mallinckrodt "*and* any other persons indemnified" upon learning of a potentially covered public liability action, irrespective of who provides notice to the government of such an action. Appx29-30 (¶¶ 31–32); Appx782-

783 (¶ 4.a). Finally, the government's indemnity obligations are expressly "*not* . . . affected by *any failure* on the part of [Mallinckrodt] to fulfill *any of its obligations* under [the Contract]." Appx30 (¶ 33) (emphasis added); Appx783 (¶ 6). Those contractual obligations include the obligation to comply with the Contract's claims-notification provisions. Thus, even accepting the court's logic, the Agreement would also excuse a third-party beneficiary's failure to provide pre-suit notice of a contract indemnity claim.

The absence of any provision requiring pre-suit notice from third parties aligns with the purpose and structure of Section 170(d) indemnification agreements. Those agreements are designed to channel all public liability claims to the relevant indemnification agreement. *See* Appx1185 (emphasis added). Among other benefits, "[t]his 'economic channeling' eliminates the need to sue all potential defendants or to allocate legal liability among multiple potential defendants." Appx1229. It follows, therefore, that the responsibility to notify the government is assigned to the person "with whom [the] indemnity agreement is executed" (i.e., the indemnified contractor), since that is the only entity with contractual responsibilities to the United States. *See* Appx816 (§11(r)).

Further, under the circumstances, there is no reason to infer that the AEC and Mallinckrodt intended to require pre-suit notice from entities like Cotter. The AEC and Mallinckrodt executed the Indemnification Agreement at a time when the government was attempting to sell the legacy nuclear material to third parties. Appx26, Appx28-30 (¶¶ 16–17, 25–34). In the process, the government could have included a provision in

the Agreement requiring advance notice of potential claims by such third parties, but it did not. And despite having the ability to amend the Agreement, *see* Appx783 (¶ 7), the United States and Mallinckrodt have never adopted such a provision.

Moreover, the government cannot credibly claim that it was prejudiced by any failure to receive pre-suit notice from Cotter. It is undisputed that the United States was in fact notified of *McClurg* in March 2012 and of the government's status as a "potential indemnitor" in February 2018. Appx31, Appx33 (¶¶ 38, 46). The government's response made clear that it would only indemnify Mallinckrodt, even if Cotter had provided pre-suit notice. Appx33 (¶ 47), Appx1374-1375. Accepting those allegations at face value, COFC erred in dismissing Cotter's complaint based on any supposed failure to notify the government of Cotter's claim.

## CONCLUSION

The factual allegations in Cotter's Complaint were sufficient to state a claim for Price-Anderson Act indemnification and establish standing to bring an indemnity claim under the Indemnification Agreement. The Court of Federal Claims erred in dismissing Cotter's claims because it misinterpreted the plain meaning, purpose, and history of both the Act and Indemnification Agreement.

For these reasons, Cotter requests that this Court reverse the order of the Court of Federal Claims and remand this matter to the lower court with instructions to reinstate Cotter's claims.

Dated: June 27, 2023

Respectfully submitted,

*/s/ Alejandro L. Sarria*
MILLER & CHEVALIER CHARTERED
Alejandro L. Sarria
Principal Attorney
Jason N. Workmaster
Connor Farrell
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5893
Fax: (202) 626-5801
asarria@milchev.com
jworkmaster@milchev.com
cfarrell@milchev.com

Jennifer Steeve
RILEY SAFER HOLMES & CANCILA LLP
100 Spectrum Center Dr., Suite 440
Irvine, CA 92618
Tel: (949) 359-5515
Fax: (949) 359-5501
jsteeve@rshc-law.com

Attorneys for *Plaintiff-Appellant*
Cotter Corp. (N.S.L.)

# ADDENDUM

**CORRECTED**

# In the United States Court of Federal Claims

No. 22-414
Filed: March 3, 2023

| |
|---|
| **COTTER CORPORATION, (N.S.L.),** |
| ***Plaintiff,*** |
| **v.** |
| **THE UNITED STATES,** |
| ***Defendant.*** |

*Alejandro L. Sarria,* Miller & Chevalier Chartered, Washington, D.C., for Plaintiff.

*John H. Roberson,* Senior Trial Counsel, *Franklin E. Wright, Jr.,* Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton,* Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

**MEMORANDUM OPINION AND ORDER DISMISSING**

**TAPP, Judge.**

Turning "swords into plowshares" characterized the post-World War II transformation of destructive atomic power into usable consumer energy. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 193 (1983). Fulfillment of that ambition required relaxation of the federal government's "monopoly over fissionable materials and nuclear technology." *Id.* at 194. However, developing nuclear energy production carries potentially enormous risk to life and property. To offset such risk, Congress passed the Price-Anderson Act ("PAA") which "encourage[d] private investment in commercial nuclear power by placing a cap, or ceiling, on the total amount of liability" the nuclear industry faced in the event of an accident and provided a system of government indemnification. *Backgrounder on Nuclear Ins. & Disaster Relief*, U.S. Nuclear Regul. Comm'n (Apr. 11, 2022), https://www.nrc.gov/reading-rm/doc-collections/fact-sheets/nuclear-insurance.htm. The most infamous instance of accidental injury, the Three Mile Island Nuclear Power Plant in Pennsylvania, resulted in approximately $71 million in claims and litigation costs. *Id.*

The genesis of the present litigation involves the exposure of hundreds of St. Louis area residents to radioactive material in the years following World War II. *McClurg v. MI Holdings*,

*Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013).[1] Ultimately, the parties reached a settlement, though related litigation continues today. *See, e.g.*, *Butler v. Mallinckrodt LLC*, No. 4:18-cv-01701-AGF, 2022 WL 4598531, at *1 (E.D. Mo. Sept. 30, 2022) (plaintiffs "assert public liability actions under" the PAA).

Here, Plaintiff, Cotter Corporation (N.S.L.) ("Cotter"), seeks compensation from the United States for the costs of defending and settling the "public liability" action regarding radioactive material Cotter purchased from Mallinckrodt Chemical Works ("Mallinckrodt"). As provided in the PAA, a "public liability action" involves the assertion that another party bears the "legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. § 2014(w). Cotter's indemnification claims implicate the PAA and a contract between the United States and Mallinckrodt. The United States asserts that (1) Cotter's PAA claim fails to state a claim upon which relief can be granted because it does not implicate either potential avenue for statutory indemnification–contractual or licensing indemnification; and (2) Cotter lacks standing because it did not plausibly allege it was an intended third-party beneficiary of the Mallinckrodt agreement. The Court agrees with the United States on both counts; therefore, the United States' Motion to Dismiss is **GRANTED**.

## I. Background

### *A. Statutory Framework of the Price-Anderson Act*

Following World War II, Congress sought to encourage private sector involvement in nuclear energy development. To do so, it established the Atomic Energy Commission ("AEC" or "Commission") to manage programs related to nuclear energy, and later provided for the licensing of private nuclear reactors regulated by the AEC. Atomic Energy Act of 1946, Pub. L. No. 79-585, §§ 1–2, 60 Stat. 755; Atomic Energy Act of 1954, Pub. L. No. 83-703, 68 Stat. 919 ("1954 Act"). Despite investment incentives included in the 1954 Act, the risk of liability following a nuclear disaster hindered private investment, so Congress enacted the PAA in 1957. Pub. L. No. 85-256 § 4, 71 Stat. 576 (current version at 42 U.S.C. § 2210). The PAA has a "dual purpose" of both "protecting the public and encouraging the development of the nuclear energy industry." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 59 (1978).

The PAA contained indemnification provisions to incentivize both contractor and licensee participation. *See, e.g.*, *id.* Importantly, these provisions distinguish between contractors and licensees. Pub. L. No. 85-256 §§ 170(a)-(d).[2] The PAA authorized the Commission to enter into indemnification agreements with any entity engaged in activities "under contract for the benefit of the United States involving activities under the risk of public liability for a substantial

---

[1] In 2012, the case was originally named *McClurg v. MI Holdings*, *Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013). It was later consolidated to become *McClurg v. Mallinckrodt, Inc.* For purposes of this Opinion and Order, it will be "*McClurg*."

[2] Both Cotter and the United States rely on statutory language from Section 170 which was in effect during the Mallinckrodt contract. (*See e.g.,* Mot. to Dismiss at 14–15; Pl.'s Resp. at 15). For purposes of this opinion, the Court will interpret Section 170.

nuclear incident." § 170(d). Indemnification agreements could, but did not necessarily, include an insurance requirement. *Id*.

Further, the PAA provided that only some commercial licensees were required—by statute or the Commission's discretion—to maintain liability insurance in the amount available from private sources. §§ 170(a)-(d). Specifically, the PAA provided licensees may have to:

> [M]aintain financial protection of such type and in such amounts as the [Commission] shall require . . . to cover public liability claims. Whenever such financial protection is required, it may be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection [170(c)].

§ 170(a). The PAA specified that the Commission[3] "agree[s] to indemnify and hold harmless the licensee and other persons indemnified . . . from public liability arising from nuclear incidents which is in excess of the level of financial protection required of the licensee." § 170(c). The indemnification could cover public liability arising out of or connected to the licensed activity. *Id.* Ultimately, the PAA provided federal licensees with robust layers of protection, including: (1) a system of mandatory private insurance, (2) indemnification from the government for public liability from nuclear incidents, and (3) limited liability for nuclear incidents. *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 476 (1999).

Under the PAA today, "public liability" refers to liability resulting from any "nuclear incident" or precautionary evacuation, except for workmen's compensation claims or claims resulting from war. 42 U.S.C. § 2014(w). A "nuclear incident" is any occurrence, injury, sickness, death, or damage to property resulting from the hazardous properties of nuclear material. § 2014(q). Taken together, these provisions provide "no fault" insurance scheme under which liability after an incident is assumed by the operator of a nuclear facility. Daniel Klein, *Litigation of Atomic Energy Act, 42 U.S.C.A. § 2011 et seq., and Amendments Thereto*, 156 Am. Juris. Trials 1, 3 (2022).

*B. Contracts and Licenses at Issue*

In 1942, the United States War Department contracted with Mallinckrodt to produce refined uranium and operate two government plants;[4] the United States maintained ownership over the radioactive material. (Compl. at 4, ECF No. 1; Mot. to Dismiss at 16–17, ECF No. 16). Initially, Mallinckrodt operated a facility in downtown St. Louis, Missouri ("St. Louis

---

[3] In the 1970s Congress abolished the AEC and divided its functions between the Energy Research and Development Administration and the Nuclear Regulatory Commission. Energy Reorganization Act of 1974, Pub. L. No. 93-438, § 104(a), 88 Stat. 1233, 1237. It went on to establish the Department of Energy ("DOE") in 1977. The Department of Energy Organization Act, Pub. L. No. 95-91, §§ 201, 301, 703, 91 Stat. 565, 569, 577–78, 606.

[4] Mallinckrodt "[p]urified and provided all of the uranium oxide used by the Manhattan Project[.]"*Our Story*, Mallinckrodt Pharmaceuticals, https://www.mallinckrodt.com/about/our-story/ (last visited Feb. 27, 2022).

Downtown Site" or "SLDS") but in the 1950s it began transporting residue material to the St. Louis Airport ("St. Louis Airport Site" or "SLAPS"). (Compl. at 4). This arrangement continued until 1966 through a series of supplemental agreements ("SA"). (Mot. to Dismiss at 17). Most SAs merely adjusted the price or quantity of materials, but some substantively changed the Mallinckrodt contract. (*Id.*).

For example, under SA No. 45 the United States and Mallinckrodt agreed that "[t]he Contractor shall promptly" determine whether a claim "arising out of, based on or caused by the toxicity and/or radioactivity of uranium-bearing raw materials and/or products or byproducts" is connected to the contract. (Ex. A at 248–50 at Art. III-E(1) and (3), ECF No. 16-2).[5] Accordingly, Mallinckrodt was required to "furnish promptly" copies of documents related to any litigation to the United States which was authorized to settle or defend the lawsuit. (*Id.* at Art. III-E(3)). Under SA No. 81, Mallinckrodt again agreed to promptly notify the United States about any impending lawsuit. (*Id.* at 495–96 at Art. III-E(3)). Further, indemnification was available "only to the extent that [Mallinckrodt] is not protected and made whole by insurance." (*Id.* at 494 at Art. III-E(1)). As a contractor, Mallinckrodt was required to maintain insurance. (*Id.* at 494 at Art. III-E(2)).

SA No. 115 reiterated Mallinckrodt's obligation to promptly notify the contracting officer ("CO") of any pending litigation and provide "all pertinent papers" related to the action or claim. (*Id.* at 674 at Art. XIV(2)). Further, it stipulated that Mallinckrodt could not assign or transfer the contract or any interest or claim under the contract to a third party, unless to a subsidiary or first approved by the CO. (*Id.* at 667 at Art. VII). SA No. 124 added "certain provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents" pursuant to Section 170 of the Atomic Energy Act. (*Id.* at 742). Importantly, it also incorporated the PAA's updated 1962 definitions and indemnification provisions into the contract. (*Id.* at 743–44). Specifically, it provided that Mallinckrodt and "any other person indemnified" will be indemnified by the Commission against claims for public liability and "the reasonable costs of investigating and settling claims, and defending suits for damage for such public liability . . . under Section 170 of the Act." (*Id.* at 743).

In 1966, the Mallinckrodt contract ended when the AEC sold radioactive material at SLAPS to Continental Mining & Milling Company ("Continental"). (Ex. C, ECF No. 16-4). The sale stipulated that the material was sold "as is" and the United States did not warrant that the materials "will not result in injury or damage when used for any purpose[.]" (*Id.* at 2). The bill of sale also (1) required Continental to obtain a license, (2) passed title of the radioactive material to Continental, and (3) gave Continental "full responsibility for the care and custody of the material . . . after passage of title." (*Id.* at 2–3). The material was transferred from SLAPS to Latty Avenue in Hazelwood, Missouri, a small community located to the northwest of St. Louis. (Compl. at 6).

---

[5] The exhibits provided by the parties are consecutively paginated. Thus, the Court will cite to each as "Ex. _ at _." If a specific article or provision is referenced, the Court will cite to "Ex. _ at _ at Art_."

In 1967, Continental's assets, including the material at Latty Avenue, were foreclosed by its creditor, Commercial Discount Corporation ("Commercial Discount"). (Ex. B at ¶ 43, ECF No. 16-3). Commercial Discount then sold the radioactive material to Cotter between 1967 and 1969. (Ex. D, ECF No. 16-5). As a result, Cotter acquired a license with the AEC to continue operations at Latty Avenue. (Ex. F, ECF No. 16-7 (AEC License No. SUB-1022)). In 1973, Cotter transported some of the nuclear material from the Latty Avenue location to the West Lake Landfill in Bridgeton, Missouri. (Ex. B at ¶ 45). Cotter's AEC license expired in 1974. (Ex. F).

### *C. The McClurg Litigation*

From February 2012 to 2018, Cotter was embroiled in tort litigation related to the "alleged release of radioactive source material" in St. Louis County, Missouri. (Compl. at 2, 9–13; Ex. B). Cotter notified the United States about the case in March 2012.[6] (Compl. at 9). In March 2013, the trial judge dismissed state law claims in the initial complaint citing federal preemption, labeled the case a "public liability action," and permitted the plaintiffs to replead under the PAA. (Compl. at 10; Ex. H at 6, ECF No. 16-9).

The amended *McClurg* complaint alleged that Cotter's activities between 1969 and 1973 released radioactive material into the surrounding environment, proximately causing injuries to the plaintiffs. (Compl. at 10–11). Specifically, the complaint traced the material from its original Mallinckrodt processing location at SLDS to SLAPs for storage to Latty Avenue. (*Id.* at 10). The complaint further alleged Cotter acquired the material located at Latty Avenue in 1969 and shipped most of it to Colorado; however, some "residue material remain[ed] at Latty Avenue." (*Id.*). This residue material was transported to the West Lake Landfill in 1973. (*Id.*). Regarding the PAA, the complaint claimed (1) the material qualified as a "source, special nuclear, or byproduct;" (2) each release of material into the environment constituted a "nuclear incident;" and (3) the injuries sustained from each "nuclear incident" was a "public liability action." (*Id.* at 11). Following stalled settlement discussions, the trial court directed DOE in February 2018, to send an authorized representative to mediation because the United States was a "possible indemnitor." (*Id.* at 11–12). The DOE declined to participate. (*Id.* at 12). Cotter and the *McClurg* plaintiffs reached a settlement agreement in September 2018. (*Id.*) In December 2019, the trial court determined the amount was "fair and reasonable compensation." (*Id.*).

### *D. Present Litigation*

In April 2022, Cotter filed its Complaint at the Court of Federal Claims. Cotter brings two counts: statutory indemnification under the PAA (Count I) and contractual indemnification as the third-party beneficiary of a PAA indemnification agreement (Count II). (Compl. at 13–15). Specifically, Cotter claims it is a "person indemnified" as defined in the PAA and thereby entitled to compensation for its "public liability action." (Compl. at 13; Pl.'s Resp. at 15 (citing Section 170(d)), ECF No. 17). Cotter maintains it is "other persons indemnified" for purposes of

---

[6] The parties dispute whether this notification was sufficient to "tender[] the litigation for DOE indemnification or representation." (Mot. to Dismiss at 23; Pl.'s Resp. at 34). For purposes of this opinion the Court assumes the government was notified no later than February 2018 when the trial judge directed DOE to send a representative to mediation. (Compl. at 11–12).

the indemnification agreement between the AEC and Mallinckrodt. (Compl. at 14–15). Based on these allegations, Cotter believes it is entitled to judgment on its indemnification "for the costs of settling and defending the public liability action in *McClurg*[.]" (Compl. at 1, 15).

The United States moves to dismiss Cotter's indemnification claims on two grounds. First, the United States argues Cotter failed to appropriately plead either avenue for statutory indemnification under the PAA. (Mot. to Dismiss at 25). Second, the United States argues Cotter failed to allege it was the intended third-party beneficiary of Mallinckrodt's contract with the United States, thus it lacks standing to bring Count II. (*Id.* at 41–45). Accordingly, the United States moves to dismiss Cotter's claims for failure to state a claim upon which relief may be granted and lack of subject-matter jurisdiction.

## II. Analysis

The Court's jurisdiction depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). The Tucker Act waives sovereign immunity over claims (1) arising under federal constitutional, statutory, or regulatory law; (2) for an express or implied contract with the United States; or (3) seeking damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1). However, the Tucker Act does not provide any substantive rights. *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Therefore, the plaintiff must have a money-mandating source on which to base their cause of action. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). A source is money-mandating if it triggers compensation for damages sustained due to a breach of the duties it imposes. *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (internal citations omitted); *see also N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882–88 (Fed. Cir. 2018) (determining "shall be indemnified" in I.R.C. § 3102(b) was money-mandating); *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) (presuming damages in contract case satisfy money-mandating requirement).

When considering a motion to dismiss for lack of subject-matter jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed Cir. 2011). However, plaintiffs bear the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, the Court must dismiss the claim if it lacks subject-matter jurisdiction. RCFC 12(h)(3). Standing is a threshold issue that involves the Court's subject-matter jurisdiction. *Lujan,* 504 U.S. at 560–61. If a plaintiff fails to establish standing, the Court lacks jurisdiction to render a decision on the merits of a claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). For purposes of the standing inquiry, the Court assumes well-pled allegations of error to be true. *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 323 (2015) (citing *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 94 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012)).

If a claim survives a jurisdictional challenge, it is still subject to dismissal under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When deciding a motion to dismiss under RCFC 12(b)(6), the court must again assume all undisputed facts in the complaint are true and draw all

reasonable inferences in the non-movant's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); RCFC 12(b)(6). The court should assume the veracity of well-pleaded factual allegations and determine whether it is plausible, to find against the movant. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). As a result, "[t]o avoid dismissal under RCFC 12(b)(6), a plaintiff 'must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Am. Bankers Assc'n v. United States*, 932 F.3d 1375, 3180 (Fed. Cir. 2019) (internal citations omitted).

*A. Cotter failed to plausibly allege it qualifies for statutory indemnification under the PAA.*

The United States argues that Cotter failed to state a claim for statutory indemnification under either available avenue prescribed by the PAA. (Mot. to Dismiss 25–41). First, the United States contends Cotter failed to establish a relationship to a government contract as required by Section 170(d). (*Id.* at 25–36). The United States argues this relationship and its benefit to the government are essential to trigger this indemnification provision. (*Id.* at 29–30, 33–36). Second, the United States argues Cotter failed to establish eligibility for the PAA's licensee indemnification provision under Section 170(a). (*Id.* at 25, 36–41). Finally, the United States asserts that Cotter's indemnification liability theories ignore historical bills of sale and Cotter's purchase of the material which did not include indemnification rights. (*Id.* at 38–41). The Court addresses each argument.

i. Cotter failed to plausibly allege indemnification eligibility under Section 170(d).

As provided above, Section 170 originally laid out the indemnification and limitation of liability provision. Pub. L. No. 85-256 § 170 (1957) (current version at 42 U.S.C.§ 2210). The United States argues the language of Section 170(d) limited the government's indemnity obligations to parties engaged in "activities with a nexus to a [g]overnment contract" and that this requirement remains today. (Mot. to Dismiss at 26, 28). Cotter, however, contends that the "plain text and legislative history of the PAA" are expansive and not limited to persons with specific relationships with the government. (Pl.'s Resp. at 15). This dispute centers on specific indemnification of liability language in Section 170(d) and key PAA definitions. Therefore, the Court must begin "with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S.Ct. 1048, 1056 (2019) (internal citations omitted). To do so, the Court looks at the plain language as well as "the placement and purpose of the language within the statutory scheme." *WestRock Va. Corp. v. United States*, 136 Fed. Cl. 267, 276 (2018) (internal citation omitted); *Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences.").

Section 170(d) provides for indemnification agreements between the AEC and contractors:

> [T]he Commission is authorized . . . to enter into agreements of indemnification with its contractors for the construction or operation of

> production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, in the amount of $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident.

§ 170(d).

First, the parties disagree whether such language limits indemnity to persons facing public liability because of their activity under or with some nexus to a government contract. (Mot. to Dismiss at 27–28; Pl.'s Resp. at 12, 17). The United States argues Cotter was not "involved in the Mallinckrodt's contract with the [g]overnment" and that its alleged "free-floating right to indemnification" derives from a definition "beyond the strictures and limitations" of Section 170. (Mot. to Dismiss at 25). Rather than an untethered right, the United States asserts PAA indemnification was tied to the AEC's indemnification agreements "with its contractors" who operate under "contracts for the benefit of the United States[.]" (Mot. to Dismiss at 26–27 (quoting § 170(d)) (emphasis removed)). The United States acknowledges that Mallinckrodt's contract did incorporate the indemnification provision, (*id.* at 29), but argues that Cotter's activities were unrelated to "the contractual activity of Mallinckrodt's contract with the United States." (*Id.* at 30 (emphasis removed)). For its part, Cotter emphasizes the discretionary nature of the agreements and contends that "nothing in Section 170(d) purported to limit the government's indemnity obligations to persons who have certain contracts or relationships or who perform certain contractual activities." (Pl.'s Resp. at 19). Cotter asserts the PAA does not impose such contractual requirements. (*Id.* at 17). The United States' arguments are persuasive while Cotter's are not.

The Court addresses the plain language of Section 170(d) to determine whether indemnification requires a nexus to contractual activity. *See Republic of Sudan*, 139 S.Ct. at 1056. The first sentence of Section 170(d) plainly emphasizes the importance of government contractors and a contractual relationship. For example, it states that the Commission may enter into indemnification agreements "with its contractors" who are engaged in activities that risk nuclear incidents. § 170(d). It further provides that agreements also include "other activities under contracts for the benefit of the United States[.]" *Id.* Such language is consistent with the United States' interpretation that agreements require some nexus or connection to a government contract. (Mot. to Dismiss at 26–27). The inclusion of "activities" is always couched in relation to the AEC's contractors or those operating "under contract." *See* § 170(d). The Commission's authority to enter into indemnification agreements is presented within the context of a contractual activity that benefits the government's nuclear program. Accordingly, the United States does not, as Cotter asserts, "overread" this sentence to limit government liability by emphasizing a relationship with the government itself or an indemnified contractor. (Pl.'s Resp.

at 18). Rather, the statutory language itself explicitly underscores the importance of a contractual relationship.

The second sentence of Section 170(d) specifies that "[i]n such [indemnification] agreements" contractors may be required to have financial protection. § 170(d). This language indicates that contractors (and other eligible parties) who may seek indemnification are subject to specific requirements—here, financial protection or insurance. The sentence goes on to provide that the government "shall indemnify the *persons indemnified* against such [public liability claims] above the amount of the financial protection required . . . for all persons indemnified *in connection with such contract* and each nuclear incident." § 170(d) (emphasis added). Such language again indicates some required nexus to contract activity as well as financial protections required by the AEC.

Cotter contests this interpretation of Section 170(d) by emphasizing the inclusion of "persons indemnified" in the second sentence. (Pl.'s Resp. at 16–17, 19). In 1962, the PAA defined "persons indemnified" as "the person with whom an indemnity agreement is executed and *any other person* who may be liable for public liability" for incidents within the United States. Pub. L. No. 87–615, § 5 (1962) (emphasis added). Cotter latches onto "any other person" in this definition to argue certain contracts or relationships were not required to obligate government indemnification. (Pl.'s Resp. at 21). Cotter argues that such language means "an unaffiliated third party" may qualify for federal indemnification based on their activities and liability, not because of their privity to the government. (*Id.* at 11, 18–22). Cotter further argues if Congress wanted to limit the scope of "persons indemnified" it could have used more qualified language such as "any person who may be liable for public liability due to their activities under an AEC contract." (*Id.* at 19–20). These arguments are unavailing.

The Court concedes that as an isolated term, "persons indemnified" appears to be untethered to a nexus to contractual activity. But the Supreme Court has held that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Therefore, the Court looks to broader statutory context of PAA indemnity. For example, Cotter's interpretation would ignore the "financial protection required" under the agreements that qualify the government's obligation to indemnify. § 170(d). Similarly, "in connection with such contract" would be rendered superfluous by Cotter's interpretation, (Pl.'s Resp. at 11); it would disregard the proverbial forest for the tree. *See Sullivan v. McDonald*, 815 F.3d 786, 790 (Fed. Cir. 2016) ("[W]e attempt to give full effect to all words contained within that statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.") (internal citations omitted). The Court will not disregard other clauses in Section 170(d) in favor of one cherry-picked term. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("we must give effect, if possible, to every clause and word of a statute.") (internal citations and quotations omitted).

Second, the Court addresses the incorporation of PAA indemnification in the Mallinckrodt contract. The United States argues the contractual language itself helps shed light on the "intended linkage between contractual activity undertaken for the United States' benefit and the [g]overnment's [indemnification provision]." (Mot. to Dismiss at 29). Specifically, the United States cites SA No. 124 wherein the government agreed to indemnify Mallinckrodt and

"other persons indemnified" for claims of "public liability." (*Id.*; Ex. A at 742–46). "[P]ublic liability" is defined as that which "arises out of or in connection with the contractual activity" and "arises out of or results from" four types of nuclear incidents. (Ex. A at 42–43). Such language mirrors the language used in Section 170(d).

Specifically, mirrored indemnification obligations under Section 170(d) apply to public liability "arising out of or in connection with the contractual activity[.]" § 170(d). Cotter correctly points out that the Court should analyze the ordinary meaning of those terms. (Pl.'s Resp. at 15 (citing *Nicely v. United States*, 23 F.4th 1364, 1369 (Fed. Cir. 2022) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (internal citations omitted)). Therefore, the Court examines the phrases "arising out of" and "in connection with." Merriam-Webster defines "arise" as "to originate from a source." *Arise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/arise (last visited Jan. 26, 2023). The Federal Circuit recently stated that "arising out of" is narrower than "relating to" because it "usually indicates a causal connection." *Kannuu Pty Ltd. v. Samsung Elecs. Co., Ltd.*, 15 F.4th 1101, 1106 (Fed. Cir. 2021) (interpreting contractual terms in patent case). As such, the Court understands "arising out of" to indicate a relationship to the contractual activity. Further, Merriam-Webster defines "connection" as a "causal or logical relation or sequence." *Connection*, Merriam-Webster, https://www.merriam-webster.com/dictionary/connection (last visited Jan. 26, 2023). This definition also evokes a tie or relationship between two things. In Section 170(d) and in SA No. 124 these terms precede "the contractual activity." § 170(d). As such, there must be a relationship to contractual activity because "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

Third, the Court declines to analyze the PAA's legislative history and subsequent reports to Congress to determine congressional intent. It is the Court's role to interpret statutory language enacted by Congress. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461 (2002). If the Court determines that statutory language is clear and unambiguous, "the inquiry ends with the plain meaning." *Myore v. Nicholson*, 489 F. 3d 1207, 1211 (Fed. Cir. 2007) (internal citation omitted); *Barnhart*, 534 U.S. at 462 ("When the words of a statute are unambiguous, then [the] first canon is also the last: 'judicial inquiry is complete.'"). The language of Section 170(d) is clear and unambiguous. The Court determines that Section 170(d) required some nexus to a contractual relationship for the benefit of the government. It further determines that such language limits who may be party to or benefit from an indemnification agreement.

Even if the Court engaged with the PAA's legislative history, it does little to "shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Here, the United States and Cotter are both able to select language supporting their arguments. For example, the United States quotes a 1965 Joint Committee on Atomic Energy report that stated the PAA was "designed to protect organizations participating in the atomic energy program" and that indemnification extends to organizations that "assist the [g]overnment in carrying out the atomic energy program[.]" (Mot. to Dismiss at 31 (quoting Ex. J at 1–2, 42, ECF No. 16-11)). Conversely, Cotter highlights a 1957 report from that same committee stating "persons indemnified" included "any person who might be found liable, regardless of the contractual relation [to the prime contractor.]" (Pl.'s Resp. at 22 (quoting Ex. 1 at 18, ECF No. 17-2)). This language highlighted by Cotter is absent from the PAA itself. Although legislative history may

be used in judicial analysis, such history does not "trump[] clear text." *Bartels Tr. For the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed. Cir. 2010). Ultimately, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Accordingly, the Court adheres to the plain meaning of the statute and declines to wade through the mire of the PAA's legislative history.

Finally, the Court addresses whether Cotter satisfies the nexus required to implicate the PAA's indemnification obligations. The United States argues that Cotter's activities were unconnected to Mallinckrodt's contractual activity performed for the benefit of the government, thus it is not entitled to indemnification. (Mot. to Dismiss at 29–30, 33–36). The United States emphasizes it "did not sell the radioactive material to Cotter" but instead to other third parties and it did not benefit from Cotter's activities with the radioactive material. (*Id.* at 34). The United States reasons the PAA indemnification provision should be read within the context of the Act and, not turn on the "uncontextualized definition of 'person indemnified.'" (*Id.* at 36). Cotter argues *McClurg* was based on its handling of "legacy nuclear material," therefore, it falls within the scope of "public liability" under the PAA. (Pl.'s Resp. at 12, 25). Cotter further argues it "actually handled and possessed" the material so it is reasonable to infer entitlement to relief. (*Id.* at 25). The Court agrees with the United States that Cotter's ownership over the radioactive material was too far "downstream" from Mallinckrodt, rendering it outside the Section 170(d) indemnification obligation. (Mot. to Dismiss at 26–27).

It is undisputed that Cotter was not in privity of contract with Mallinckrodt. As detailed above, Mallinckrodt's contract with the AEC ended in 1966 when the government transferred the material's title to Continental. (Mot. to Dismiss at 19). At that time, Mallinckrodt was no longer producing refined uranium and operating the plants under contract with the government. (Compl. at 4; Mot. to Dismiss at 16–17, 19). Accordingly, the benefit to the government's nuclear program ended. Further, Cotter only became linked to the material in 1969 after it had changed hands several times. (Mot. to Dismiss at 19–21). Title transfers between 1967 and 1969 only involved private entities, not the government. (Mot. to Dismiss at 16–17, 19). The question then becomes, is it plausible to infer the United States is liable for damages related to activity after the conclusion of the Mallinckrodt contract and once Cotter was responsible for the material.

Here again, Cotter's argument relies on issues addressed above, namely, that it qualifies as a "persons indemnified" and its activities "ar[ose] out of or in connection with the contractual activity." § 170(d). However, Cotter's handling of the material did not "originate from" Mallinckrodt's contractual activity, but rather possession by third parties. The Court finds handling material that was once under Mallinckrodt's contract is an insufficient causal sequence to trigger indemnification obligations, particularly considering Section 170(d)'s limiting language analyzed above. For the stated reasons, Cotter failed to plausibly claim it qualifies for statutory indemnification under Section 170(d).

ii. <u>Bills of Sale and Government Disavowal of Responsibility</u>

The Court analyzes whether disavowal of the government's responsibility for the radioactive material applies to this case. The United States argues that the "chain of sales transactions" for the material demonstrates the government "did not intend" to extend

indemnification rights to those purchasers. (Mot. to Dismiss at 38). Specifically, the United States highlights the "as is" clause in the Continental sale as well as the Residue Purchase Agreement between Commercial Discount and Cotter to show they contained no promises for government indemnity. (*Id*. at 38–39). The United States also reiterates that Cotter "cannot claim that it is entitled to PAA indemnification as 'a person indemnified.'" (*Id*. at 39).

For its part, Cotter argues the sale and licensing documents are irrelevant to its indemnity claims under the PAA. (Pl.'s Resp. at 28). Specifically, Cotter argues Count I only addresses statutory indemnity, rendering such contractual documents irrelevant. (*Id*.) Cotter further asserts that congressional intent and "broad terms" like "person indemnified" support its position that government liability extends to commercial entities. (*Id*. at 28–29). Cotter also argues if the government wanted to disavow responsibility, it should have explicitly done so in the Mallinckrodt indemnity agreement. (*Id.* at 29–30). This argument fails to acknowledge that the government cannot disavow a statutory obligation through contract interpretation. *See Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1365 (Fed. Cir. 2010) (discussing order "prohibit[ing] the government from using contract interpretation as a means of avoiding its statutory obligations"). Cotter concludes that the existence of an indemnification agreement between Mallinckrodt and the AEC was sufficient to support both Counts I and II. (*Id.* at 30).

Cotter is merely rehashing earlier arguments that the Court found unpersuasive. Furthermore, the documents at issue are relevant to the chain of title for the radioactive material as explored above. They also shed light on whether Cotter was an intended third-party beneficiary of the Mallinckrodt contract. Accordingly, the bills of sale are considered by the Court. As explained above, the Court determines that Cotter failed to allege facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief" under Sections 170(a) and (d). [7] *Am. Bankers Assc'n*, 932 F.3d at 3180. Accordingly, Cotter failed to state a claim for PAA statutory indemnification for which relief can be granted and Count I must be dismissed.

*B. Cotter cannot prevail on its contractual indemnification theory.*

The United States argues Cotter lacks standing to bring Count II because Cotter failed to plausibly allege it was the intended third-party beneficiary of Mallinckrodt's contract with the United States. (Mot. to Dismiss at 41–45). The United States first contends that Cotter's claims rely on its overbroad reading of "persons indemnified" and that the contracting parties did not have the authority to "extend any such indemnification[]" to Cotter. (*Id.* at 43–44). Second, the United States argues Cotter failed to allege that the government breached its contract with Mallinckrodt so it cannot bring a third-party beneficiary claim before this Court. (*Id.* at 44).

---

[7] The United States also argues Cotter fails to plausibly plead indemnification under Section 170(a) as a licensee. (Mot. to Dismiss at 36). Section 107(a) addresses the indemnification and limitation of liability for licensees. *See* § 170(a). For its part, Cotter does not argue its AEC license provided for indemnification under Section 170(a). (Compl. at 6; Pl.'s Resp at 26–28). Accordingly, the Court does not engage in an analysis of Section 170(a) because Cotter does not claim eligibility under its indemnification provision.

Cotter disagrees. (Pl.'s Resp. at 30). First, Cotter argues the facts alleged in the Complaint were sufficient to state a claim because it is within "a class clearly intended to be benefited" by the indemnity agreement. (*Id.* at 31). Cotter also contends the Mallinckrodt contract incorporated the PAA, qualifying it for indemnification. (*Id.* at 32–33). Second, Cotter argues it sufficiently supported the assertion that the government breached the indemnification agreement when it rejected indemnity claims in *McClurg*. (*Id.* at 33–36). Specifically, Cotter argues it did not have a duty to present indemnity claims to the government but that the United States was aware of *McClurg*. (*Id.* at 34). Finally, Cotter concludes that it has standing to pursue Count II because it was the intended third-party beneficiary under the PAA indemnification agreement and the government breached its contractual duty. (*Id.* at 36). The Court again agrees with the United States and finds Cotter's arguments unavailing.

Standing is a threshold jurisdictional issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). Typically, standing in a contract claim against the government requires the plaintiff to be in privity of contract with the United States. *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016). However, the Federal Circuit permits an exception for intended third-party beneficiaries. *See id.* at 1361. "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (citing *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001)). Importantly, "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). To find intent, the Court looks at:

> (1) [W]hether the language of the contract demonstrates that the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him, (2) the governing statute and its purpose, to the extent that the contract implements a statutory enactment, or (3) other objective evidence.

*Boye v. United States*, 90 Fed. Cl. 392, 409 (2009) (internal citations omitted). If Cotter cannot establish standing, the Court must dismiss Count II for lack of subject-matter jurisdiction. *Myers Investigative & Sec. Servs.*, 275 F.3d at 1369–70.

Against this backdrop, the Court must evaluate whether the AEC and Mallinckrodt intended for Cotter to directly benefit from their contract. *See Flexfab, LLC*, 424 F.3d at 1529; *see also Montana*, 124 F.3d at 1273. First, the Court looks to the terms of Mallinckrodt's contract with the United States, including the SAs described above, to determine if it would be reasonable for Cotter to rely on the promise to indemnify. *See Dewakuku v. Martinez*, 271 F.3d 1031, 1041 (Fed. Cir. 2001). Here, the United States argues the contract "does not identify Cotter as an intended beneficiary." (Mot. to Dismiss at 41). The United States explains the contract is silent regarding Cotter because it was a "downstream purchaser" of the material, its activities "were not undertaken for the benefit of the United States' contract with Mallinckrodt," and its license did not require financial protection. (*Id.* at 43). As such, the United States maintains that no contractual language indicates the AEC or Mallinckrodt intended to extend indemnification

rights to Cotter, who was not even considered when the contract was in effect. (*Id.*). The United States' arguments regarding contractual silence towards Cotter are unconvincing.

To show standing, Cotter need only demonstrate it falls within the class intended to benefit from the contract; it does not need to be "specifically or individually identified" in the Mallinckrodt contract as the United States seems to suggest. *Montana*, 124 F.3d at 1273. For its part, Cotter fails to engage with specific language in the Mallinckrodt contract and SAs. (Pl.'s Resp. at 30–33). Instead, Cotter relies on terms like "persons indemnified" and "arising out of" and "in connection with" in the PAA. (*Id.*). As the Federal Circuit recently stated, parties "are responsible for advancing the facts and arguments entitling them to relief." *Baude v. United States*, 955 F.3d 1290, 1304–05 (Fed. Cir. 2020) (internal citations). Accordingly, the Court turns its attention from language of the contract and SAs to the PAA. *See id.*; *see also Boye*, 90 Fed. Cl. at 409.

Here, both the United States and Cotter rehash previous arguments regarding the language and purpose of the PAA. Specifically, the United States argues Cotter was "a downstream purchaser of the radioactive material" and thus subject to the "express disavowal of [g]overnment responsibility for the material;" Cotter's activities did not benefit the government contract with Mallinckrodt, and it was not a "persons indemnified" for purposes of public liability. (Mot. to Dismiss at 43). Cotter contends belonging to the class of "other persons indemnified" under Section 170(d) sufficiently states intent. (Pl.'s Resp. at 31). Cotter again highlights the language "arising out of or in connection with" the contract. (*Id.* at 32). Again, the Court finds the United States' arguments persuasive while Cotter's are not. Therefore, Cotter does not fall within the class "clearly intended to be benefited" by the PAA's indemnification under Section 170(d).[8] Accordingly, Cotter failed to establish it has standing as an intended third-party beneficiary of the Mallinckrodt contract and indemnification agreement. *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1296 (Fed. Cir. 2022).

Even if Cotter had standing, it failed to state a contractual claim upon which relief could be granted. "If a plaintiff can establish . . . third party beneficiary status, a plaintiff must also be able to establish 'an obligation or duty arising out of the contract, a breach of that duty, and damages cause by the breach.'" *Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The United States argues that Cotter cannot show the government breached the Mallinckrodt contract because it never submitted a PAA indemnity claim. (Mot. to Dismiss at 44–45; Def.'s Reply at 23–25). The United States asserts that Cotter presented "a claim for its costs in this Court as a third-party beneficiary" rather than directly presenting it to the government as required. (Mot. to Dismiss at 44; Def.'s Reply at 24–25). The United States concludes that because Cotter does not and cannot allege the government rejected the indemnification claim, Cotter cannot plausibly allege an "actual breach" of contract. (Mot. to Dismiss at 44–45).

---

[8] The United States does not cite "other objective evidence" to further its argument that Cotter was not an intended third-party beneficiary. (*See* Mot. to Dismiss at 41–46). Therefore, the Court will not further analyze "other objective evidence." *Baude*, 955 F.3d at 1304–05.

Cotter argues it "had no duty to present an indemnity claim to the government." (Pl.'s Resp. at 33). To support this assertion, Cotter cites SA No. 124 arguing that "at most" only Mallinckrodt was required to present a claim. (*Id.* at 34). However, Cotter does not expand on this point nor address the language used in multiple SAs that required Mallinckrodt as the contractor to promptly notify the AEC about pending claims and submit "pertinent papers" to the Commission. (*See, e.g.*, Ex. A at 495 at Art. III-E(3)).

Cotter further contends that even if it did have a duty to submit a claim, SA No. 124 provided that any government obligations "shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract." (Pl.'s Resp. at 34 (citing Ex. A at 745)). Cotter continues that because the United States was aware of the *McClurg* litigation, it breached its indemnification agreement by failing to participate in mediation and fulfill its legal obligations. (*Id.* at 34–35). However, Cotter is unconvincing. Cotter's arguments boil down to the assertion that the government should indemnify Cotter simply because it was a defendant in *McClurg*. Cotter does not allege the United States was aware that it was seeking indemnification before this suit was filed. Cotter also does not allege that the United States ever refused indemnification before this Motion. Therefore, Cotter did not provide sufficient factual detail to put the United States on notice for its breach of contract claim. *See Dobyns v. United States*, 91 Fed. Cl. 412, 422–30 (2010).

## III. Conclusion

For the stated reasons, Cotter failed to allege facts plausibly suggesting entitlement to relief on its statutory and contractual claims. Accordingly, the Court finds that Cotter failed to state a claim upon which relief can be granted for Count I. Further, Cotter failed to establish standing, therefore this Court does not possess subject-matter jurisdiction to render a decision on the merits of Count II. Therefore, the Court **GRANTS** the United States' Motion to Dismiss pursuant to RCFC 12(b)(1) and (6).

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge

# In the United States Court of Federal Claims

**No. 22-414 C**
**Filed: March 3, 2023**

**COTTER CORPORATION,**
**(N.S.L)**
**Plaintiff**

**v.**

**THE UNITED STATES**
**Defendant**

**JUDGMENT**

Pursuant to the court's Memorandum Opinion and Order, filed March 3, 2023, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed for failure to state a claim upon which relief can be granted and for lack of subject-matter jurisdiction.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Fed. R. of App. P. 32(a)(5) and the type-style requirements of Fed. R. of App. P. 32(a)(6). This document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font Garamond type style. According to that word processing system, this document contains 13,096 words, excluding the parts of the brief exempted by Fed. R. of App. P. 32(f) and Fed. Cir. R. 32(b).

By: *_/s/ Alejandro L. Sarria_*
Alejandro L. Sarria