No. 23-1826

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

COTTER CORPORATION, N.S.L.,
Plaintiff-Appellant,

v.

UNITED STATES,
Defendant-Appellee,

Appeal from the United States Court of Federal Claims
No. 22:414, Judge David A. Tapp

**DEFENDANT-APPELLEE'S RESPONSE BRIEF**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

JOHN H. ROBERSON
Senior Trial Attorney
Commercial Litigation Branch
Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-7972
Fax: (202) 514-8624
Email: John.Roberson@usdoj.gov

November 29, 2023

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

DEFENDANT-APPELLEE'S RESPONSE BRIEF ..... 1

STATEMENT OF RELATED CASES ..... 1

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE SETTING OUT RELEVANT FACTS ..... 2

I. Statement Of Facts ..... 4

A. The Regulatory Framework ..... 4

1. The Atomic Energy Act; And The Establishment Of The Department Of Energy And The Nuclear Regulatory Commission ..... 4

2. The Price-Anderson Act ..... 5

B. Mallinckrodt Entered Into A Contract With AEC To Process Uranium In The St. Louis Area ..... 8

1. The Initial Agreements ..... 8

2. SA No. 45 ..... 9

3. SA No. 81 ..... 10

4. SA No. 115 ..... 10

5. SA No. 124 ..... 10

C. AEC Sold The Radioactive Material Located At The SLAPS To Continental Mining ..... 11

D. Commercial Discount Took Ownership And Possession Of The Material ........ 12

E. Cotter Purchased The Radioactive Material From Commercial Discount, Maintained The Latty Avenue Site, Transported Most Of The Material To Colorado, And Disposed Of Some Of The Material In A St. Louis Landfill ........ 12

F. Cotter Was Acquired By Commonwealth Edison, Which Sold Cotter To General Atomics, With Commonwealth Edison Agreeing To Indemnify Cotter For Any Liability Related To The West Lake Landfill And Latty Avenue Site ........ 13

G. The McClurg Litigation ........ 14

II. Course Of Proceedings Below ........ 17

SUMMARY OF THE ARGUMENT ........ 18

ARGUMENT ........ 19

I. Cotter Is Not Entitled To PAA Indemnification Because Its Underlying Private Commercial Activity Did Not Have A Nexus To An Atomic Weapons Program Contract Between Mallinckrodt And the United States ........ 19

A. The Court Properly Rejected Cotter's Claim That It Need Not Have A Nexus With A Contract For The Benefit Of The United States ........ 19

B. The 1962 And 1975 Amendments With Respect To PAA Indemnification For Incidents Outside The United States Do Not Affect The PAA's Terms Requiring A Nexus With A Contract For The Benefit Of The United States For Incidents Occurring Within The United States ........ 29

C. Cotter's Mere Possession Of Radioactive Material That Resulted From Mallinckrodt's Contract Does Not Satisfy The Necessary Condition Of A Nexus Between Cotter's Activities Or Public Liability And Mallinckrodt's Contract ... 32

D. Cotter's Participation In An Industry That Utilizes Radioactive Material Does Not Create An Entitlement To PAA Indemnification ........ 34

E. The Trial Court Correctly Determined That Cotter's Radioactive Material Did Not Have A Causal Or Logical Connection To Mallinckrodt's Contractual Activity And Its Public Liability Was Too Far Downstream From Mallinckrodt's Contractual Activity ........ 36

F. The Phrase "In Connection With" Does Not Provide A Nexus Between Cotter's Activity Or Liability And The PAA's Indemnification Provisions ........ 42

G. The PAA's Legislative History And A 1999 DOE Report Do Not Support Cotter's Thesis That "Any Other Person" Is Entitled To Indemnification Based Upon Their Status As A Person Facing Public Liability For A Nuclear Incident .......... 44

1. Section 170(d) Is Clear And Unambiguous And Thus Select Passages From The PAA's Legislative History That Could Be Read To Conflict With The Plain Meaning Of The Text Should Not Be Considered By This Court To Assess The Statute's Meaning .............. 44

2. A 1999 DOE Report To Congress Does Not Support Cotter's Interpretation Of Section 170(d)...................... 49

II. Mallinckrodt's Contract Did Not Provide Cotter With The Right To Assert A Third-Party Beneficiary Claim For PAA Indemnification..... 51

A. The Trial Court Correctly Determined That Cotter Lacked Standing To Assert A Third-Party Beneficiary Claim ............ 51

B. The Trial Court Correctly Held That Cotter Failed To State A Claim As A Third-Party Beneficiary Of Mallinckrodt's Contract Because Cotter's Liability Did Not Arise Out Of Or In Connection With Mallinckrodt's Contract..................... 56

CONCLUSION ........ 61

## TABLE OF AUTHORITIES

### CASES

*Bartels v. United States*,
617 F.3d 1357 (Fed. Cir. 2010) ....................................................................48

*Bedroc Ltd. v. United States*,
541 U.S. 176 (2004)..........................................................................................44

*Bituminous Coal Operators' Ass'n, Inc. v. Connors*,
867 F.2d 625 (D.C. Cir. 1989).........................................................................59

*Bostock v. Clayton County, Ga.*,
140 S. Ct. 1731 (2020).......................................................................................48

*Clark v. Rameker*,
573 U.S. 122 (2014)..........................................................................................27

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1983)..........................................................................................26

*Doyle v. United States*,
129 Fed. Cl. 147 (2016)....................................................................................56

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*,
438 U.S. 59 (1978).......................................................................................... 5-6

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005)..........................................................................................48

*Flexfab, LLC v. United States*,
424 F.3d 1254 (Fed. Cir. 2005) ......................................................................52

*Flynn v. Tiede-Zoeller, Inc.*,
412 F. Supp. 2d 46 (D.D.C. 2006)....................................................................59

*G4S Tech. LLC v. United States*,
779 F.3d 1337 (Fed. Cir. 2015) .....................................................................51

*German Alliance Ins. Co. v. Home Water Supply Co.,*
226 U.S. 220 (1912).....................................................................................51

*Glass v. United States*,
258 F.3d 1349 (Fed. Cir.), 273 F.3d 1072 (Fed. Cir. 2001) ...............................51

*Gutierrez v. Ada*,
528 U.S. 250 (2000).....................................................................................43

*In re Cotter Corp, (N.S.L.),*
22 F.4th 788 (8th Cir. 2022) .........................................................................22

*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303 (1961).....................................................................................43

*Kiick v. Metro. Edison Co.*,
784 F.2d 490 (3rd Cir. 1986) .........................................................................31

*Loc. 1303-362 of Council 4 v. KGI Bridgeport Co.*,
No. 3:12 CV 1785 AWT, 2013 WL 4735584 (D. Conn. Sept. 3, 2013)........ 56-57

*Maracich v. Spears*,
570 U.S. 48 (2013)................................................................................. 42, 43

*McClurg et al. v. Mallinckrodt, Inc.*,
No. 4:12-cv-00361-AGF (E.D. Mo.) (Aug. 16, 2017) ........................................ 2

*Milner v. Dep't of Navy,*
*562* U.S. 562 (2011).....................................................................................48

*Montana v. United States*,
124 F.3d 1269 (Fed. Cir. 1997) .....................................................................52

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995).....................................................................................42

*NVT Techs., Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004) ....................................................................54

*Regions Hosp. v. Shalala*,
522 U.S. 448 (1998)........................................................................................26

*San Carlos Irrigation & Drainage Dist. v. United States*,
877 F.2d 957 (Fed. Cir. 1989) ......................................................................56

*Schneider Moving & Storage Co. v Robbins*,
466 U.S. 364 (1984)................................................................................ 59, 60

*Sullivan v. McDonald*,
815 F.3d 786 (Fed. Cir. 2016) ......................................................................27

*United States Nat. Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439, (1993)......................................................................................26

*United Steelworkers of Am. AFL-CIO-CLC v. Rawson*,
495 U.S. 362 (1990).................................................................................. 59-60

*WestRock Va. Corp. v. United States*,
136 Fed. Cl. 267 (2018)..................................................................................43

**STATUTES**

42 U.S. C. 2012(i) ...............................................................................................5

42 U.S.C. 2014(q) .................................................................................................6

42 U.S.C. 2014(w) ................................................................................................6

42 U.S.C. § 2210 ...................................................................................................5

42 U.S.C. § 2210(a) ..............................................................................................7

42 U.S.C. § 2210(c) (1958)....................................................................................6

42 U.S.C. § 2210(d) ..............................................................................................7

42 U.S.C. § 2210(d)(1)(A) (2006) ....................................................................7

Pub. L. 79-585 § 2, 60 Stat. 755 (1954)....................................................................4

Pub. L. 83-703, 68 Stat. 919 (1954)........................................................................4

Pub. L. 85-256 § 170(a)-(d), 71 Stat. 576 (1957) .......................................... 6, 7, 24

Pub. L. 87-615 § 5, 76 Stat.409 (1962)...................................................................21

Pub. L. 93-438, 88 Stat. 1233 (1974).......................................................................5

Pub. L. 95-91§§ 201, 301, 703, 91 Stat. 565, 569, 577-78, 606 (1977)....................5

Pub. L. 100-408, § 4(a), 102 Stat. 1066, 1068 (1988) .............................................7

**RULES**

Fed. R. App. P. 32(a) (5) and (6) ..........................................................................64

Fed. R. App. P. 32(a)(7)(B)(iii) ..............................................................................64

Fed. R. App. P. 32(f)...............................................................................................64

Fed. Cir. Rule 28(f)................................................................................................ 40

Fed. Cir. Rule 47.5(b) .............................................................................................. 1

RCFC 12(b)(1) ........................................................................................ 17, 53, 61

RCFC 12(b)(6) ........................................................................................ 17, 53, 61

**REGULATIONS**

48 C.F.R. § 952.250-70 (2016) ..............................................................................7

## STATEMENT OF RELATED CASES

We are not aware of any related case as defined in Rule 47.5(b) of the Rules of the United States Court of Appeals for the Federal Circuit.

## STATEMENT OF THE ISSUES[1]

1. Whether this Court should affirm the dismissal of Cotter's complaint given that Cotter failed to state a claim for statutory indemnification pursuant to the Price Anderson Act (PAA) based upon a contract between Mallinckrodt Chemical Works (Mallinckrodt) and the United States Atomic Energy Commission (AEC) (the Mallinckrodt Contract) when Cotter does not meet the PAA's definition of a "person indemnified" and its mere downstream ownership and possession of residual radioactive material resulting from Mallinckrodt's Contract does not entitle it to indemnification.

2. Whether this Court should affirm the dismissal of Cotter's third-party beneficiary claim given that Cotter lacked standing and failed to state a claim because it was not an intended beneficiary of Mallinckrodt's Contract and never sought indemnification from the United States before filing suit in the United States Court of Federal Claims (CFC or trial court).

---

[1] We present our Statement of the Issues and Statement of the Case here because our view of the key issues and facts differ from those presented by Cotter.

## STATEMENT OF THE CASE SETTING OUT RELEVANT FACTS

In 2012, Cotter was sued in the United States District Court for the Eastern District of Missouri by approximately 500 plaintiffs who alleged that, starting in the late 1960s, Cotter's reckless, negligent, and grossly negligent mishandling of radioactive material that it owned resulted in the public being exposed to that radioactive material. *See McClurg et al. v. Mallinckrodt, Inc.*, No. 4:12-cv-00361-AGF (E.D. Mo.); Appx1289-1324 (*McClurg* complaint); Appx1341-1370 (*McClurg* second amended complaint). Cotter's alleged activities included, for instance, the dumping of its radioactive waste in a public landfill, from which the material eventually leached into nearby creeks and rivers in the St. Louis area. The *McClurg* plaintiffs allege that their exposure to Cotter's radioactive material resulted in various forms of cancer and, in some instances, death.

In September 2018, Cotter settled the *McClurg* claims through a payment to the plaintiffs. In its complaint filed in the CFC, Cotter claimed that it should be indemnified by the United States under the PAA for its costs in settling the *McClurg* litigation based on the fact that Cotter's radioactive material was residual material resulting from a nuclear defense contract between the United States and an unrelated company, Mallinckrodt. Cotter sought indemnification from the United States notwithstanding that it: (1) had no contractual relationship with Mallinckrodt; (2) did not perform any services to further the contract with Mallinckrodt; (3) did not obtain

its radioactive material from either the United States or Mallinckrodt, but instead was a downstream purchaser of the material for its own private business undertakings, through purchase agreements that contained no Government indemnification; (4) transported and disposed of the material at places other than site of Mallinckrodt's contract performance; and (5) allegedly handled materials in a way that resulted in the release of radionuclides into the surrounding environment. Cotter's unique theory of PAA liability rests upon a claim that PAA indemnification runs with radioactive material, and if a PAA indemnification agreement ever in the past could have provided indemnification for liabilities caused by that material, the United States is forever responsible for any harm to the public resulting from the material regardless of who subsequently owns the material or when or why the harm occurred.

As the trial court correctly found in dismissing Cotter's complaint, Cotter misreads the PAA. As an entity that did not work under, in support of, in connection with, or at the site of an AEC weapons production contract for the benefit of the United States, Cotter does not meet the definition of a person that has a right to indemnification (a "person indemnified") under the PAA. *See* Appx816. The PAA's indemnification provisions do not create open-ended Government liability for any and all owners of radioactive material that resulted from a Government contract that contained a PAA indemnification agreement. Instead, the PAA

provides indemnification where a claimant has a nexus with a contract undertaken for the benefit of the United States. Cotter can show no such nexus with Mallinckrodt's Contract, and its mere later ownership and possession of radioactive material that resulted from that Contract is too tenuous a thread to entitle it to PAA indemnification either directly or as an alleged third-party beneficiary.

Therefore, as the trial court correctly held, Cotter failed to state a claim pursuant to the PAA, or as an alleged third-party beneficiary of Mallinckrodt's Contract. Moreover, having never presented a claim for indemnification to the United States prior to filing its complaint in the CFC, Cotter lacks standing to assert a third-party beneficiary claim for the breach of the Mallinckrodt Contract's indemnification provisions. This Court should affirm the dismissal of Cotter's complaint.

## I. Statement Of Facts

### A. The Regulatory Framework

#### 1. The Atomic Energy Act; AEC; And The Establishment Of The Department Of Energy And The Nuclear Regulatory Commission

The Atomic Energy Act of 1946, Pub. L. 79-585, § 2, 60 Stat. 755, 756, established the AEC. The Atomic Energy Act (AEA) of 1954, Pub. L. 83-703, 68 Stat. 919, substantially revised the Atomic Energy Act of 1946. Although the AEA

has been amended repeatedly, the overall structure of the 1954 Act remains the central statutory framework in the field.

The AEC was abolished with the enactment of the Energy Reorganization Act of 1974. Pub. L. 93-438, § 104(a), 88 Stat. 1233, 1237. Congress provided for this change, in part, because "it is in the public interest that the licensing and related regulatory functions of the [AEC] be separated from the performance of the other functions of the [AEC][.]" Pub. L. 93-438, § 2(c). The Energy Reorganization Act established in the AEC's place the Energy Research and Development Administration (ERDA) and the Nuclear Regulatory Commission (NRC). Pub. L. 93-438, §§ 101, 201. Congress "transferred to the [NRC] all the licensing and related regulatory functions of the [AEC]." Pub. L. 93-438, § 201(f). In 1977, Congress established the Department of Energy (DOE), to which were transferred, among other things, ERDA's functions. Pub. L. 95-91, §§ 201, 301, 703, 91 Stat. 565, 569, 577–78, 606; Appx30 ¶ 35.

### 2. <u>The Price-Anderson Act</u>

The PAA was a 1957 amendment to the AEA. It was enacted for the dual purpose of "protect[ing] the public and encourag[ing] the development of the atomic energy industry." § 1, 71 Stat. 576 (42 U.S. C. 2012(i)) (current version at 42 U.S.C. § 2210); *see also* Appx22 ¶ 1. Congress added the indemnification provisions to incentivize private industry's participation in the nuclear field. *See, e.g., Duke Power*

*Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 63–64 (1978). The indemnification provisions added by the PAA distinguished between two groups of potential indemnitees: licensees and contractors. *See* Pub. L. No. 85-256 § 170(a)-(d). This distinction remains today.

With respect to *licensees*, the PAA provided that certain AEC licensees were required to obtain financial protection, and other licensees could be required to obtain private financial protection. Pub. L. No. 85-256 §170(a). And if financial protection was required (either statutorily or in AEC's discretion), then an indemnification agreement would also be required. In these cases, the PAA required the Government to indemnify its licensees for "public liability" from a "nuclear incident" above the amount of any required financial protection. *See* 42 U.S.C. § 2210(c) (1958).[2]

With respect to AEC *contractors,* however, indemnification was authorized but not required, and requiring a contractor to obtain private financial protection was, as

---

[2] A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. 2014(q). "Public liability" is defined (with exceptions not relevant here) as any legal liability arising out of or resulting from a "nuclear incident." 42 U.S.C. 2014(w).

the PAA existed in 1962, in the discretion of AEC even if indemnification was provided. Pub. L. No. 85-256 at § 170(d).[3]

The PAA's indemnification provisions have been revised over time, but this general distinction between indemnification for licensees and contractors remains. *Compare* 42 U.S.C. § 2210(a), (c) *with* 42 U.S.C. § 2210(d).

With the separation of AEC's functions into the NRC and DOE in the 1970s, NRC is responsible for the indemnification of licensees (when they are granted indemnification), and DOE is responsible for indemnification of its contractors. DOE provides its indemnification through "agreements of indemnification," 42 U.S.C. § 2210(d), which is accomplished through standardized language in its contracts. *See* 48 C.F.R. § 952.250-70 (2016).

---

[3] In 1988, Congress amended the PAA to make contractor indemnification mandatory instead of discretionary. *See* Pub. L. 100-408, § 4(a), 102 Stat. 1066, 1068 (1988). Thus, the current codified version requires that the Secretary enter into indemnification agreements with those who "conduct activities under a contract" with DOE that involve the risk of public liability. *See* 42 U.S.C. § 2210(d)(1)(A) (2006). Therefore, although the phrase "for the benefit of" was discontinued, the statute still links DOE's indemnification authority with a requirement that entities indemnified conduct activities under a DOE contract.

## B. Mallinckrodt Entered Into A Contract With AEC To Process Uranium In The St. Louis Area

### 1. The Initial Agreements

In April 1942, Mallinckrodt entered into an agreement with the University of Chicago to produce "a special oxide." *See* Appx39-40; Appx25 ¶ 12. Several months later, this contract was merged with a contract between Mallinckrodt and the United States War Department. *See* Appx41-64. This contract called for Mallinckrodt to operate two Government-owned plants and to produce specific quantities of secret products (refined uranium) to be derived from a Government product. *See* Appx44-45; Appx25 ¶ 13.

Mallinckrodt processed uranium under the contract in a facility in downtown St. Louis, Missouri (the St. Louis Downtown Site or SLDS). Appx25 ¶ 14. The raw material provided to Mallinckrodt for processing, the processed uranium, and the by-product material from the processing were all, while in Mallinckrodt's possession, owned by the United States. *See id.*; Appx156-157 ¶ 2(a); Appx541 Art. III(G)(1).

On January 1, 1946, Mallinckrodt and the United States entered into Supplemental Agreement (SA) No. 1, (Contract No. W-14-108-Eng-8) (the Mallinckrodt Contract). *See* Appx67-68; Appx23-24 ¶ 5. Thereafter, the parties entered into a long series of supplemental agreements, with the last one executed in August 1966. *See* Appx814-815. While most of the supplemental agreements

addressed the production of increased quantities of material or changes in pricing, certain agreements presented substantive changes.

First, as acknowledged by SA 10, the Contract with the War Department was transferred to AEC by executive order in December 1946. *See* Appx96.

With the continued processing of uranium material in the post-war period, Mallinckrodt began transporting radioactive residue material from the SLDS to a site near the St. Louis Airport (the St. Louis Airport Site or SLAPS). Appx25 ¶ 15. By the late 1950s, several thousand tons of radioactive material had been accumulated at SLAPS. *Id.*

**2. <u>SA No. 45</u>**

In September 1950, the parties agreed to SA 45. SA 45 required that, with respect to a claim for indemnification involving personal injury caused by radioactivity, Mallinckrodt must "promptly" give the AEC "written notice" of any claim and "any proceeding or lawsuit in connection with such claim." Appx250, Appx286-288 Art. III-E(1) and (3). SA 45 also required Mallinckrodt to "furnish promptly to the Commission copies of all pertinent papers . . . with respect to any such claim[.]" Appx287. It also required Mallinckrodt, upon AEC's request, to "authorize representatives of the Government to settle or defend any such claim, proceeding or lawsuit and to represent the Contractor in, or take charge of, any such proceeding or lawsuit[.]" *Id.*

**3. SA No. 81**

In January 1953, SA 81 was put into effect. Appx503. SA 81 required that Mallinckrodt transport "all residues which are or may be by-products of the operations under this contract," to facilities at the SLAPS. Appx507 Art. I-A (7)(b). SA 81 again noted Mallinckrodt's obligation to promptly notify the Government if it faced any lawsuit involving radioactive material. *See* Appx533-532 Art. III-E(3).

**4. SA No. 115**

SA 115 went into effect on January 1, 1956. Appx679. This SA reiterated Mallinckrodt's obligation to provide the contracting officer with "immediate notice" of any actions filed against Mallinckrodt and to provide AEC with all pertinent papers connected with such action. Appx711-712 Art. XIV(2). SA 115 allowed Mallinckrodt to settle any such action or claim but only "with the Contracting Officer's approval." Appx712.

**5. SA No. 124**

In August 1962, Mallinckrodt and AEC entered into SA 124. Appx780-785. The purpose of the supplement was to add, pursuant to the authority of AEA Section 170, "certain provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents." Appx780. SA 124 further provided that the definitions set forth in the updated 1962 PAA applied to the new indemnification provision and set forth the newly incorporated

indemnification provisions, including, most importantly here, the provisions in paragraphs 3 and 4. *See* Appx781-783 ¶¶ 3-4. Specifically, SA 124 provided that Mallinckrodt and "any other person indemnified" will be indemnified by AEC against claims for public liability and "the reasonable costs of investigating and settling claims and defending suits for damages for such liability" under Section 170 of the PAA. Appx781 ¶ 3(a).

### C. AEC Sold The Radioactive Material Located At The SLAPS To Continental Mining

In February 1966, AEC sold the radioactive residual material located at the SLAPS to Continental Mining & Milling Company (Continental). Appx27 ¶ 21; Appx1289, Appx1309 ¶ 42; Appx1106-1113. AEC's Bill of Sale stipulated the material was sold "as is" and AEC did not warrant that the materials "will not result in injury or damage when used for any purpose." Appx1107 ¶3. The Bill of Sale also: (1) required Continental to obtain a license; (2) passed title of the radioactive material to Continental; (3) gave Continental full responsibility for the material's care and custody; and (4) stated that there were no other agreements or understandings of any kind between the parties. *See* Appx1107-1108 ¶¶ 3, 8, 10, 11. Soon thereafter, Continental began transporting the material at SLAPS to 9200 Latty Avenue, Hazelwood, Missouri (Latty Avenue). Appx27 ¶ 21.

### D. Commercial Discount Took Ownership And Possession Of The Material

In early 1967, Commercial Discount Corporation (Commercial Discount), as creditor to Continental, foreclosed on Continental's assets, including the radioactive material located at Latty Avenue. Appx1309 ¶ 43.

### E. Cotter Purchased The Radioactive Material From Commercial Discount, Maintained The Latty Avenue Site, Transported Most Of The Material To Colorado, And Disposed Of Some Of The Material In A St. Louis Landfill

Between 1967 and 1969, pursuant to an initial sales agreement between Commercial Discount and Cotter, some of the radioactive material was transported to a Cotter facility in Colorado. Appx27 ¶ 22. In 1969, Commercial Discount sold the remaining radioactive materials at Latty Avenue to Cotter. *Id.*; Appx1309 ¶ 44; Appx1128-1140. In connection with that sale and Cotter's ownership and possession of the radioactive material, Cotter applied to AEC for a Source Material License, so that it could continue its operations at Latty Avenue. *See* Appx1141-1144.

On December 30, 1969, pursuant to Section 63 of the AEA, AEC issued Cotter a Source Material License. *See* Appx1145-1146; AEA § 63. AEC's license only authorized the use of the source material by Cotter at Latty Avenue. *See* Appx1146. Between July and October 1973, Cotter arranged for the transportation of some of its radioactive material at Latty Avenue to the West Lake Landfill in Bridgeton, Missouri. Appx27 ¶ 23; Appx31-32 ¶ 41; Appx1309-1310 ¶ 45.

By the end of 1973, Cotter had stopped its operations at Latty Avenue. Appx27-28 ¶ 24. In November 1974, at Cotter's request, AEC terminated Cotter's source material license. *Id.*

### F. Cotter Was Acquired By Commonwealth Edison, Which Sold Cotter To General Atomics, With Commonwealth Edison Agreeing To Indemnify Cotter For Any Liability Related To The West Lake Landfill And Latty Avenue Sites

Cotter has existed as a uranium production company since its incorporation in 1956. *See* https://www.ga.com/affiliated-companies. Its ownership, however, has changed over time. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison (ComEd) in 1975. Appx1299 ¶ B.5. *See also* https://www.ga.com/affiliated-companies. ComEd, in turn, became a subsidiary of Exelon Corporation (Exelon). *See, e.g.*, https://www.exeloncorp.com/companies. ComEd sold Cotter to General Atomics in early 2000. Appx1299 ¶ B.5; *see also* https://www.ga.com/affiliated-companies. As part of that sale, ComEd agreed to indemnify Cotter for any liability costs arising from Cotter's activities at the West

Lake Landfill and Latty Avenue sites.[4] Cotter's current parent company is General Atomics Uranium Resources, LLC. *See* ECF No. 4 at 2.[5]

### G. The McClurg Litigation

Between February 2012 and 2018, Cotter was a defendant in tort litigation related to its alleged release of its radioactive material in St. Louis County, Missouri. *See* Appx23 ¶ 4; Appx30-34 ¶¶ 36-52; Appx1289-1324; Appx1341-1370.

---

[4] ComEd's indemnification obligations with respect to Cotter are noted in Exelon's 10K filings:

> In 2000, ComEd sold Cotter to an unaffiliated third-party. As part of the sale, *ComEd agreed to indemnify Cotter for any liability arising in connection with the West Lake Landfill.* In connection with Exelon's 2001 corporate restructuring, this responsibility to indemnify Cotter was transferred to Generation [Constellation Energy Generation LLC].

Appx1379, Appx1380 (emphasis added). Constellation Energy Generation LLC is identified as "Generation" at page 1 of Exelon's Form 10-K under Glossary of Terms and Abbreviations. *See* *https://www.sec.gov/Archives/edgar/data/27879/000110935722000039/exc-20211231.htm#i0fa971ac9e834218957059819155291f_139*).

[5] Cotter's complaint does not acknowledge the indemnification that it or its owners appear to have received or the effect of that indemnification given the provisions of SA 124 at ¶ 3(a). Appx781. These provisions only provided for indemnification against public liability claims "[t]o the extent that the Contractor and any other person indemnified are not compensated by any financial protection permitted or required by the Commission." Appx781 ¶3(a).

Specifically, in *McClurg*, plaintiffs alleged that they suffered radiation exposure injuries (including cancer and death) caused by Cotter's "reckless, negligent, and/or grossly negligent" handling of radioactive material. Appx23 ¶ 4; Appx30 ¶ 36; *See* Appx1325-1340, Appx1330; Appx1289-1324; Appx1341-1371. Cotter's allegedly improper handling of radioactive material "which proximately caused the *McClurg* plaintiffs to be exposed to the radioactive residue material" occurred over four years, from 1969 until 1973. Appx31-32 at ¶ 42; Appx1341-1371.

According to the *McClurg* plaintiffs, Cotter undertook improper activities that contaminated the air, soil, and surface and ground water near the location in North St. Louis County where Cotter processed the radioactive material (the Latty Avenue site), and where Cotter disposed of a portion of that material (the West Lake Landfill site). Appx1341-1371. *See also* Appx31-32 ¶ 42. Specifically, among other things, the *McClurg* plaintiffs alleged that:

> In 1969, the remaining hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to [Cotter] . . . . During the relocation of waste material, improper handling and transportation from the SLAPS to the Latty Avenue Sites, caused contamination to spread along haul routes. Improper storage exacerbated the contamination and caused adjacent properties (the SLAPS and the Latty Avenue Vicinity Properties (VPs)) to be contaminated.

Appx1361-1362 ¶¶ 50, 53.

> In 1973, Cotter disposed of approximately 47,700 tons of soil mixed with uranium ore processing residues, including leached barium sulfate, uranium, and thorium, into the

> West Lake Landfill. This radiologically contaminated soil was routinely used as cover for municipal wastes and other landfill operations.

Appx1362 ¶ 51. *See also* Appx1362-1363 ¶¶ 56-57 (noting DOE investigation confirming widespread radioactive contamination at the North St. Louis County Sites); Appx1364-1365 ¶¶ 64-66 (noting that Cotter's "negligent, grossly negligent, and reckless releases occurred in various ways, including through direct and indirect discharges of radioactive and toxic materials into public water bodies, such as Coldwater Creek, the exposure of workers to these materials . . . and the improper disposal of hazardous, toxic, and radioactive materials").

In March 2013, the McClurg court summarized the plaintiffs' radiation-related counts, noting that Cotter's conduct exposed plaintiffs to radioactive material causing "various forms of cancer, with some Plaintiffs having died as a result." Appx1330. *See also* Appx31 ¶ 39; Appx1360-1362 ¶¶ 45-53; Appx1364-1365 ¶¶ 65-68.

Cotter does not allege (nor could it) that it presented the information and documents connected with McClurg lawsuit to DOE, or that it tendered the litigation for DOE indemnification or representation. Instead, Cotter merely states that the McClurg Court sought DOE's involvement in settlement discussions. Appx33 ¶¶ 46-47.

In September 2018, Cotter and the McClurg plaintiffs entered into a settlement agreement to resolve the public liability claims. Appx33 ¶ 48. In the CFC, Cotter

alleges that it is entitled to an indemnification payment of $14,961,418 for its attorney fees, litigation-related expenses, and settlement costs. Appx22 and Appx33-36 ¶¶ 48-52, 59, 74.

## II. Course Of Proceedings Below

Cotter filed its complaint in the CFC on April 11, 2022, asserting statutory indemnification claims pursuant to the PAA and third-party beneficiary claims.

On March 3, 2023, the trial court dismissed Cotter's complaint pursuant to Rules 12(b)(1) and 12(b)(6). *See* Appx3-17. The trial court determined that Cotter's private, commercial use of its radioactive material was not undertaken in furtherance of or in a nexus with Mallinckrodt's Contract, and thus, without a relationship to that Government contract, Cotter did not establish a viable indemnification claim pursuant to PAA Section 170(d). Appx10-13. It further determined that the mere possession of radioactive material that resulted from a contract involving the United States was an insufficient causal sequence to establish a claim for PAA indemnification. Appx13. Moreover, the trial court determined that Cotter lacked standing to present a claim as a third-party beneficiary because the Mallinckrodt Contract incorporated the PAA's indemnification provisions, which do not provide for indemnification where there is no nexus between the claimant and a contract for the benefit of the United States. Appx14-16. Finally, the trial court determined that, prior to filing suit, Cotter never presented a claim for indemnification and thus the United States never denied

its indemnification claim. Appx16-17. The trial court concluded, therefore, that because Cotter did not allege that the United States ever refused any claim presented by Cotter for indemnification, it did not sufficiently allege a third-party beneficiary claim for a breach of the Mallinckrodt Contract's indemnification provisions. Appx17.

## SUMMARY OF THE ARGUMENT

Cotter's appeal rests upon two untenable claims. First, Cotter claims that it falls under the definition of a "person indemnified" insofar as that is defined as "the person with whom an indemnity agreement is executed and any other person who may be liability for public liability." Appx816. Cotter claims to be "any other person" in this definition given that it faced liability arising from a nuclear incident. Based on this status, Cotter claims that it is entitled to PAA indemnification.

Second, although Cotter argues that no connection with a contract for the benefit of the United States is necessary for it to obtain PAA indemnification, it also argues that it nonetheless possesses a sufficient connection to Mallinckrodt's Contract for purposes of PAA indemnification given that Cotter's residual material had been created as a result of Mallinckrodt's Contract. According to Cotter, its downstream purchase of the radioactive material from a third party created all the connection with Mallinckrodt's Contract needed for Cotter to claim its entitlement to PAA indemnification directly under the statute and as a third-party beneficiary.

Cotter's arguments fail because the notion of a person indemnified pursuant to Section 170(d) requires that a claimant have *some* nexus to a contract for the benefit of the United States. As a downstream purchaser of radioactive material from a third party, and as an entity with no connection to Mallinckrodt's Contract, Cotter cannot meet this test. Furthermore, Cotter's mere possession of radioactive material that resulted from Mallinckrodt's Contract is not a sufficient connection to the Contract to entitle Cotter to PAA indemnification.

In *McClurg*, Cotter settled claims concerning its alleged reckless and grossly negligent handling and disposal of ***its*** radioactive material. The responsibility for the costs of settling claims concerning Cotter's private actions and public liability lie with Cotter, not the United States.

## ARGUMENT

### I. Cotter Is Not Entitled To PAA Indemnification Because Its Underlying Private Commercial Activity Did Not Have A Nexus To An Atomic Weapons Program Contract Between Mallinckrodt And The United States

#### A. The Court Properly Rejected Cotter's Argument That It Need Not Have A Nexus With A Contract For The Benefit Of The United States

The trial court properly dismissed Cotter's complaint seeking PAA indemnification for its *McClurg* settlement costs. As a matter of statutory interpretation, Cotter cannot be considered a person indemnified under Mallinckrodt's Contract. Cotter undertook no work for Mallinckrodt or AEC; it was

not in any contractual relationship with either; and it came into possession of residual radioactive material (resulting from work under Mallinckrodt's Contract) through a private, downstream purchase from Commercial Discount. Ostensibly then, Cotter had no connection with Mallinckrodt's Contract and its embedded PAA indemnification agreement. Thus, Cotter is not a "person indemnified" pursuant to Section 170(d), even under the broader ("any other person who may be liable") component of that term. Cotter's theory of PAA indemnification, whereby the Government's indemnification liability is tied without limitation to radioactive material, irrespective of any nexus between a claimant's activities or public liability and a contract for the benefit of the United States, does not comport with the statute and was properly rejected by the trial court.

Cotter restates its theory to this Court, which rests upon the premise that, under the PAA, Cotter's mere possession of radioactive material (now referenced as a "nuclear hazard") leaves the Government responsible for any public liability Cotter faces involving that material.

To begin, Cotter concedes that for a claimant to invoke PAA indemnification under Section 170(d), a contract with the Government must have been in place – at least by someone – through which an indemnification agreement arose. Cotter Br. 21-22. Here, even though Cotter has no apparent connection with Mallinckrodt's Contract, it invokes that Contract as the source of its purported right to PAA

indemnification. Cotter Br. 18-19. Cotter argues that "the existence of such an agreement triggers the government's indemnity obligations to all 'the persons indemnified' in the agreement." *Id*., at 19.

And Cotter argues that it is a "person indemnified" under Mallinckrodt's Contract given its interpretation of the statutory definition of that phrase. The PAA defines a "person indemnified" as "'the person with whom an indemnity agreement is executed and *any other person* who may be liable for public liability' for incidents within the United States." Appx11 (citing Pub. L. No. 87-615, §5 (1962)); *see also* Appx824 § 2014(r). Cotter argues that the definition of "persons indemnified" broadly encompasses "'*any* [] person' (person indemnified) with '*any* legal liability' to the public'" irrespective of that person's connection with a contract for the benefit of the United States. Cotter Br. 19. Cotter argues that as long as there is one party with an indemnification agreement, then that "agreement extends protection to '*any other person*' with public liability covered thereunder – even if such 'other person' has no contractual relation with the government or the indemnified contract." Cotter Br. 29. In support of this position, Cotter cites to a Senate Report, whose language, as the trial court correctly noted, "is absent from the PAA itself." Appx12.

Given Cotter's argument that a PAA claimant need not show a contractual relationship with a contract for the benefit of the United States, Cotter argues that,

once radioactive material has been created pursuant to a contract involving a PAA indemnification agreement, it is an entity's mere status of being sued for public liability pertaining to that material that renders it a "person indemnified." Cotter Br. 22. Thus, Cotter argues that its status as a corporation that has been sued for public liability in *McClurg* renders it "a 'person indemnified' ***because*** it was sued for public liability" resulting from a nuclear incident. *Id*. (emphasis added).[6] Cotter concludes that, when an entity is sued for public liability resulting from radioactive material that had been – at any point in time – within the scope of a PAA indemnification agreement, it is the status of facing liability that renders that entity a "person indemnified." *Id*.

Therefore, instead of acknowledging the requirement of a connection to a contract for the benefit of the United States, Cotter argues that all "any person" must show is a causal or logical *"connection to a nuclear hazard* created by the original contract work." Cotter Br. 19 (emphasis added). That is, Cotter reworks the requirement of Section 170(d) from one where a claimant must have a connection *to*

[6] Cotter cites to *In re Cotter Corp, (N.S.L.)*, 22 F.4th 788, 791, 793-94 (8th Cir. 2022), apparently suggesting that it supports Cotter's claim that it is a "person indemnified" because it faced public liability for a nuclear incident. Cotter Br. 22. But any such suggestion would be incorrect. *In re Cotter* pertained to a determination of Federal subject matter jurisdiction under the PAA when there is an alleged nuclear incident caused by a party (here, Cotter) that does not have an applicable indemnification agreement; it did not resolve whether Cotter is a "person indemnified." *See Cotter*, at 793-96.

*a contract* for the benefit of the United States, to one where a claimant merely needs a connection *to a nuclear hazard* (*i.e.*, radioactive material) created by the original contract work. *Id.* Cotter's reconfiguration of Section 170(d) thus posits that the only critical connection required by a PAA claimant is a connection to radioactive material.

Cotter's argument fails because it misreads the PAA's definition of a "person indemnified" as that term is situated within the context of Section 170(d). By focusing on the uncontextualized phrase "any other person who may be liable for public liability," Cotter argues that it is a "person indemnified" entitled to indemnification (under Mallinckrodt's Contract). *See* Cotter Br. 19-20, 29; Appx816; Appx901. Cotter is incorrect. As the trial court recognized, "Cotter latches onto 'any other person' in this definition to argue certain contracts or relationships were not required to obligate government indemnification," an argument the trial court concluded was "unavailing." Appx11. As the trial court correctly held, for an entity to be considered a "person indemnified," Section 170(d) requires a nexus between that entity and a contract for the benefit of the United States. *See* Appx11-12.

Cotter's error starts with its disregard in Section 170(d)'s coupling of PAA indemnity authorization and obligations to contractual activity for the benefit of the United States. The statute states:

> [T]he Commission is authorized . . . to enter into agreements of indemnification ***with its contractors*** for the construction or operation of production or utilization facilities or other activities ***under contracts for the benefit of the United States*** involving activities under the risk of public liability for a substantial nuclear incident. ***In such agreements of indemnification*** the Commission *may* require ***its contractor*** to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover *public liability* ***arising out of or in connection with the contractual activity***, and shall indemnify *the persons indemnified* against *such claims* above the amount of the financial protection required, in the amount of $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified ***in connection with such contract*** and for each nuclear incident.

Pub. L. 85-256, 71 Stat. 576, §170(d) (Appx817) (emphasis added).

Section 170(d) has two sentences. The first sentence authorizes the AEC to enter into indemnification agreements to cover activities involving the risk of public liability undertaken pursuant to contracts for the benefit of the United States. The second sentence provides that, where such indemnification agreements have arisen, the persons indemnified pursuant to those agreements will be indemnified above the amount required, if any, of financial protection needed to cover the costs of public liability arising out of or in connection with the contractual activity undertaken for the benefit of the United States. Thus, both sentences' provisions – pertaining to

PAA authorization and the boundaries of PAA indemnification – tie directly to a contract for the benefit of the United States.

As the trial court correctly recognized, "[t]he first sentence of Section 170(d) plainly emphasizes the importance of government contractors and a contractual relationship," specifically involving activities undertaken through "contracts for the benefit of the United States." Appx10. It further noted, "[t]he inclusion of 'activities' is always couched in relation to the AEC's contractors or those operating 'under contract.'" *Id.* (citing §170(d)). Moreover, it noted that "[t]he Commission's authority to enter into indemnification agreements is presented within the context of a contractual activity that benefits the government's nuclear program." *Id.* The trial court also noted that Section 170(d) provides that AEC may require its contractors to have financial protection, and that the Government will indemnify these "'*persons indemnified* against such [public liability claims] above the amount of the financial protection required . . . for all persons indemnified *in connection with such contract* and each nuclear incident.'" Appx11 (citing §170(d)). Thus, the trial court correctly held that "the statutory language itself explicitly underscores the importance of a contractual relationship." Appx11.

But Cotter's interpretation of the phrase "any other person who may be liable for public liability" is divorced from the PAA's overall statutory scheme, violating a foundational cannon of statutory interpretation. As the trial court recognized, the

meaning of "persons indemnified," including the phrase "any other person who may be liable for public liability," "'must be read in their context and with a view to their place in the overall statutory scheme.'" Appx11 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1983)). *See also Regions Hosp. v. Shalala*, 522 U.S. 448, 460 n.5 (1998) ("the Court has said '[o]ver and over': "'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting *United States Nat. Bank of Ore. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, (1993)).

Here, Cotter's interpretation of the phrase "any other person who may be liable for public liability" ignores and renders meaningless the critical passages of the statute requiring a connection or nexus to a contract for the benefit of the United States. Cotter posits a free-floating "person indemnified" that requires no causal connection to activity on a Government contract. Thus, it argues that PAA indemnity "is *not* restricted to persons who perform *activities* under or with a *causal* connection to activity on a government Contract." Cotter Br. 21. Indeed, Cotter argues that the phrase "persons indemnified" as used in Section 170(d) includes anyone with "'*any* legal liability" to the public for "'*any* [nuclear] occurrence within the United States," irrespective of "the specific activities or identity of the person

who causes the nuclear incident" and irrespective of the "time, place, or manner in which a domestic nuclear incident" occurs. Cotter Br. 19-20.

As the trial court held, Cotter's interpretation of a person indemnified ignores the first sentence of Section 170(d) which provides that PAA's authority to enter into indemnification agreements is limited to the context of contracts for the benefit of the United States. Appx10-11. And Cotter's interpretation would also render superfluous the language in the second sentence of Section 170(d) concerning the obligation of persons indemnified to provide, at AEC's option, financial protection to cover costs "in connection with" contracts for the benefit of the United States. Appx11. The Court is required, however, "'to give full effect to all words contained within [a] statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.'" Appx11 (quoting *Sullivan v. McDonald*, 815 F.3d 786, 790 (Fed. Cir. 2016)). *See also Clark v. Rameker*, 573 U.S. 122, 131 (2014).

Cotter posits that any references to obtaining financial protection in Section 170(d) is irrelevant to that Section's provisions providing indemnification to other "persons indemnified" (including "any other person"). *Id.*[7] But Cotter's argument

---

[7] Notably, Cotter's discussion of the second sentence ignores the provisions in Section 170(c) and (d) that AEC will only provide indemnification "above the amount of financial protection required," where it appears that here Cotter has obtained full indemnification from ComEd. *See above* at 14.

fails because the trial court's discussion concerning the second sentence of Section 170(d) was for the purpose of demonstrating that the right of a "person indemnified" to PAA indemnification is not untethered but has to be understood in the context of the overall statutory scheme whereby a PAA claimant has to show "some required nexus to contract activity as well as financial protections required by the AEC." Appx11.

Cotter also argues that it is significant that Section 170(d) provides that, in indemnification agreements, the Government *may* require its contractor to maintain financial protection, but that the Government *shall* indemnify "persons indemnified" above the amount of the financial protection. Cotter Br. 30-31. And Cotter concludes that because Congress has provided the indemnification benefit to persons indemnified (such as itself), Cotter need not demonstrate that it has met any nexus requirement with Mallinckrodt's Contract. *Id.* Cotter's argument, however, begs the question of whether it is a "person indemnified" in the first place. Properly viewed, the indemnification obligations that the Government *shall* provide pertain to "settling claims and defending suits . . . in connection with *such contract*." §170(d) (emphasis added). The Government's indemnification obligations necessarily tie to a "contract[] for the benefit of the United States involving activities under the risk of public liability." *Id.*

Cotter further argues that AEC did not require Mallinckrodt to obtain its own financial protection, and "[t]herefore, financial protection clearly cannot be a requirement of indemnity." Cotter Br. 31. Again, Cotter misses the point of the trial court's invocation of the provisions entitling AEC to require that the contractor obtain financial protection. The point is not that obtaining private financial protection is, *per se,* a requirement for PAA indemnity. Instead, it is that the claimant be subject to the AEA's right to require that the claimant obtain financial protection *ex ante*. This provision demonstrates that a claimant's right to indemnification is not a freely floating right but is tied to a contract with AEC (where AEC can demand a contractor provide financial protection).

Given that Cotter's interpretation of Section 170(d) disregards the context of PAA indemnity and renders superfluous passages of the statute that tie to a connection with "a contract for the benefit of the United States," the trial court rightly rejected Cotter's definition of "a person indemnified" that is untethered to a nexus to contractual activity for the benefit of the United States. *See* Appx11.

### B. The 1962 And 1975 Amendments With Respect To PAA Indemnification For Incidents Outside The United States Do Not Affect The PAA's Terms Requiring A Nexus With A Contract For The Benefit Of The United States For Incidents Occurring Within The United States

Cotter argues that the 1962 and 1975 amendments to the PAA demonstrate, by implication, that a claimant for PAA indemnification concerning an incident that

occurs within the United States need not be in privity or show a causal connection with a contract for the benefit of the United States. *See* Cotter Br. 20-21; 27-28; 34. Specifically, Cotter argues that the 1962 and 1975 PAA amendments changed the definition of a "person indemnified" and a "nuclear incident" with respect to incidents occurring outside the United States. Through these amendments, claimants seeking PAA indemnification for incidents outside the United States have to be in contractual privity (or be working directly under a person with contractual privity) with the United States and the incident must involve a facility or device owned by and used by or under contracts with, the United States. Cotter Br. 20 (citing Appx901 ¶ 4(o)). Cotter argues that, because these provisions concerning liability outside the United States were added to the existing PAA definitions of a "person indemnified" and "nuclear incident," it necessarily follows that these provision do not limit the scope of the pre-existing PAA indemnification regime concerning incidents within the United States. Cotter Br. 20-21; 27-28, 34. Cotter concludes that, because its claim pertains to a nuclear incident within the United States, it need not show that it was in privity with or had any causal connection to a contract for the benefit of the United States. *Id.*

Cotter's argument is a red herring. We have not asserted that contractual privity or a direct causal relationship is required for a claimant to seek PAA indemnification within the United States. Instead, our assertion is that a nexus is

required between a PAA claimant and a contract being undertaken for the benefit of the United States.[8]

Certainly, the trial court did not base its decision on such a paradigm, despite Cotter's claims to the contrary. *E.g.,* Cotter Br. 34 (claiming that "privity of contract . . . factored into the court's decision here."). Instead, the trial court recognized that Cotter had to at least meet the broader condition that it had a *nexus* with a contract for the benefit of the United States; *i.e.*, with the Mallinckrodt Contract. *See, e.g.*, Appx12 ("The Court determines that Section 170(d) required some nexus to a contractual relationship for the benefit of the Government."); *id.* (concluding that "there must be a relationship to contractual activity.").

Cotter's invocation of the 1962 and 1975 amendments do not affect the requirement under Section 170(d) that a claimant for PAA indemnification show a nexus with a contract for the benefit of the United States.

---

[8] The court has recognized that entities *assisting* in the performance of contracts that included PAA indemnification agreements are "persons indemnified." In this instance, there is a sufficient nexus between the claimants and a contract for the benefit of the United States. Specifically, with respect to the Three Mile Island litigation, entities who supplied "design, engineering, or maintenance services, or that were vendors of systems or equipment incorporated in the [nuclear power plant] facility," were each considered as "a 'person indemnified' as defined in the [PAA]." *Kiick v. Metro. Edison Co.*, 784 F.2d 490, 491 (3rd Cir. 1986).

### C. Cotter's Mere Possession Of Radioactive Material That Resulted From Mallinckrodt's Contract Does Not Satisfy The Necessary Condition Of A Nexus Between Cotter's Activities Or Public Liability And Mallinckrodt's Contract

Cotter argues that a nexus to a contract for the benefit of the United States is not required to present a claim for PAA indemnification. But, it argues, it can nonetheless show a causal link to the Mallinckrodt Contract – based upon its mere possession of residual radioactive material that resulted from that Contract. Cotter argues that this is because the PAA permits an "invariably . . . vague, loose connective" between a claimant's indemnification claims and a contract for the benefit of the United States. Cotter Br. 25-26.

In making its claims of a causal link with Mallinckrodt's Contract, Cotter underscores the central and unprecedented premise to its complaint. Which is that it views the United States' PAA indemnification obligations as running now and forevermore with any radioactive material that resulted from the performance on a Government contract with a PAA indemnification clause. Cotter argues that there is a "causal or logical connection" between the public liability occasioned during Cotter's ownership of the radioactive material and Mallinckrodt's Contract sufficient to justify PAA indemnification. *Id.*, at 22-26. And it argues that the trial court's view of Section 170(d) reflected too narrow a view of the PAA. *See id.*, at 26-28. To reach this outcome, Cotter invokes the second sentence of Section 170(d), which, again, concerns AEC's capacity to require its contractors to obtain

(private) financial protection "to cover public liability arising out of or in connection with the contractual activity." Appx817; Cotter Br. 27.

Cotter acknowledges that its public liability does not "arise out of" Mallinckrodt's contractual activity. Cotter Br. 27. But it argues that its liability has "some causal or logical connection to" Mallinckrodt's contractual activity and thus its liability exists "in connection with" Mallinckrodt's Contract. *Id.*, at 27-28. But the only connection to Mallinckrodt's contractual activity that Cotter can invoke is simply that Cotter's radioactive material was a product of Mallinckrodt's Contract. *Id.*

Textually, Cotter focuses upon the PAA's definition of "public liability" (Appx816), suggesting that this term is "broad" and that PAA indemnification covers all liability that "results from a nuclear incident involving the radioactive materials produced by Mallinckrodt." Cotter Br. 28. It suggests that the requirement that public liability arise "in connection with" Mallinckrodt's contractual activity is met by there being a "causal or logical" connection to that activity – which is found through the mere possession of radioactive material that was once in Mallinckrodt's possession. *Id.*

Thus, Cotter posits that it is of no moment that it purchased the residual material from a third-party creditor without any express statement of Government indemnification, that it used the material for its own commercial purposes, that its

activities were not in furtherance of Mallinckrodt's Contract, or that, as alleged in *McClurg*, it chose to dispose its radioactive material in a public landfill and undertook other reckless activity leading to public harm.

Cotter's reading of the PAA is incorrect. Cotter cannot cite to a single case where the court has found that PAA indemnification obligations run with radioactive material. Simply put, and as the trial court correctly concluded: "handling material that was once under Mallinckrodt's contract is an insufficient causal sequence to trigger indemnification obligations, particularly considering Section 170(d)'s limiting language." Appx13. Section 170(d) requires a nexus with contractual activity for the benefit of the United States. Mere possession of radioactive material that resulted from Mallinckrodt's contract does not meet that test.

### D. Cotter's Participation In An Industry That Utilizes Radioactive Material Does Not Create An Entitlement To PAA Indemnification

In an attempt to demonstrate that its use of its radioactive material was similar to that of Mallinckrodt (and apparently from this that it deserves to be in the class of "person indemnified"), Cotter argues that its position relative to the PAA is like Mallinckrodt's because both were participants in the "atomic energy industry that the [PAA] was designed to promote." Cotter Br. 23. But Cotter points to no provision in the PAA that provides that the mere participation in an

industry that utilizes radioactive material is a basis for obtaining PAA indemnification.[9]

Next, Cotter argues that it was known that the production of atomic weapons would involve the creation of concentrated excess radioactive material and that it was the creation of this material that "created the risk that a nuclear incident would cause injury to the American public and result in legal liability." Cotter Br. 23.[10] Because this risk was known, Cotter argues that the Indemnification Agreement was expressly meant to "cover[] (all) nuclear incidents involving that material." *Id.*, at 24. But, again, Cotter points to no such provision in the PAA; instead, Cotter points to paragraph 25 of its complaint as support for this proposition. But paragraph 25 merely invokes the incorporation of the PAA indemnification provisions into Mallinckrodt's Contract. Which, again, simply begs the question

[9] To the contrary, Cotter's suggestion is belied by the fact that the PAA historically did not mandate indemnification for *any* AEC contractors under 170(d) or all licensees under 170(a). *See* Appx817.

[10] Cotter emphasizes that atomic weapons production involves the creation of "excess radioactive 'material.'" Cotter Br. 22. This fact proves nothing, given that source, special nuclear, and byproduct material present risks, whatever the use. It cannot be that Congress intended to create indemnification whenever there would be activity involving "radioactive material requiring storage and handling," *id.*, at 23, which is demonstrated by the fact that the PAA did not require indemnification for AEC contractors or all licensees.

of whether, in the first instance, Cotter can be considered either a "person indemnified" (or an intended third-party beneficiary of Mallinckrodt's Contract).

### E. The Trial Court Correctly Determined That Cotter's Radioactive Material Did Not Have A Causal Or Logical Connection To Mallinckrodt's Contractual Activity And Its Public Liability Was Too Far Downstream From Mallinckrodt's Contractual Activity

Contrary to Cotter's arguments, the trial court did *not* err in finding that Cotter's public liability was too far removed from Mallinckrodt's Contract to be eligible for PAA indemnification. In its brief, Cotter notes that the Government "placed the material into the domestic economy," and that, because the material was risky, "AEC continued to regulate the material." Cotter Br. 24. Cotter argues that these facts "show Cotter's public liability has a causal or logical connection to the contractual activity." *Id*., at 24-25. Cotter's arguments fail.

The sale transactions involving the material prior to Cotter's eventual purchase demonstrate the lack of a causal connection with Mallinckrodt's Contract, while the fact that Cotter's radioactive material was licensed adds nothing to demonstrate such a connection given that licensing is a pre-requisite for possession of source material.

As noted above, AEC sold the radioactive residual material that resulted from performance on the Mallinckrodt Contract to a third party, Continental. *See above* at 12-13. AEC's Bill of Sale to Continental did not make any representation concerning a right to PAA indemnification. Instead, it passed title

of the material to Continental while stating that the radioactive material was being transferred "as is" and that Continental bore all of the costs of site cleanup. Appx1107-1108 ¶¶ 3, 8, 9. The risk involving the material was acknowledged, as the Bill of Sale stated that AEC *was not* representing that the material "would not result in injury or damage when used for any purpose." Appx1107. At the same time, the Bill of Sale gave Continental *full responsibility* for the material care and custody. Appx1108 ¶ 10. And if there was any doubt that there was nonetheless some silent or implicit agreement or understanding concerning a right to PAA indemnification traveling with the material, the Bill of Sale further stated that there were "no other agreements or understandings between the parties" of any kind. Appx1108-1109 ¶ 11.[11]

Moreover, when Cotter purchased its initial batch of radioactive material at Latty Avenue from Commercial Discount in June 1967, that sales agreement did not provide for PAA indemnification. *See* Appx1114-1127. Instead, the sales agreement provided a limited warranty that *Commercial Discount* would "*indemnify Buyer* and hold it harmless from all suits . . . related to claims of third parties *against the residue . . . attributable to the period prior to delivery*."

[11] Cotter argues that the PAA indemnity provisions could not be waived by contract. Cotter Br. 37-38. This argument is beside the point because it presumes (incorrectly) that there was a nexus between Cotter and Mallinckrodt's Contract such that the PAA would apply in the first instance.

Appx1115 ¶ B(1)(b) (emphasis added). And when Cotter bought the remainder of the radioactive material from Commercial Discount in August 1969 (*see* Appx1128-1140), the parties agreed to similar indemnification terms. Appx1134. These purchase agreements do not evidence any understanding that PAA indemnification traveled with the material. Instead, they evidence that the seller, Commercial Discount, would, for the period prior to Cotter's possession, indemnify Cotter with respect to the radioactive material.

Cotter also invokes the facts that the last month of Mallinckrodt's Contract was in June 1967, and that Cotter's initial purchase of the radioactive material at Latty Avenue was in June 1967, as though these events were connected and evidence of a causal nexus between Cotter and Mallinckrodt's Contract. Cotter Br. 24-25. Cotter further argues that the trial court erred in stating that Mallinckrodt's work ended in 1966 and that Cotter only purchased the material in 1969; and it claims that these factual errors were central to the trial court's holding that Cotter was too far downstream to state a PAA indemnification claim. Cotter Br. 34-35 (citing Appx13). As such, Cotter pronounces that "these errors provide an independent basis for reversing the court's judgment." *Id.*

But Cotter ignores that the trial court recognized that Commercial Discount began its sales of the radioactive material *in 1967*: "Commercial Discount . . . sold the radioactive material to Cotter between 1967 and 1969." Appx7. Although the

trial court later stated that "Cotter only became linked to the material in 1969" (Appx13), this pronouncement is tempered by the trial court's earlier finding. Moreover, the facts that Mallinckrodt ended its work in June 1967 and that Cotter first purchased radioactive material in June 1967 are unrelated. Mallinckrodt did not work at the Latty Avenue site (which was a secondary level storage area to which Continental had transported its radioactive material) (Appx27 ¶ 21), and it did not sell the radioactive material to Cotter. By the time Cotter purchased any of the material, it had already been sold by AEC to Continental and then separately obtained by Commercial Discount. The fact that Mallinckrodt's Contract was still existent in 1967 adds nothing to show that Cotter had a nexus to Mallinckrodt's Contract. Indeed, Cotter activities and Mallinckrodt's contract work were no closer related in 1967 than they were in 1969.

The trial court correctly concluded that "Cotter's handling of the material did not 'originate from' Mallinckrodt's contractual activity, but rather possession by third parties." Appx13. And it correctly concluded that "handling material that was once under Mallinckrodt's contract is an insufficient causal sequence to trigger indemnification obligations." *Id.*

Cotter further argues that it ultimately does not matter whether the United States owns and possesses the material or whether that material is possessed by a

downstream purchaser.[12] Cotter Br. 37. And it argues that the trial court (incorrectly) imposed a requirement that, for indemnification to be available, the United States has to have title or possession of the radioactive material. *Id.*

Cotter misreads the trial court's opinion. The court did not hold that liability only arises when the United States has title or possession of radioactive material; at the same time, however, it also rejected Cotter's claims that the sale and licensing documents are irrelevant. Instead, the trial court held that the sale documents between AEC and Continental, and Commercial Discount and Cotter, are relevant to the chain of title, *i.e.*, showing that Cotter owns the radioactive material and did not purchase that material from the AEC. Appx14. "They also shed light on whether Cotter was an intended third-party beneficiary of Mallinckrodt's contract." *Id.* Simply put, if AEC intended to provide third-party beneficiary indemnification benefits through the Mallinckrodt Contract to any downstream purchaser of the radioactive material, it would have been incongruous for it to provide a sale agreement that not only states that it was selling the material as is, but also that there were no other agreements between the parties. *See above* at 36-38. Instead,

[12] In violation of Federal Circuit Rule 28(f), Cotter improperly seeks to incorporate wholesale into its brief 12 pages of its CFC response brief; and two pages from its surreply brief, which the trial court refused to entertain. *See* Cotter Br. 37 n.10.

the AEC sale agreement to Continental demonstrates the lack of any intent on AEC's part to provide third-party beneficiary indemnification benefits.

Therefore, rather than support Cotter's argument, the facts concerning the sales transactions only underscore that Cotter's purchase and possession of the material was far removed from Mallinckrodt's Contract. *See* Appx14.

Cotter also argues that AEC's regulating or licensing of Cotter's possession of its radioactive material reflects a continued Government interest in the material coupled with an intent to provide PAA indemnification. Cotter Br. 24. Cotter is incorrect. AEC's licensing merely reflected its adherence to a statutory requirement that entities that obtain radioactive material must have an AEC license. *See* Appx1107 ¶ 4 (noting that, because of the concentration of uranium, the material was subject to licensing requirements pursuant to the AEA). Thus, subsequent owners of the material, including Cotter, had to obtain a license to possess the material.[13] At the same time, AEC had the right, pursuant to §170(a), to not provide an indemnification agreement connected with the material. *See* §170(a) (licenses *"**may**,* have as a condition of the license requirement that the licensee have and maintain financial protection of such type and in such amounts as the Commission shall require . . . to cover public liability claims.). AEC did not

[13] *See* Appx1141 (noting Commercial Discount's license); Appx1141-1144 (Cotter's license application); Appx1145-1146 (license award to Cotter).

enter into an indemnification agreement connected with the licensing of the radioactive material at issue here. *See* Appx1146. And Cotter makes no claim that it has a right to indemnification under Section 170(a). *See* Appx14 n.7.

### F. The Phrase "In Connection With" Does Not Provide A Nexus Between Cotter's Activity Or Liability And The PAA's Indemnification Provisions

Cotter also claims that its ownership and handling of its radioactive material can be seen to have been "in connection with" Mallinckrodt's Contract because that phrase is "sweeping in scope," and can encompass "invariably a vague, loose connective." Cotter Br. 25-26. But Cotter's claim that a claimant seeking PAA indemnification pursuant to Section 170(d) need only show a vague, loose connection with Mallinckrodt's Contract, is incorrect. The phrase "in connection with," interpreted with regard to a statute is not an unbounded provision but must be interpreted in a way that is consistent with the statutory framework and design. *See Maracich v. Spears*, 570 U.S. 48, 60 (2013). "The phrase 'in connection with' provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions." *Id.* (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) ("We simply must go beyond the unhelpful text and the frustrating difficulty of defining [in 'connection with'], and look instead to the objectives of [the statute being interpreted."). Thus, in *Maracich*, the Court applied the maxim of *nosicur a sociis*

(words and people are known by their companions). *See Gutierrez v. Ada*, 528 U.S. 250, 255 (2000). Under this rule, the phrase "in connection with," which is capable of many meanings, can be construed in light of their accompanying words to avoid giving the statute "unintended breath." *Maracich*, 570 U.S. at 62-63 (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

Here, the phrase "in connection with" appears in Section 170(d) twice and, in both cases, it is followed with either "the contractual activity" (for the benefit of the United States) or "such contract" (for the benefit of the United States). *See* §170(d). Thus, the PAA's use of the phrase "in connection with" is meant to limit PAA statutory indemnity to circumstances where the public liability arises from an activity with a nexus to a contract for the benefit of the United States. And this reading is entirely consistent with the trial court's recognition that, in interpreting Section 170(d), the court must "look at the plain language as well as 'the placement and purpose of the language within the statutory scheme.'" Appx9 (citing *WestRock Va. Corp. v. United States*, 136 Fed. Cl. 267, 276 (2018)).

## G. The PAA's Legislative History And A 1999 DOE Report Do Not Support Cotter's Thesis That "Any Other Person" Is Entitled To Indemnification Based Upon Their Status As A Person Facing Public Liability For A Nuclear Incident

### 1. Section 170(d) Is Clear And Unambiguous And Thus Select Passages From The PAA's Legislative History That Could Be Read To Conflict With The Plain Meaning Of The Text Should Not Be Considered By This Court To Assess The Statute's Meaning

Throughout its brief Cotter invokes a selection of passages from the PAA legislative history as purported support for its interpretation of the Section 170(d). Cotter Br. 25, 28-29, 32-33, 39-42. But Cotter acknowledges that Section 170(d) and the parallel language in PAA indemnity agreements are "clear and unambiguous." *Id.*, at 18. The trial court also concluded that Section 170(d) is "clear and unambiguous." Appx12. Because Section 170(d) is clear and unambiguous, resort to the legislative history is unnecessary. *See Bedroc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (the court's "inquiry begins with the statutory text[] and ends there as well if the test is unambiguous.").

Cotter argues though that it is invoking legislative history to "further reinforce what is obvious from the Act's statutory text." Cotter Br. 39. But in contravention of Section 170(d)'s plain text, Cotter cites to legislative history as purported support for its novel argument that PAA indemnification is available to "'any person who might be found liable, regardless of the contractual relation.'" *Id.*, at 29 (citing Appx880); *see also id.*, at 28-30.

As the trial court correctly concluded, the select passages from the legislative history that Cotter invokes, *as characterized by Cotter*, appear to be inconsistent with the plain text of Section 170(d). But the court recognized both that the statute was clear and unambiguous and that the "language highlighted by Cotter is absent from the PAA itself." Appx12 (citing Cotter's quote from Appx880).

For example, Cotter invokes a 1957 congressional joint committee report's discussion of a hypothetical, negligently maintained airplane's crash into a nuclear power plant where the airplane company is indemnified. Cotter argues that the discussion concerning this hypothetical demonstrates congressional intent with respect to the phrase "arising out of or in connection with the contractual activity" as set forth in §170(d). And Cotter concludes that the hypothetical underscores congressional intent in Section 170(d) to provide indemnification for activities that are disconnected from a contract for the benefit of the United States, irrespective of "the activities" or "identity" of the claimant. Cotter Br. 25, 41 (citing Appx880).

But the airplane crash scenario discussed in the report is inapposite to the circumstances of Cotter's liability in *McClurg* and offers no guidance on the proper interpretation of Section 170(d). Most importantly, the airplane crash hypothetical involves ongoing nuclear power generation undertaken pursuant to a license held by the owner of the power plant (in the context where reactors are

subject to mandatory indemnification under the PAA). In that scenario, even though the power plant owner and licensee did not cause the nuclear incident, the airplane crash occurred *during* the performance of indemnified activity and at the site of the indemnified activity. And in that case, the third-party airline would be entitled, consistent with Section 170(d), to indemnification due to its nexus with the indemnified (or protected) activity (the licensed production of nuclear energy). And this would be so even though the nexus with the licensed activity for the benefit of the United States arose by accident.

In contrast to the airplane crash hypothetical, Cotter's public liability and its release of radioactive material did not occur at the site of or in connection with Mallinckrodt's indemnified contractual activity. Instead, its liability resulted from its own private commercial activity and mishandling of ***its*** radioactive material at separate locations from where Mallinckrodt performed its contracted for activity.

Cotter also cites various other select legislative history passages that broadly characterize PAA indemnification coverage. For example, Cotter cites to a 1962 Senate Report passage which stated that PAA indemnity coverage "has, from its inception extended to any person who may be liable for public liability." Appx910. And Cotter quotes a 1974 Senate *Congressional Record* passage which stated that PAA indemnification applies to "each and every person who might have liability regardless of that person's relationship with [an indemnified contractor]."

Cotter Br. 41 (citing Appx1160). *See also id*., at 41-42 (citing a 1987 Senate Report (Appx1184) for the notion that "any person who might be held liable for public liability resulting from a nuclear incident. . . was to be indemnified under the [PAA].").[14] In short, Cotter argues that the legislative history shows that Congress wanted to guarantee compensation for victims of any domestic nuclear incident, regardless of when or how the incident arose, and regardless of the claimant's relationship with an indemnified contractor. Cotter Br. 40-42.[15]

---

[14] Cotter ignores legislative history passages that tie PAA indemnification to entities that "assist the Government in carrying out the atomic energy program" or that are "participating in the atomic energy program." *See* Appx965 and Appx924-25. For example, rather than stating that any and all persons facing nuclear incident liability are entitled to PAA indemnification, the June 1965 Joint Committee on Atomic Energy recognized a much more narrowly defined set of persons who are so entitled. *See* Appx965 (noting that under the PAA, AEC "is authorized to execute indemnification agreements with its contractors . . . and such other contractors who are engaged in activities for the benefit of the United States involving a risk of public liability for a substantial nuclear incident."); *id.* (noting that a "person indemnified" as defined in the PAA, allows AEC "to provide protection to the industrial organizations which assist the Government in carrying out the atomic energy program.").

[15] Cotter also argues that its broad interpretation of the definition of "persons indemnified" is consistent with a congressional policy to protect victims of a nuclear incident, regardless of the cause or when the incident occurred, especially where a "company becomes insolvent under the threat of liability for an incident involving legacy material first produced for the government." Cotter Br. 40-42. But Cotter's policy argument fails because a downstream purchaser of legacy radioactive material that knew that it would always be indemnified by the Government would be dis-incentivized, especially if thinly capitalized, from taking proper safety measures and might undertake cost saving but reckless activities –

Thus, Cotter does not seek to introduce legislative history passages that reinforce the plain statutory text, but rather appear facially to conflict with it, a tack that is prohibited under long-standing canons of statutory interpretation. *See Bartels Tr. For the Benefit of Cornell Univ. ex re. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed. Cir. 2010) ("While our decisions recognize that legislative history can shed light on congressional intent, we have never held that legislative history trumps clear text."). *See also Bostock v. Clayton County, Ga.,* 140 S. Ct. 1731, 1749 (2020) ("'Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.'") (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Judicial investigation of legislative history has a tendency to become … an exercise in looking over a crowd and picking out your friends.").

This Court should accept Cotter's admission that Section 170(d) is "clear and unambiguous" at face value and, like the trial court, reject Cotter's invitation to "wade through the mire of the PAA legislative history." Appx13.

like dumping radioactive material into a landfill – knowing that the resulting costs of any public harm would ultimately be borne by the Government.

### 2. A 1999 DOE Report To Congress Does Not Support Cotter's Interpretation Of Section 170(d)

Cotter also cites (twice) to a statement from a 1999 DOE Report to Congress concerning a hypothetical nuclear incident as support for its interpretation of the scope of Section 170(d) indemnification. Cotter Br. 25; 42 (citing Appx1236). Cotter argues that DOE's report supports the proposition that, where a commercial entity is "*operating on government property* 'in proximity to nuclear material that is a legacy from prior contractual activity conducted for DOE,'" then, if a nuclear incident results from that material, the commercial activity would be entitled to PAA indemnification. *Id.*, at 42 (emphasis added) (citing Appx1236). Cotter concludes that, because it was actually using "legacy material" (as euphemistically titled by Cotter) and not merely in proximity to it, then it is even more properly eligible for PAA indemnification than the entity in the DOE hypothetical.

DOE's 1999 report does not, however, support Cotter's conclusion. First, at the beginning of the paragraph cited by Cotter, the report states, consistent with Section 170(d), that "DOE indemnification *does not cover commercial activities that are not for the account of DOE*, even if such activities take place on DOE property." Appx1236 (emphasis added). Second, unlike here, the hypothetical nuclear incident discussed in DOE's report results from material *DOE still possessed and that was located on DOE property. See id.* Moreover, while Cotter references the radioactive material in the hypothetical as "legacy material," it was

material that DOE still possessed. Here, in contrast, Cotter owned and possessed ***its own*** radioactive material that it then mishandled in pursuit of ***its own*** commercial activities that were not for the account of DOE, nor on DOE property.[16] DOE's 1999 report does not support Cotter's interpretation of Section 170(d).

Finally, Cotter's policy and legislative arguments fail because Cotter presents an inaccurate paradigm. Here, unlike in the paradigms it invokes, Cotter has apparently obtained private indemnification from ComEd concerning Cotter's liability connected with its activities in the St. Louis area. Cotter's former parent, Exelon Corporation has stated in a Securities Exchange Commission filing, that, in connection with ComEd's 2000 sale of Cotter, ComEd "agreed to indemnify Cotter for any liability arising in connection with the West Lake Landfill." Appx1380.[17]

---

[16] DOE's 1999 report is unhelpful to Cotter's case for the additional reason that it was not offered as a formal interpretation of the PAA, let alone one that addresses Cotter's novel theory. Rather, in the PAA Amendments Act of 1988, Congress directed DOE to submit a report "concerning the need for continuation or modification of the provisions" of the PAA. Appx1220.

[17] Cotter's complaint does not acknowledge the indemnification that it or its owners appear to have received from ComEd (or Generation [to whom the indemnification obligation was transferred by ComEd]) (Appx1380) or the effect of that indemnification given the PAA indemnity provisions of SA124 at ¶ 3(a). Appx781. The PAA indemnification provisions in Section 170(d) are incorporated into Mallinckrodt's Contract at Paragraph 3(a) "[*t*]*o the extent that the Contractor and any other persons indemnified are not compensated by any financial protection*[.]" *Id.* (emphasis added).

Cotter cites to no legislative history describing an intent by Congress to provide PAA indemnification in this circumstance, and Section 170(d) only provides indemnification to the extent that a claimant has not been indemnified through private means.

## II. Mallinckrodt's Contract Did Not Provide Cotter With The Right To Assert A Third-Party Beneficiary Claim For PAA Indemnification

### A. The Trial Court Correctly Determined That Cotter Lacked Standing To Assert A Third-Party Beneficiary Claim

Cotter argues that the trial court erred in dismissing its third-party beneficiary claim for lack of standing because the court used the wrong standard of review in assessing whether a party is a third-party beneficiary of a contract and because the court misapplied the PAA. Cotter Br. 42-46. Cotter is wrong.

In order to present a claim as a third-party beneficiary of a contract, which is "an 'exceptional privilege,'" the claimant must show an intent by the primary contracting parties to directly benefit that claimant either personally or as a class. *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir.), *opinion amended on reh'g,* 273 F.3d 1072 (Fed. Cir. 2001) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230 (1912)). *Accord G4S Tech. LLC v. United States*, 779 F.3d 1337, 1340 (Fed. Cir. 2015).

Cotter argues that the trial court erred by holding that Cotter lacked standing because it failed to establish that it was an intended third-party beneficiary of

Mallinckrodt's Contract. *See* Appx16. Cotter posits that at the pleading stage it did not have to establish that it was intended third-party beneficiary of Mallinckrodt's Contract but, instead, merely had to show that it "belongs to a class of persons who are clearly intended to benefit" from the Contract's indemnification provisions. Cotter Br. 43. Cotter characterizes the court's decision as improperly disposing the third-party beneficiary claim on the merits. *Id.*

Cotter is wrong because the court disposed of its third-party beneficiary claim as a matter of law given that, under a plain reading of the PAA indemnification provisions incorporated in Mallinckrodt's Contract, Cotter cannot show it was an intended beneficiary of Mallinckrodt's Contract.

Certainly, the trial court recognized that a third-party beneficiary "'need not be specifically or individually identified in the contract, but must fall within a class *clearly intended to be benefited thereby*.'" Appx15 (quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997)) (emphasis added). The court recognized, however, that its task was to evaluate whether "AEC and Mallinckrodt intended for Cotter to directly benefit from their contract." *Id.* (citing *Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005)). Cotter objects to the court's inquiry into whether the intent is demonstrated in the Mallinckrodt Contract. And Cotter argues that the court, by making this inquiry, improperly

jumped from a 12(b)(1) jurisdiction inquiry into a merits-based 12(b)(6) determination.

But the trial court properly held that Cotter did not show any intent by Mallinckrodt and AEC to benefit a class of persons such as Cotter (*i.e.*, downstream purchasers of radioactive material that resulted from Mallinckrodt's Contract). Appx16. Importantly, the court held that intent could be determined as a matter of law by review of the Mallinckrodt Contract, because it incorporated the PAA indemnification regime, including the definition of a "persons indemnified" under Section 170(d). *Id.* And the trial court concluded that, just as the PAA does not provide indemnification rights to downstream purchasers of radioactive material such as Cotter, the incorporation of the PAA into Mallinckrodt's Contract does not change that dynamic with respect to a third-party beneficiary claimant. *Id.*

Cotter's third-party beneficiary claim is based upon a facially incorrect reading of the Mallinckrodt Contract's indemnification provisions. *See* Appx780-784. These provisions provide that indemnification obligations only exist when the liability for which indemnification is sought *arises out of or in connection with the contractual activity. See* Appx781-782 ¶ 3. Cotter's interpretation of the Contract's indemnification provision is in error because Cotter reads the first conjunctive requirement in paragraph 3(b) out of that provision. The provision

requires that public liability (for which indemnification rights apply) "*arise[] out of or in connection with the contractual activity*" ***and*** satisfy one of four listed scenarios. Appx781-782 ¶ 3(b)(i) and (ii) (emphasis added). One of the four scenarios, subsection (ii)(4), sets forth the scope of public liability as including "a nuclear incident which involves items (such as . . . material . . .) produced or delivered under this contract." *Id.* ¶3(b)(ii)(4). But even assuming, for the sake of argument, that Cotter's downstream purchase of radioactive materials originally resulting from Mallinckrodt's Contract would satisfy subsection (ii)(4), that subsection alone is insufficient to fall within the scope of indemnification set forth in paragraph 3. It must be read in conjunction with the provisions of paragraph 3(b)(i), which requires that public liability "arise out of or in connection with" the activity of the Mallinckrodt Contract. Cotter's reading of the Contract's indemnification provision, whereby it propounds the theory that indemnification obligations simply attach to radioactive material involved in the Contract, renders the first mandatory conjunctive element of paragraph 3(b) as entirely superfluous. And thus, its reading is facially flawed. *See NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

Therefore, the trial court properly determined as a matter of law that the Mallinckrodt Contract does not evidence an intent to benefit persons such as Cotter, and as a result, Cotter lacks standing to assert a third-party beneficiary claim. Appx16. The court noted that it did *not* analyze other objective (presumably factual) evidence concerning whether Cotter was an intended third-party beneficiary. Appx16 n.8. Thus, its determination was rendered as a matter of law based upon the terms of the Mallinckrodt Contract alone.[18] Therefore, contrary to Cotter's claim, Cotter Br. 45-46, the trial court's holding was not based merely upon an improper inference or "nonexistent criteria."

Finally, Cotter offers no facts demonstrating a contrary intent by Mallinckrodt or AEC. *See* Cotter Br. 45-46. Instead, its counterarguments are based solely on its interpretation of the PAA and Mallinckrodt's Contract. That is, its only arguments involving intent are similarly based solely on matters of law. As such, its arguments only undermine its assertion that the court *improperly* disposed of its third-party beneficiary claim "on the merits." Cotter Br. 43.

[18] Earlier in its opinion, the trial court noted that the sale chain of title and licensing documents "shed light on whether Cotter was an intended third-party beneficiary of the Mallinckrodt contract." Appx14.

### B. The Trial Court Correctly Held That Cotter Failed To State A Claim As A Third-Party Beneficiary Of Mallinckrodt's Contract Because Cotter's Liability Did Not Arise Out Of Or In Connection With Mallinckrodt's Contract

Cotter next argues that the trial court erred by dismissing Cotter's third-party beneficiary claim "because Cotter did not allege that it had provided notice to the United States before filing suit." Cotter Br. 46 (citing Appx16-17). Cotter mischaracterizes the court's holding. The trial court did not merely find that Cotter failed to notify the Government concerning Cotter's request for indemnification; it found, as is uncontested, that Cotter never presented *a claim* for indemnification to the Government. Appx16-17. And thus, because it is undisputed that Cotter never presented a claim for indemnification, the Government's failure to indemnify cannot constitute a breach of the indemnification agreement with Mallinckrodt. The issue is not one merely of notice, but whether Cotter properly alleged a breach of contract.

"If a plaintiff can establish privity or third party beneficiary status, a plaintiff must also be able to establish 'an obligation or duty arising out of the contract, *a breach of that duty*, and damages caused by the breach.'" *Doyle v. United States*, 129 Fed. Cl. 147, 154-55 (2016) (emphasis added) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). *See also Loc. 1303-362 of Council 4 v. KGI Bridgeport Co.*, No. 3:12 CV 1785 AWT, 2013

WL 4735584 at * 7 (D. Conn. Sept. 3, 2013) (finding that where there was no breach of contract there is no liability to third-party beneficiaries).

Put another way, a breach of contract claim requires, in the first instance, a breach of the contract. As the trial court correctly observed:

> Cotter's arguments boil down to the assertion that the government should indemnify Cotter simply because it was a defendant in *McClurg*. Cotter does not allege the United States was aware that it [Cotter] was seeking indemnification before this suit was filed. Cotter also does not allege that the United States ever refused indemnification before this Motion.

Appx17.

Cotter's third-party beneficiary claim fails because it is akin to a homeowner filing a lawsuit against its insurer for a breach of its home insurance policy without first presenting a claim to the insurer.

Cotter attempts to sidestep this fundamental flaw in its third-party beneficiary claim, instead focusing upon an argument concerning "whether it had *provided notice* to the United States before filing suit" for indemnification. Cotter Br. 46 (emphasis added). Certainly, Mallinckrodt's Contract had a notice provision requiring that Mallinckrodt provide documents to the Government with respect to any actual or threatened lawsuit. *See* Appx286-288; Appx533-534; Appx711-712. But, Cotter argues, Cotter Br. 46-48, that its right to indemnification existed irrespective of its adherence to any notice provisions.

Even assuming Cotter had such an indemnification right, that does not change the salient point that, to present a claim for a breach of an indemnity contract, a claimant must first present a claim for indemnification to its indemnitor before filing suit for a failure to indemnify.

Cotter also argues that the Government breached the Mallinckrodt Contract by declining an order from the *McClurg* Court to participate in mediation and by failing to collaborate with Cotter in its settlement or defense. Cotter Br. 47-48. Cotter's arguments fail at the outset, however, because they beg the question whether Cotter was an intended beneficiary of the Mallinckrodt Contract and eligible for Government litigation assistance in the first instance.

Second, DOE's decision not to participate in the *McClurg* mediation (Appx1372-75) could not constitute a breach of any contract with Cotter because the Government had not been presented with a claim by Cotter and DOE did not state that it would not indemnify Cotter.[19]

[19] Cotter mischaracterizes the *McClurg* mediation order and DOE's responsive letter. First, the district court stated that "*Plaintiffs* have requested the presence of an appropriate DOE representative at the Court-ordered, regularly-held mediation conferences . . . ." Appx1372 (emphasis added). The order does not even mention Cotter. Second, DOE's letter explains at length why the court lacked jurisdiction to order DOE to participate in mediation. Appx1374-75. Third, DOE made no determinations about indemnification; it simply declined to concede indemnification liability. *Id.* And fourth, DOE did not refuse to consider an indemnification request, but rather explained that because indemnification is primarily a contractual matter, DOE did not view direct participation in a tort litigation mediation as appropriate. Appx1374.

Cotter argues the Government breached the Mallinckrodt Contract even as it claims, as it did before the CFC, that "it 'had no duty to present an indemnity claim to the government.'" Appx17. Indeed, Cotter claims that while Mallinckrodt may have had obligations under its Contract to provide notice of litigation and to provide litigation-related documents to the Government, those provisions only bound Mallinckrodt and not a third-party beneficiary, such as Cotter, who is free to claim breach of contract without having even previously presented a claim for indemnification. Cotter Br. 50. In support of this argument Cotter cites to *Schneider Moving & Storage Co. v Robbins*, 466 U.S. 364, 370-71, 371 n.11 (1984). But *Schneider* recognized the "general rule that the promisor may assert against the beneficiary any defense that he could assert against the promise if the promisee were suing on the contract." *Schneider*, at 370. And this rule is based upon the premise that "a third party beneficiary that brings a contract claim steps into the shoes of the promisee and is therefore subject to any . . . defense that the promisor would have against the promisee." *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989).

The policy rationale is clear: there is an "inherent inequity in widening the class of individuals that can recover from a contract, yet at the same time narrowing the defendant's available defenses." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 55 (D.D.C. 2006). *See also, e.g., United Steelworkers of Am. AFL-*

*CIO-CLC v. Rawson*, 495 U.S. 362, 375 (1990) ("[T]hird-party beneficiaries generally have no greater rights in a contract than does the promisee.").

*Schneider* also recognized that its general rule could be qualified where the parties to the contract "provide[] that the right of the beneficiary is not to be affected by any defenses that the promisor might have against the promisee." *Schneider*, at 370-371. And it is this language that Cotter latches onto in arguing that it was exempt from any of the notices or litigation-related clauses in the Mallinckrodt Contract. But the only evidence here that Cotter cites to support its argument is that the Mallinckrodt Contract does not state that its provisions pertain to third party beneficiaries. Cotter Br. 50. That is, Cotter propounds the remarkable stance that where the contract describes provisions that apply to Mallinckrodt, those provisions do not apply to Cotter, as an alleged third-party beneficiary, but "***only***" to Mallinckrodt. *Id.* (citing Appx711-712). But Cotter's idea of express provisions in favor of Cotter are flawed. Just because the Contract describes Mallinckrodt's obligations without express references to third party beneficiaries, it does not follow that those obligations do not pertain to a party claiming to be a third-party beneficiary. The general rule of *Schneider* applies here, and Cotter failed to adhere to the Mallinckrodt Contract's Defense and Settlement of Claims provisions. *See* Appx711-712.

Given the foregoing, the trial court properly denied Cotter's third-party beneficiary claims under Rules 12(b)(1) and 12(b)(6).

## CONCLUSION

For the foregoing reasons, this Court should affirm the Court of Federal Claims's dismissal of Cotter's complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC. 20044
Tel: (202) 353-7972
Fax: (202) 514-8624
Email: john.roberson@usdoj.gov

November 29, 2023 Attorneys for Defendant-Appellee

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

The participants in this case are CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Alejandro L. Sarria
MILLER & CHEVALIER CHARTERED ,
Black Lives Matter Plaza
900 16th Street, N.W.
Washington, DC 20006
202-626-5822
asarria@milchev.com

*Attorneys for Plaintiff-Appellant*
*Cotter Corporation, N.S.L.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a) (5) and (6) because it has been prepared in 14-point New Times Roman, a proportionately spaced font.

I further certify that this brief contains 13,993 words, excluding the words exempted pursuant to Fed. R. App. P. 32(a)(7)(B)(iii), according to the count of Microsoft Word. The brief therefore complies with the word limitation of 14,000 words set forth in Federal Circuit Rule 32(a) and (b) and Fed. R. App. P. 32(f).

/s/ John H. Roberson
John H. Roberson
*Counsel for the United States*