# United States Court of Appeals for the Federal Circuit

______________________

**COTTER CORP., N.S.L.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

______________________

2023-1826

______________________

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00414-DAT, Judge David A. Tapp.

______________________

Decided: February 10, 2025

______________________

JENNIFER R. STEEVE, Riley Safer Holmes & Cancila LLP, Irvine, CA, argued for plaintiff-appellant. Also represented by CONNOR FARRELL, ALEJANDRO LUIS SARRIA, JASON NICHOLAS WORKMASTER, Miller & Chevalier Chartered, Washington, DC.

JOHN HUGH ROBERSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, FRANKLIN E. WHITE, JR.

______________________

Before MOORE, *Chief Judge*, TARANTO, *Circuit Judge*, and SCHROEDER, *District Judge*.[1]

TARANTO, *Circuit Judge*.

In 1957, in order to protect the public and to encourage private-sector engagement in activities involving atomic energy, Congress enacted the Price-Anderson Act (PAA), Pub. L. 85-256, 71 Stat. 576 (Sept. 2, 1957) to amend the Atomic Energy Act of 1954 (1954 Act or AEA), Pub. L. 83-703, 68 Stat. 919 (Aug. 30, 1954), which had replaced the Atomic Energy Act of 1946 (1946 Act), Pub. L. 79-585, 60 Stat. 755 (Aug. 1, 1946). The PAA provided, as relevant here, that when the government entered into a contract for a contractor to engage in specified nuclear-energy "activities under the risk of public liability for a substantial nuclear incident" and the contract included a specified indemnity provision, the government "shall indemnify" not only its contractor, but also the broader class of "persons indemnified" for "public liability arising out of or in connection with the contractual activity." PAA § 4, 71 Stat. at 576–77 (adding new § 170(d) to AEA). The PAA defined the key terms: "person indemnified" included both "the person with whom an indemnity agreement is executed and any other person who may be liable for public liability"; "public liability" broadly covered "any legal liability arising out of or resulting from a nuclear incident"; and "nuclear incident" broadly covered occurrences within the United States causing personal or property-related harm "arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* § 3, 71 Stat. at 576 (adding § 11(o), (r), (u) to AEA). A 1962 amendment to the 1954 Act, made by Pub. L. 87-615, §§ 4–5, 76 Stat. 409, 410 (Aug. 29, 1962)

[1] Honorable Robert W. Schroeder III, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

(1962 Act), essentially reiterated the definitions of "nuclear incident" and "person indemnified" for domestic incidents.

In 1962, the Atomic Energy Commission (AEC) entered into a PAA-covered, indemnity-containing contract (the Indemnification Agreement) with Mallinckrodt Chemical Works (Mallinckrodt), which had processed uranium for the government's use since early in World War II. In the late 1960s, Cotter Corporation (N.S.L.) (Cotter) bought some of the radioactive material and residues ("source materials" under the AEA as amended) originally produced by Mallinckrodt. And in 2012, numerous plaintiffs brought a tort action in federal court in Missouri against Cotter, Mallinckrodt, and others, the plaintiffs seeking compensation based on allegations of serious harm from the release of radioactive material (*i.e.*, a "nuclear incident" under the PAA-amended AEA) in the St. Louis area. Public Redacted Complaint at 9 ¶ 36, *Cotter Corporation (N.S.L.) v. United States*, 165 Fed. Cl. 138 (Fed. Cl. 2023) (No. 22-cv-00414), ECF No. 13 (Public Redacted Compl.).

In 2022, Cotter brought the present action against the United States under the Tucker Act, 28 U.S.C. § 1491(a), in the United States Court of Federal Claims (Claims Court), seeking indemnification under the PAA for the costs of defending and settling the Missouri case, which Cotter asserted was a "public liability" action under the PAA. *Id.* at 1 ¶ 1, 2 ¶ 4, 3 ¶¶ 7–9, 9–13 ¶¶ 36–52. In the Claims Court, Cotter alleged that it was entitled to government indemnification on two bases under the Tucker Act. One basis was directly under the money-mandating PAA. *Id.* at 13–14 ¶¶ 54–59. The other was under the (AEC-Mallinckrodt) Indemnification Agreement, of which Cotter asserted it was a third-party beneficiary. *Id.* at 14–15 ¶¶ 61–74.

The government moved to dismiss Cotter's complaint for failure to state a claim for statutory indemnification and, regarding the claim for contractual indemnification,

for lack of subject-matter jurisdiction (based on lack of standing) and for failure to state a claim. The Claims Court granted the motion on all grounds. *Cotter Corporation (N.S.L.) v. United States*, 165 Fed. Cl. 138, 142, 152 (Fed. Cl. 2023) (*Claims Court Opinion*). We now reverse, and we remand for the case to proceed past the motion-to-dismiss stage.

## I

We first describe the relevant statutory regime. We then summarize facts we accept as true for purposes of this appeal, which the parties agree include the allegations of the complaint here, the AEC-Mallinckrodt contract as repeatedly supplemented (*e.g.*, Indemnification Agreement), and judicially noticeable facts about the Missouri case that underlies the claim for government indemnification. We then describe the present litigation.

### A

After the Manhattan Project's development of fission-based atomic bombs during World War II, Congress enacted the AEA in 1946 to create the AEC and establish tight AEC control over atomic energy, including through government ownership of "fissionable materials" (*e.g.*, certain enriched uranium), AEC near-monopolization of the production of such materials (*e.g.*, through enriching or processing uranium, uranium ore, or other "source material") and the distribution of "byproduct materials," and requiring licenses for activities involving "source materials," "fissionable materials," and "atomic energy." 1946 Act §§ 1–2, 4–5, 7, 9, 12, 60 Stat. at 755–66, 770–71. Congress enacted a full revision of the 1946 Act in the 1954 Act, which sought "to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes." AEA § 3(d), 68 Stat. at 922. (In a newly centralized definitional provision, it also substituted "special nuclear materials" for the 1946 Act's "fissionable materials." AEA §§ 11(t), 41, 68 Stat. at 924, 928; 1946 Act § 4,

60 Stat. at 759.) The Supreme Court explained in *Duke Power Co. v. Carolina Environmental Study Group, Inc.* that, whereas the 1946 Act "contemplated that the development of nuclear power would be a Government monopoly," the 1954 Act's "policy," reflected in various provisions, was to "encourage[] the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." 438 U.S. 59, 63 (1978).

"It soon became apparent," however, that the risk of substantial liability following a nuclear incident (though such an incident appeared unlikely) was a "major obstacle" to private industry making the desired investments into the atomic energy industry. *Id.* at 63–64; *see* S. REP. NO. 85-296, at 1 (1957) (explaining that "the problem of liability has become a major roadblock" to "further industrial participation in the [atomic energy] program"). The Price-Anderson Act of 1957 was Congress's response to that problem. The PAA amended the AEA to authorize the government to "make funds available for a portion of the damages suffered by the public from nuclear incidents" and to "limit the liability of those persons liable for such losses" "[i]n order to protect the public and to encourage the development of the atomic energy industry, in the interest of the general welfare and of the common defense and security." PAA, 71 Stat. at 576 (amending AEA § 2); *see Duke Power*, 438 U.S. at 64–65; S. REP. NO. 85-296, at 1, 15. And, what is key in the present matter, the PAA also added several provisions concerning government indemnification of persons liable for harm from nuclear incidents. *See* PAA § 3, 71 Stat. at 576 (adding definitional provisions to AEA § 11); PAA § 4, 71 Stat. at 576–79 (adding a new § 170 to AEA).[2]

[2] The parties and the Claims Court agree that the provisions we quote in text govern this case, given the

As relevant here, PAA-added § 170 of the AEA, after addressing indemnification related to certain government licensees (not at issue before us), provided in subsection (d) for indemnification agreements with government *contractors*. PAA-amended AEA § 170(d) provided:

> [T]he [AEC] is *authorized . . . to enter into agreements of indemnification with its contractors* for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification the [AEC] may require its contractor to provide and maintain financial protection of such a type and in such amounts as the [AEC] shall determine to be appropriate to cover *public liability arising out of or in connection with the contractual activity*, and *shall indemnify the persons indemnified against such claims* above the amount of the financial protection required, in the amount of [the public-liability cap of] $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident.

PAA § 4, 71 Stat. at 577 (adding AEA § 170) (emphases added). The first sentence, at least on its face, provided the

---

timing of the actions and incidents at issue. We follow suit. For current versions, *see*, *e.g.*, 42 U.S.C. §§ 2010, 2011, 2014. We refer to the AEC, even though in 1974 its functions were transferred to a pair of new agencies. *See* Energy Reorganization Act of 1974, Pub. L. 93-438, 88 Stat. 1233 (Oct. 11, 1974). The indemnification function at issue here is now performed by the U.S. Department of Energy. *See* 42 U.S.C. § 2210(d).

AEC discretion to enter into an indemnity agreement with a contractor; and the second sentence, in its first portion, provided discretion to require the contractor to purchase its own insurance for "public liability arising out of or in connection with the contractual activity." But the second half of the second sentence provided that, at least when an indemnity agreement is made, the indemnification "shall" extend to "the persons indemnified against such claims"—where the antecedent of "such claims" is necessarily claims asserting "public liability arising out of or in connection with the contractual activity."

The PAA expressly defined the key terms used in § 170(d). Thus, PAA-amended AEA § 11 defined "person indemnified" as "the person with whom an indemnity agreement is executed *and* any other person who may be liable for public liability"; "public liability" as "any legal liability arising out of or resulting from a nuclear incident"; and "nuclear incident" as "any occurrence within the United States causing bodily injury, sickness, disease, or death, or loss of or damage to property, or for loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." PAA § 3, 71 Stat. at 576 (adding § 11(r), (u), and (o) to AEA) (emphasis added).

In 1962, in Pub. L. 87-615, 76 Stat. at 410, Congress amended two of the PAA's definitional provisions. One was the definition of "person indemnified" in PAA-amended AEA § 11(r). 1962 Act § 5, 76 Stat. at 410. The amendment reaffirmed that, for a "nuclear incident occurring *within* the United States" (and one involving the nuclear ship Savannah, even when it was abroad), "person indemnified" meant "the person with whom an indemnity agreement is executed *and any other person who may be liable for public liability*." PAA-amended AEA § 11(r) (after 1962 amendment) (emphases added). In contrast, for nuclear incidents "occurring *outside* the United States" (except when

involving the Savannah), "person indemnified" was more limited: It meant "the person with whom an indemnity agreement is executed and any other person who may be liable for public liability *by reason of his activities under any contract with the [AEC]*" or certain other "project[s]." *Id.* (emphases added).[3] The domestic-incident "person indemnified" is not limited by such a requirement of a connection to under-contract-or-project activities.

The second altered provision was the definition of "nuclear incident," PAA-amended AEA § 11(o), for which Congress introduced a similar domestic/foreign distinction. 1962 Act § 4, 76 Stat. at 410. For incidents occurring *within* the United States (and for the ship Savannah), Congress essentially retained the broad 1957 definition but clarified that the term applied where the resulting *harms* caused by the occurrence were "within or outside the United States." *Id.* In contrast, coverage was narrowed for an "occurrence outside the United States" to require that

---

[3] New § 11(r) of the AEA read: "The term 'person indemnified' means (1) with respect to a nuclear incident occurring within the United States and with respect to any nuclear incident in connection with the design, development, construction, operation, repair, maintenance, or use of the nuclear ship Savannah, the person with whom an indemnity agreement is executed and any other person who may be liable for public liability; or (2) with respect to any other nuclear incident occurring outside the United States, the person with whom an indemnity agreement is executed and any other person who may be liable for public liability by reason of his activities under any contract with the [AEC] or any project to which indemnification under the provisions of section 170d. has been extended or under any subcontract, purchase order or other agreement, of any tier, under any such contract or project." 1962 Act § 5, 76 Stat. at 410.

the "occurrence involve[] a facility or device *owned by, and used by or under contract with, the United States*." *Id.* (emphasis added).[4]

B

1

Starting in 1942, Mallinckrodt processed uranium for use in the government's atomic-weapons program. *Claims Court Opinion*, at 143 & n.4; J.A. 39–40, 44. In 1943, the United States (for the War Department) entered into a contract with Mallinckrodt (effective late 1942) to operate government-owned plants located in downtown St. Louis, Missouri ("St. Louis Downtown Site," or SLDS, Public Redacted Compl. at 4 ¶ 14) and to produce, store, and prepare for shipment specific quantities of secret products (refined uranium). J.A. 41–64; *see* J.A. 131–37 (map of some of the facilities in downtown St. Louis provided in 1947 supplemental agreement No. 15), 309–20 (describing and showing the same from supplemental agreement No. 45, entered into in 1950); *Claims Court Opinion*, 143. The government

---

[4] New § 11(o) of the AEA read: "The term 'nuclear incident' means any occurrence within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material: *Provided*, *however*, That as the term is used in subsection 170l. [concerning the Savannah], it shall include any such occurrence outside the United States: *And provided further*, That as the term is used in section 170d., it shall include any such occurrence outside the United States if such occurrence involves a facility or device owned by, and used by or under contract with, the United States." 1962 Act § 4, 76 Stat. at 410.

furnished supplies to Mallinckrodt for the latter to process into uranium products and required Mallinckrodt to deliver any unused materials to the government and to dispose of "finished product or any part thereof . . . found not to meet the [government] specifications . . . as directed by the Contracting Officer." J.A. 44–45 (1943 contract Articles 1, 4), 62 (1943 contract Article 33). In 1945, the War Department also contracted Mallinckrodt for "research consultant services and plant operations." J.A. 65.

Over the years, Mallinckrodt and the government adopted more than a hundred supplemental agreements (SAs) to modify their contractual relationship. *See* J.A. 65–815. One recognized the transfer of the War Department's role to the AEC shortly after the 1946 Act became law, J.A. 96, 110 (1947 SA No. 10), and the last (entered into in August 1966) stated that the contract work would continue "through June 30, 1967," J.A. 814 (1966 SA No. 129). Several SA provisions have particular importance here.

SA No. 45 (entered into in 1950 but effective as of October 1949), J.A. 250–333, merged the 1943 and 1945 contracts and required, among other things, that Mallinckrodt transport certain "uranium containing raw materials" from a government-owned storage site near the airport ("St. Louis Airport Site" or SLAPS) to the government plants (at SLDS), J.A. 261 (Article I-A ¶ 7(c)), and transport certain residues and byproducts from the plants to SLAPS and "dispose of these by-products in the facilities supplied at the Airport Site, as directed by the [AEC]," J.A. 260 (Article I-A ¶ 7(b)). SA No. 45 also provided for government indemnification of Mallinckrodt for losses, expenses (including for litigation), and damages "arising out of, based on or caused by the toxicity and/or radioactivity of uranium-bearing raw materials and/or products or by-products derived therefrom that may be or may at any time have been involved in the performance of the work under this contract." J.A. 286 (Article III-E ¶ 1). Mallinckrodt was to notify the AEC of any "claim . . . described in" the above

language and to authorize, if requested by the AEC, a government representative to "settle or defend any such claim." J.A. 287–88 (Article III-E ¶ 3); *see also* J.A. 532–34 (SA No. 81, entered into in 1952 but effective 1953, reaffirming the indemnification and litigation claims), 691–92 (SA No. 115, entered into in 1955 but effective 1956, reaffirming government indemnification for litigation and claims under Article XIV, J.A. 711–12).

SA No. 122 (entered into in 1961 but effective as of November 1960), J.A. 763–75, addressed certain post-contract-termination duties and rights. The government was to take "reasonable efforts to decontaminate" property. J.A. 772; *see also* J.A. 765–74. And for five years, Mallinckrodt could dispose of contaminated material in a government-owned Weldon-Spring Quarry Site, J.A. 773—which was near production facilities constructed, operated, and maintained by Mallinckrodt pursuant to SA No. 110 (entered into in 1955), J.A. 660–66, and SA No. 126 (entered into in 1963), J.A. 789–801.

On August 28, 1962, the day before enactment of the 1962 PAA amendment, Mallinckrodt and the United States (represented by the AEC) entered into SA No. 124 (the Indemnification Agreement), J.A. 780–85, "for the purpose of including . . . certain provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents," as authorized by the PAA-amended AEA, J.A. 780. It provided in part:

> 3. a. To the extent that the Contractor and any other persons indemnified are not compensated by any financial protection permitted or required by the [AEC], the [AEC] will and does hereby indemnify the Contractor, *and other persons indemnified*, against (i) claims for public liability as described in Paragraph b. of this Section 3; and (ii) the reasonable costs of investigating and settling claims, and

> defending suits for damage for such public liability, provided that the [AEC's] liability under all indemnity agreements entered into by the [AEC] under Section 170 of the [Atomic Energy] Act, including this contract, shall not exceed $500,000,000, including such reasonable costs, in the aggregate for each nuclear incident irrespective of the number of persons indemnified in connection with this contract.
>
> b. The public liability referred to in Paragraph a. of this section is public liability which (i) *arises out of or in connection with the contractual activity*; and (ii) arises out of or results from: . . .
>
>> (4) a nuclear incident which involves items (such as equipment, material, facilities, or design or other data) produced or delivered under this contract, . . . .

J.A. 781–82 (emphases added). The Indemnification Agreement also stated that "[t]he obligations of the [AEC] . . . shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract, and shall be unaffected . . . by the completion, termination or expiration of this contract." J.A. 783.

2

As early as 1960 or as late as 1962, the AEC started to solicit private companies to purchase radioactive residues stored at SLAPS. Public Redacted Compl. at 5 ¶¶ 16–17; J.A. 1108. According to the complaint here, the AEC stated that "contents of value," such as rare earth metals and uranium, could be extracted from this "source material" and that the remaining material could be disposed of at the government-owned Weldon Spring Quarry Site. Public Redacted Compl. at 5 ¶ 16.

In February 1966, the AEC completed a sale to Continental Mining & Milling Co. (Continental)—a Delaware

corporation with its principal office in Chicago, Illinois—of approximately 117,000 tons of materials and "[m]iscellaneous [r]esidues" from SLAPS. *See id.* at 6 ¶ 21; J.A. 1106–12. To take possession of this "source material," as defined by the AEA, Continental was required to obtain a license from the AEC, which the AEC issued. Public Redacted Compl. at 6 ¶ 21. Continental was to move the materials to a storage site in Hazelwood, Missouri, referred to in this case as "Latty Avenue." *Id.*

In quick succession, within the following sixteen months, two important changes in possession occurred. First, Commercial Discount Corporation (Commercial) foreclosed on Continental's assets, including the radioactive materials and Continental's property at Latty Avenue, where at least some of the radioactive materials were stored. Complaint at 10–11 ¶ 12.B.3 & nn.2–3, 21 ¶ 43, *McClurg v. MI Holdings, et. al*, No. 4:12-cv-00361 (E.D. Mo. Feb. 28, 2012), ECF No. 1 (McClurg Compl.). Then, on June 9, 1967, Commercial sold 54,000 dry tons of mineral residue at Latty Avenue to Cotter—a New Mexico corporation with a facility in Cañon City, Colorado.[5] J.A. 1114–26. Commercial was to deliver the material to a specified location and indemnify Cotter for liability "attributable to the period prior to delivery." J.A. 1114–15; *see also* J.A. 1134. Commercial and Cotter entered into additional purchase agreements, including an August 1969 agreement for Cotter to pick up certain materials left at Latty Avenue. J.A. 1128–40. Both parties were to have an AEC license, J.A. 1119–20, and Cotter would "sample the residue by methods

---

[5] The record before us contains information about Cotter's subsequent history and possible non-government indemnification for at least some of the *McClurg* liability. *See* McClurg Compl. at 11–13 ¶¶ 12.B.5, 12.B.6, 12.B.12, 12.B.13; *see also* J.A. 1380. The issue before us does not turn on that information.

presently employed by it in accordance with contractual requirements imposed upon [Cotter] by the [AEC]," J.A. 1117; *see also* J.A. 1135.

In December 1969, Cotter applied for, and received, a "source material" license from the AEC to transport the material, noting in its application that its "activities will be conducted in a manner identical to those previously conducted by Commercial" under its own AEC license. J.A. 1141–46; *see also* J.A. 1142 (identifying "ore residues" with ".3–2.0% U"); Public Redacted Compl. at 2–3 ¶¶ 4–6 (referring to "radioactive source material"). Most of the material was transported by rail to Cotter's Cañon City plant between 1970 and 1973. Public Redacted Compl. at 6 ¶ 22. The AEC withdrew its offer for Cotter to dispose of the remaining Latty Avenue material at the government-owned Weldon Spring Quarry Site. *Id.* at 6 ¶ 23. Cotter subsequently had some of the source material transported by other entities to the West Lake Landfill in Bridgeton, Missouri, between July and October 1973. *Id.*; *id.* at 3 ¶ 6. In 1973, Cotter's license ended after Cotter ceased its operations at Latty Avenue. *Id.* at 6–7 ¶ 24. A 1974 AEC inspection of Latty Avenue confirmed compliance with relevant regulations and requirements. *Id.*

C

In 2012, more than 500 plaintiffs sued Cotter, Mallinckrodt, and others in the Eastern District of Missouri (*McClurg* litigation). Public Redacted Compl. at 9 ¶ 36; McClurg Compl. at 10–13 ¶ 12. In a second amended complaint, plaintiffs asserted that their filing constituted a "public liability action" within the meaning of the PAA against Mallinckrodt (for its activities between 1942 and 1957) and Cotter (for its activities between 1969 and 1973). Second Amended Complaint at 3–4 ¶¶ 6–12, 4–5 ¶¶ 16–20, 25–26 ¶¶ 70–72, *McClurg v. MI Holdings, et. al*, No. 4:12-cv-00361 (E.D. Mo. Jan. 10, 2014), ECF No. 178 (McClurg Second Amended Compl.). According to the complaint,

Mallinckrodt and Cotter's release of hazardous, toxic, and radioactive waste materials caused the plaintiffs bodily injury, sickness, disease, or death, for which the plaintiffs were asserting tort liability under Missouri law, based on a "nuclear incident" (or series of such incidents). *Id.* at 25–30 ¶¶ 70–88.

In particular, the *McClurg* plaintiffs alleged that Mallinckrodt and Cotter contaminated the air, soil, surface water, and ground water in the St. Louis area by improper processing, handling, transportation, storage, and disposal of radioactive materials and residues that had been originally produced by Mallinckrodt (under its contract with the government) at and around SLDS, SLAPS, Latty Avenue facility, and West Lake Landfill. *Id.* at 3 ¶¶ 7, 10–11, 4–5 ¶¶ 15–18, 16–20 ¶¶ 27–43. Radioactive materials and residues in Coldwater Creek, which is close to and a major drainage mechanism for SLAPS and Latty Avenue, allegedly migrated to other sites in St. Louis. *Id.* at 17 ¶ 30, 18–19 ¶ 39, 21 ¶ 47, 22 ¶ 52, 23–24 ¶¶ 58–65. The plaintiffs further alleged harm from the use of contaminated soil from the West Lake Landfill for landfill in other locations, *id.* at 4–5 ¶ 16, 22 ¶ 51, and from improper transportation of radioactive material and residues from SLAPS to Latty Avenue, *id.* at 22 ¶ 53.

In the present case, Cotter alleges that the federal government—specifically, the U.S. Department of Energy (DOE), which by then had responsibility for indemnification functions under the AEA, 42 U.S.C. § 2210(d), *see supra* n.2—was notified of the *McClurg* litigation no later than March 2012. Public Redacted Compl. at 10 ¶ 38. Moreover, the *McClurg* record is clear that in February 2018, the district court ordered settlement discussions with a court-appointed mediator. Memorandum and Order for Settlement Discussions at 1–2, *McClurg v. MI Holdings, et. al*, No. 4:12-cv-00361 (E.D. Mo. Feb. 22, 2018), ECF No. 690 (Settlement Order). In that order, noting that DOE may be "a possible indemnitor in this case" and that,

despite the plaintiffs' requests, no DOE representative had appeared at any mediation conferences to date, the district court directed that a DOE representative attend the settlement conference and that counsel for Mallinckrodt provide the order to DOE. *Id.*

In a letter sent the day before the scheduled mediation, DOE declined to participate, saying that it was not its "usual practice for addressing potential indemnification . . . to participate directly in [the underlying tort litigation] settlement discussions." Letter to Court from Department of Energy re: Order ECF No. 690 at 1, *McClurg v. MI Holdings, et. al*, No. 4:12-cv-00361 (E.D. Mo. Mar. 7, 2018), ECF No. 692 (DOE Letter). DOE added that "[i]ndemnification . . . is primarily an issue of contract between DOE and a contractor;" so indemnification was better addressed as "separate and distinct" from the "claims of liability by private parties (who do not have privity of contract with the Government) against a DOE contractor." *Id.* DOE further stated that "to the extent that DOE has any indemnification liability in connection with the claims in this litigation—which DOE does not concede—any such liability, as noted above, would be as a result of a contractual relationship with a party to this litigation." *Id.* at 2.

On September 12, 2018, with amendments made on April 29, 2019, the *McClurg* plaintiffs entered into Master Settlement Agreements with Mallinckrodt and Cotter to resolve the "asserted 'public liability actions' . . . for injuries and death allegedly resulting from exposure to hazardous, toxic, and radioactive substances (byproduct materials) handled by Defendants at various times between 1942 and 1974, near Plaintiffs' residences and places of employment in north St. Louis County, Missouri." Order Approving Wrongful Death Settlements, Attorney Fees, and Costs at 1–2, *McClurg v. MI Holdings, et. al*, No. 4:12-cv-00361 (E.D. Mo. Dec. 30, 2019), ECF No. 806. The district court approved the settlements as "fair and

reasonable compensation for the[] wrongful death claims." *Id.* at 4; *see also* Public Redacted Compl. at 12 ¶ 48.

D

On April 11, 2022, Cotter filed the present action under the Tucker Act in the Claims Court, seeking compensation from the United States under the PAA in the amount of $14,961,418.74 "for the costs of settling and defending the public liability action" in the *McClurg* litigation. Public Redacted Compl. at 1; *see also id.* at 3 ¶¶ 7–8, 13–14 ¶¶ 57–59, 15 ¶¶ 72–74. Cotter asserted entitlement to indemnification based on two counts: statutory indemnification pursuant to the PAA and contractual indemnification as an intended third-party beneficiary of the AEC-Mallinckrodt Indemnification Agreement. *Id.* at 13–15 ¶¶ 53–74. In August 2022, the United States filed a motion to dismiss. Def.'s Mot. to Dismiss, *Cotter Corporation, (N.S.L.) v. United States*, 165 Fed. Cl. 138 (Fed. Cl. 2023) (No. 22-cv-00414), ECF No. 16; *see also Claims Court Opinion*, at 141–42. Regarding the statutory claim, the government argued that Cotter failed to state a claim on which relief could be granted under Rule 12(b)(6) of the United States Court of Federal Claims (RCFC) because Cotter failed to plead a basis for statutory indemnification under the PAA. Def.'s Mot. to Dismiss at 17–33. Regarding the contract claim, the government sought dismissal under RCFC Rule 12(b)(6) for want of plausible allegations that it was an intended third-party beneficiary of the Indemnification Agreement and also sought dismissal under RCFC Rule 12(b)(1) for want of jurisdiction because, the government argued, Cotter lacked standing. *Id.* at 33–37.

On March 3, 2023, the Claims Court granted the government's motion to dismiss on all grounds and entered judgment. *Claims Court Opinion*, at 138; Judgment, *Cotter Corporation (N.S.L.) v. United States*, 165 Fed. Cl. 138 (Fed. Cl. 2023) (No. 22-cv-00414), ECF No. 21. Regarding the statutory claim, the Claims Court concluded that the

"clear and unambiguous" language of § 170(d) "limits who may be party to or benefit from an indemnification agreement" by providing for indemnification for "public liability '*arising out of* or *in connection with* the contractual activity,'" § 170(d) (emphasis added)—meaning, in the court's view, liability that "originate[s] from" or has "a relationship to" the contractual activity. *Claims Court Opinion,* at 148–49. Considering that formulation, and the PAA as a whole, the Claims Court then held the complaint insufficient, reciting several reasons: Cotter "was not in privity of contract with Mallinckrodt"; the "benefit to the government's nuclear program" ended when Mallinckrodt stopped its contractual activities; "Cotter's handling of the material did not 'originate from' Mallinckrodt's contractual activity, but rather possession by third parties"; and Cotter's "handling [of] material that was once under Mallinckrodt's contract is an insufficient causal sequence to trigger indemnification obligations." *Id.* at 149.

The court dismissed the contract count of the complaint, concluding that Cotter lacked subject-matter jurisdiction and failed to state a claim upon which relief can be granted. *Id.* at 150–52. Because Cotter "d[id] not fall within the class 'clearly intended to be benefit[t]ed' by the PAA's indemnification under Section 170(d)," the Claims Court concluded that Cotter "failed to establish it has standing as an intended third-party beneficiary of the Mallinckrodt contract and indemnification agreement." *Id.* at 152. Without standing, the Claims Court determined it must grant the motion for lack of subject-matter jurisdiction. *Id.* at 151. Moreover, "[e]ven if Cotter had standing," the Claims Court concluded, Cotter could not "plausibly allege an 'actual breach' of [the AEC-Mallinckrodt] contract" necessary for a contract claim because Cotter never asked the government for indemnity and so was never denied it. *Id.* at 152.

Cotter timely filed an appeal to this court on April 25, 2023. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

"We review the dismissal for lack of subject-matter jurisdiction de novo. We review the dismissal for a failure to state a claim on which relief can be granted de novo." *Taylor v. United States*, 959 F.3d 1081, 1086 (Fed. Cir. 2020) (citations omitted). The Rule 12(b)(6) inquiry is whether the factual allegations "cross the line to support a plausible inference" that the government is statutorily or contractually liable for indemnifying Cotter. *See UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984, 991–92 (Fed. Cir. 2024) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57, 570 (2007). The "plausibility" requirement also applies to the government's facial Rule 12(b)(1) challenge to jurisdiction over the contract claim here, which challenges Cotter's standing: The inquiry is whether the complaint "'contain[s] sufficient factual matter' that would plausibly establish standing." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In reviewing both dismissals, we accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of Cotter. *Harris v. United States*, 868 F.3d 1376, 1379 (Fed. Cir. 2017); *see also Taylor*, 959 F.3d at 1086; *Ute Indian Tribe of the Uintah & Ourah Indian Reservation v. United States*, 99 F.4th 1353, 1364 (Fed. Cir. 2024). "We 'may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record.'" *Ute Indian Tribe*, 99 F.4th at 1364 (quoting *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014)). We interpret both the statute and the contract at issue here de novo. *See Harris*, 868 F.3d at 1379; *NOAA Maryland, LLC v. Administrator of the General Services Administration*, 997 F.3d 1159, 1165 (Fed. Cir. 2021); *Genentech, Inc. v. Immunex Rhode Island Corp.*, 964 F.3d 1109, 1111 (Fed. Cir. 2020).

We conclude that the Claims Court erred in dismissing Cotter's statutory indemnification claim for failure to state a claim, because the complaint states a plausible allegation of entitlement to indemnification under the PAA. We then address the contract claim. We reverse the district court's conclusion of lack of standing, which rested on the court's error on the statutory entitlement question. We also reverse the dismissal of the contract claim, because, on the present record and arguments, the only argument made for insufficiency of the contract claim is the same argument we reject in reversing the dismissal of the statutory claim.

A

1

As is undisputed, the Claims Court had jurisdiction to adjudicate the claim made under § 170(d). The Tucker Act gives the Claims Court jurisdiction, and waives the sovereign immunity of the United States, for money claims "against the United States founded [upon] . . . any Act of Congress." 28 U.S.C. § 1491(a)(1). That provision applies when the statute invoked is a "so-called money-mandating provision[]," *i.e.*, "it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Maine Community Health Options v. United States*, 590 U.S. 296, 324, 322 (2020) (internal quotation marks and citation omitted). Section 170(d)'s "shall indemnify" language, like the "shall pay" language held sufficient in *Maine Community*, 590 U.S. at 324–25, qualifies under that standard. We therefore address the merits question of what is required to come within § 170(d)'s "shall indemnify" language and whether Cotter has met the requirement for motion-to-dismiss purposes.

2

The "shall indemnify" obligation, where (as here) there is a government-contractor indemnity agreement, reached "persons indemnified" for "public liability arising out of or

in connection with the contractual activity." § 170(d). That language plainly required, because of the express definitions of the key terms in § 170(d), that the indemnification duty, for a domestic nuclear incident (such as the one at issue here), extends beyond the contractor to "*any other person who may be liable for public liability*." PAA-amended AEA § 11(r) (before and after 1962 amendment) (emphasis added). The last phrase—"public liability"—meant "any legal liability arising out of or resulting from a nuclear incident" (for a domestic nuclear incident). PAA-amended AEA § 11(u) (before and after 1962).

This appeal turns on who is a "person indemnified" for "public liability arising out of or in connection with the contractual activity." Those terms, with their embedded statutory definitions, are what address the needed relationship between the indemnity-claiming person's liability and the "contractual activity." There is no meaningful dispute before us about two premises needed for that language to apply. First, there was a qualifying indemnity agreement, *i.e.*, the 1962 AEC-Mallinckrodt Indemnification Agreement. *See supra* Part I.B.1. And second, Cotter is asserting a right to indemnity for a liability arising out of or resulting from a domestic occurrence causing harms from radioactive and other hazardous properties of covered nuclear materials—materials created as part of Mallinckrodt's performance of its contract with the government. *See*, *e.g.*, Cotter Opening Br. at 9–10, 21–22; Government Response Br. at 10–11.

The Claims Court gave the statutory provision at issue a narrow interpretation, which effectively required (a) a contemporaneous relationship between the liability-generating acts of the non-contractor indemnity claimant (Cotter) and the performance of the contract (by Mallinckrodt or the government) and, seemingly, (b) that the indemnity claimant's activities (generating liability to others) were related to the contractual activities in the particular sense of contributing to the performance of the contract. Such a

view is suggested by the Claims Court's reasons for finding the standard not met even for motion-to-dismiss purposes. Those reasons focus on the fact that Cotter's actions (giving rise to liability) post-dated Mallinckrodt's work for the government, and they deem other facts insufficient—*e.g.*, that the materials Cotter was handling were created for the government under the contract, had an obvious potential to remain hazardous for an extended period, were sold by the government before the contract ended, and shortly thereafter were acquired by Cotter and held under an AEC license. *Claims Court Opinion*, at 148–50. In this court, the government insists on what we understand to be materially the same focus on a contemporaneous contribution to contract performance when it says that the statutory standard is met where the indemnity claimant "work[ed] under, in support of, in connection with, or at the site of an AEC weapons production contract for the benefit of the United States" (*i.e.*, when the contract was being performed) but not where the claimant has "mere later ownership and possession of radioactive material that resulted from [such a] Contract." Government Response Br. at 3–4; *see*, *e.g.*, *id.* at 19–20, 23, 25.

For the reasons we next explain, we conclude that the narrow view taken by the Claims Court and argued by the government is not the best reading of the statute and that Cotter properly survives the motion to dismiss here.

3

To begin with the terms that precede "arising out of or in connection with"—"persons indemnified" for "public liability"—it is clear that those terms (with the embedded definition of "nuclear incident") contemplate a broader range of indemnity than the narrow view taken by the Claims Court. The phrase "persons indemnified" is defined broadly to cover not just the contractor but "*any* other person who may be liable for public liability." PAA-amended AEA § 11(r) (before and after 1962 amendment) (emphasis

added). Public liability, in turn, broadly reaches the "public" by embracing "*any* legal liability arising out of or resulting from a nuclear incident," with exceptions (not at issue here) for workers' compensation for certain incident-site employees and for certain losses of incident-site property. *Id.* § 11(u) (emphasis added). And the definition of "nuclear incident" covers "*any* occurrence within the United States causing bodily injury . . . arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." PAA-amended AEA § 11(o) (emphasis added).

None of those provisions limits indemnity to the period before the government contract ended or includes a requirement that the indemnity claimant's (exposure-causing) activity was contributing to the contracting parties' performance. They are focused simply on the hazard from the material—a hazard that is not limited in time to the period of performance of a particular contract and may be long lasting, for at least some of the covered nuclear materials. *See*, *e.g.*, J.A. 286 (1950 S.A. No. 45 provisions recognizing that harms may arise from radioactive materials, products, or byproducts "that may be or may at any time have been involved in the performance of the work under this contract"), 298–300 (1950 S.A. No. 45 provisions recognizing that hazards will outlast the contract), 772–73 (1961 S.A. No. 122 provisions recognizing the same).[6] Unless

---

[6] *See also Atomic Energy Part 1: Hearings Before the Special Comm. on Atomic Energy Pursuant to S. Res. 179*, 79th Cong. 149 (1945) ("The manufacture of fissionable materials is by long odds the most dangerous manufacturing process in which men have ever engaged. The process is accompanied by the production of radioactive by-products as poisonous as the basic material itself . . . .") (statement of Dr. Vannevar Bush, President, Carnegie Institution of

Case: 23-1826 Document: 39 Page: 24 Filed: 02/10/2025



potential investors in nuclear energy were confident that such materials, as byproducts of contract use or residues from creating material for such use, would no longer be hazardous beyond the time of contract performance—and we have been given no reason to infer such confidence—a contract-termination temporal limit (*i.e.*, excluding government compensation if and when harm occurred after termination) would undermine the declared statutory purposes "to protect the public" and to remove an important deterrent to private investment in nuclear energy. PAA, 71 Stat. at 576 (amending AEA § 2); *see* S. REP. 85-256, at 16 (recognizing the government's "primary concern" of protecting the public, that "the steady exposure to radiation, such as from an undetected leak of radioactive materials from a storage bin" cannot be "pinpointed in time," that covered incidents do not "necessarily have to occur within any relatively short period of time," and (discussing licensees) that "[t]he indemnity agreements are intended to cover damages caused by nuclear incidents for which there may be liability no matter when the damage is discovered, i.e., even after the end of the license"); S. REP. 100-218, at 2 (1987) (later committee's understanding of PAA as "remov[ing] the deterrent of potentially catastrophic liability," including through "channeling of liability" provisions that indemnify "any person who might be held liable for public liability resulting from a nuclear incident").

---

Washington, and Director, Office of Scientific Research and Development); *New York v. United States*, 505 U.S. 144, 149–50 (1992) (observing that even "low level radioactive waste" "must be isolated from humans for long periods of time, often for hundreds of years"); *Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Commission*, 685 F.2d 459, 467–68 n.14, 469 (D.C. Cir. 1982) (noting long-term hazards from radioactive wastes).

The breadth of the foregoing terms, apparent from their definitions, is emphasized by the evident contrast of key definitions with immediately neighboring standards. In particular, as recited above, in 1962 Congress amended the definitions of "person indemnified" and "nuclear incident" to retain the 1957 language for domestic occurrences while pointedly narrowing the scope for foreign occurrences. *See supra* Part I.A. For the latter, "person indemnified" reached a person other than the contractor only if that person's exposure to public liability was "*by reason of his activities under* any contract with the [AEC]" or certain other "project[s]" (including under subcontracts or the like). PAA-amended AEA § 11(r) (after 1962 amendment) (emphasis added). In a similar way, for "nuclear incident," Congress retained the pre-existing scope for domestic occurrences (with a clarification that stressed breadth), while adopting a narrow scope for most foreign occurrences—applying to a foreign occurrence only if it "involves a facility or device *owned by, and used by or under contract with, the United States*." PAA-amended AEA § 11(o) (after 1962 amendment) (emphasis added). The adoption of those narrower standards for foreign occurrences (where the harm will typically fall on another country's "public"), combined with their conspicuous absence from the adjacent domestic-occurrence language, confirms the breadth of the domestic-occurrence language. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) (stating that "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (same); *Collins v. Yellen*, 594 U.S. 220, 248 (2021) (same).

Here, as the case is presented to us, Cotter incurred liability through its settlement with the *McClurg* plaintiffs based on allegations that it injured members of the public in the St. Louis area by releasing, between 1969 and 1973,

radioactive materials and residues originally produced by Mallinckrodt for the government under the AEC-Mallinckrodt contract. McClurg Second Amended Compl. at 3–4 ¶¶ 6–12, 4–5 ¶¶ 16–20, 25–26 ¶¶ 70–72; Public Redacted Compl. at 9–13 ¶¶ 36–52; *see supra* Parts I.B.2, I.C. Taking all well-pleaded factual allegations before us as true, we conclude that Cotter is a "person indemnified" seeking indemnity for a "public liability."

4

We also answer the remaining question under § 170(d) in Cotter's favor. We conclude that Cotter has pleaded enough to proceed past the dismissal stage on the question of whether the public liability Cotter incurred was one "arising out of or in connection with the contractual activity" of performance of the AEC-Mallinckrodt contract, a contract that (as we have noted) undisputedly included an indemnity agreement. The parties read the phrase as meaning "arising out of" or "in connection with," but it might be understood as meaning "arising out of" or "arising in connection with." For present purposes, we do not see that the precise parsing makes a difference, including because "arising in connection with" would encompass "arising out of."

The "arising out of" phrase alone clearly requires that what follows the phrase (here, the contractual activity) was the cause (sometimes, just one of the causes) of what precedes the phrase (here, the public liability of the indemnity claimant). *See, e.g.*, *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 361–62 (2021); *United States v. Shearer*, 473 U.S. 52, 54–55 (1985). The concept of causation often combines but-for causation and an additional limit often called "proximate" causation, which prevents attribution to a "remote cause." *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 201 (2017) (citation omitted); *Lexmark International Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014); *see also*

*Burrage v. United States*, 571 U.S. 204, 210 (2014) (explaining that "[t]he law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause," which is "often called the 'proximate cause'") (citations omitted); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1546 (Fed. Cir. 1995) (en banc). We have explained, in the patent-damages setting, that "'reasonable, objective foreseeability' is 'generally' sufficient for proximate causation, while indicating that a different conclusion might be justified if there is 'a persuasive reason to the contrary.'" *Brumfield, Trustee for Ascent Trust v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024) (quoting *Rite-Hite*, 56 F.3d at 1546); *see also CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 702–04 (2011) (discussing reasonable foreseeability's role in proximate-cause analysis). As reflected in that formulation, a particular statutory context may alter the general standard for proximate causation. *See Bank of America*, 581 U.S. at 201–04; *see also Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 769 (2018).

The "in connection with" phrase (alone or viewed as part of "arising . . . in connection with") undoubtedly broadens the reach of the overall clause at issue here. The phrase, we have repeatedly recognized in another context, is on its face "very sweeping in scope." *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999); *see Acetris Health, LLC v. United States*, 949 F.3d 719, 728 (Fed. Cir. 2020); *Diaz v. United States*, 853 F.3d 1355, 1357–58 (Fed. Cir. 2017); *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015); *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008). Relatedly, in the AEA context, Congress in 1961 changed the language of AEA § 152, 42 U.S.C. § 2082, to delete "in connection with" from a list that included "in the course of" and "under" and also to delete "or other relationships with the [AEC]" from a list that included "any contract," "subcontract," and "arrangement." Pub. L. 87-208, 75 Stat. 475, 477 (Sept. 6, 1961). Congress

did so, we have recognized, because the deleted language was "unclear and possibly too sweeping." *Fitch v. Atomic Energy Commission*, 491 F.2d 1392, 1395–96 (CCPA 1974) (quoting H.R. REP. 87-963, at 8 (1961), 1961 U.S.C.C.A.N. 2591, 2597). In contrast, Congress did not change the "arising out of or in connection with" language of § 170(d) when it enacted the 1962 amendments introducing the domestic/foreign distinction. *See* 42 U.S.C. § 2210(d) (where this language remains); *supra* Part I.A.

The Supreme Court has stated that "[t]he phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'" *Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 655 (1995)) (second alteration in original); *cf. Ford Motor*, 592 U.S. at 361–62. As a result, the phrase, when used in any given statutory setting, needs to be, and has been, construed to respect not only its breadth but also the particular statute's structure, other provisions, and objectives. *Maracich*, 570 U.S. at 59–60; *see New York State Conference*, 514 U.S. at 656; *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 324–25 (1997); *cf. Ford Motor*, 592 U.S. at 361–62 (noting that the phrase "arise out of or relate to" in precedent goes beyond a "strict causal relationship" but "does not mean that anything goes").

Under those standards, which obviously do not create a bright-line rule, the materials proper for consideration on the motion to dismiss, including the complaint's allegations (which we must take as true at this stage), suffice to preclude dismissal here. The AEC-Mallinckrodt contractual activity of creating the nuclear material at issue was a but-for cause of the public liability, because that material, which was inherently dangerous, was the source of the nuclear incident giving rise to Cotter's public liability. That is so even though there were other but-for causes, such as

Cotter's own actions (or omissions) involving that material. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes.").

The path from the contractual activity to the nuclear incident was not a long or tortuous one. Indeed, the AEC-Mallinckrodt contract itself had not yet terminated when the material was sold to Cotter. *See supra* Part I.B; J.A. 814 (1966 SA No. 129, stating that contract work continued through June 30, 1967); J.A. 1114 (Cotter's purchase agreement entered into on June 9, 1967). The path involved the February 1966 transfer of the materials by the government—as owner, seeking to avoid having to dispose of the material itself—to a company that quickly folded, causing the materials to pass to the foreclosing (financing) company for a brief time before, in June 1967, the materials were put into the hands of Cotter, which was in the relevant line of work and which secured an AEC license for that work in December 1969, as legally required. *See supra* Part I.B.2. On the facts alleged, the contractual activity need not be deemed "remote" from the nuclear incident, *Bank of America*, 581 U.S. at 201, that is alleged by the *McClurg* plaintiffs (regarding Cotter) to have begun in 1969. The relevant record lays out extensive facts or alleged facts about the nature of the material, the statutory requirement of obtaining a license, the contract provisions and government actions recognizing a need for careful long-term management of the materials, and even the government's awareness that an initial transferee might default (hence that a subsequent transfer might be needed). *See, e.g.*, Public Redacted Compl. at 5–6 ¶¶ 16–23; J.A. 45 (1943 contract Article 4), 62 (1943 contract Article 33), 288–300 (1950 SA No. 45), 662 (1955 SA No. 110), 773 (1961 SA No. 122), 789–90 (1962 SA No 126); *see generally supra* Parts I.B, II.A.3. On this record, we have been given no basis for ruling that it is implausible that the eventual exposure of the public in the asserted nuclear incident meets a standard of "reasonable, objective foreseeability." *Rite-*

*Hite*, 56 F.3d at 1546. This is not a case, on the record presented and considering the Rule 12(b)(6) standard, where we can say that the connection at issue is so "thin" that it goes beyond a "cutoff" point of the statutory phrase. *See Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 149 (2009).

This conclusion readily serves, rather than undermines, the declared and evident purpose of the statutory provision at issue, which is relevant to confirming that "in connection with" can apply here. The purpose of § 170(d) was a broad one—to indemnify private-sector participants involved in the nuclear-energy industry for risks of nuclear incidents, and hence of liability, that were high enough that Congress recognized that the risk was significantly deterring private investment. The aim of the government indemnification was a dual one: to guarantee the (domestic) public compensation for harm if such an incident occurred; and to induce private-sector investment in work Congress deemed of great value to the country. *See supra* Parts I.A., II.A.3. Applying the "arising out of or in connection with" phrase on the record here furthers the declared purpose of the statutory provision of indemnification.

For the foregoing reasons, we reverse the dismissal of the claim for indemnity under § 170(d).

B

We also reverse the dismissal—for lack of jurisdiction (because of lack of standing) and, in the alternative, for failure to state a claim—of Cotter's claim for contractual indemnification.

1

The jurisdictional (standing) dismissal rested solely on the Claims Court's determination that Cotter failed to establish, in response to the government's Rule 12(b)(1) facial challenge, that it was a third-party beneficiary of the Indemnification Agreement—and therefore did not come within the Tucker Act provision providing jurisdiction to

hear a damages claim founded "upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1). *Claims Court Opinion*, at 151–52. There is no dispute, and it is clear, that Cotter had constitutional and Tucker Act standing if it did allege enough to make it a third-party beneficiary under motion-to-dismiss standards. To defeat the government's motion to dismiss under Rule 12(b)(1), Cotter was "merely required to set forth a non-frivolous allegation of breach of a contract with the government." *Columbus Regional Hospital v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021). The complaint readily meets that low standard, as its allegation that it is among the class of intended beneficiaries of the contractual provision promising indemnity (using "persons indemnified" language like that of PAA-amended AEA § 170(d)) is not frivolous. The Claims Court erroneously applied what amounts to the higher Rule 12(b)(6) standard of plausible allegations supporting relief. *Claims Court Opinion*, at 151–52. It was improper to dismiss this claim for lack of jurisdiction. We may and do, however, convert the government's argument against Cotter having the status of a third-party beneficiary into an argument for dismissal under Rule 12(b)(6). *Columbus Regional Hospital*, 990 F.3d at 1342.

2

With that conversion, we address the two grounds for dismissal for failure to state a claim—that, under the pleading standard applicable under Rule 12(b)(6), Cotter was not an "intended third-party beneficiary" of the AEC-Mallinckrodt Indemnification Agreement; and that Cotter had failed sufficiently to allege breach by the government of the indemnity obligation because it failed to give the government assertedly required notice. *Claims Court Opinion*, at 151–52. We reject both grounds for dismissal.

a

Cotter has alleged sufficient facts to make plausible its claim that it is an intended third-party beneficiary of the Indemnification Agreement. That agreement, quoted in significant part *supra* Part I.B.1, used language substantially the same as the language we have discussed in rejecting the dismissal of the claim for indemnification under PAA-amended AEA § 170(d). J.A. 780–82 (1962 SA No. 124). The Indemnification Agreement incorporated the relevant statutory definitions, of "person[s] indemnified," "public liability," and "nuclear incident." J.A. 780; Public Redacted Compl. at 7 ¶ 27. It also stated that "the Commission will and does hereby indemnify the Contractor, *and other persons indemnified*, against (i) claims for public liability as described . . . and (ii) the reasonable costs of investigating and settling claims, and defending suits for damage for such public liability." J.A. 781 (emphasis added); Public Redacted Compl. at 7–8 ¶ 28. The "public liability" had two requirements—that it "arises out of or in connection with the contractual activity" and that it "arises out of or results from" one of four specified "nuclear incidents," including a "nuclear incident which involves items (such as equipment, *material*, facilities, or design or other data) produced or delivered under this contract." J.A. 781–82 (emphasis added); Public Redacted Compl. at 8 ¶ 29.

On the well-pleaded allegations discussed above, as we have concluded *supra* Part II.A, Cotter was a "person indemnified" against the liability at issue here. Our conclusion about Cotter's coverage by statutory language that is materially identical to the contract language means that Cotter was a person expressly stated by the contract to be a direct beneficiary, as among the indemnitee class, of the contract's indemnity obligation. That is sufficient for Cotter to pass the test for third-party-beneficiary status at the Rule 12(b)(6) stage. *See Columbus Regional Hospital*, 990 F.3d at 1345 ("The test for third-party beneficiary status is whether the contract reflects the intent of the contracting

parties to benefit a third party. . . . The intended benefit must be direct.") (citation omitted).

In rejecting Cotter's entitlement to such status, the Claims Court principally relied on its rejection of the statutory analysis we have adopted. It also pointed to provisions in the bill of sale between AEC and Continental and in the purchase agreement between Commercial (Continental's transferee upon foreclosure) and Cotter. *Claims Court Opinion*, at 149–50. The AEC-Continental bill of sale passed title of the material to Continental and stated that the material was sold "as is" and that the government did not warrant that the material would "not result in injury or damage." J.A. 1107–08. The Commercial-Cotter purchase agreement passed title of the material to Cotter and included provisions for Cotter and Commercial to indemnify each other for liability resulting from certain activities. J.A. 1114–15; J.A. 1132–34. But those documents do not end the government's indemnification duties or otherwise make Cotter's allegation of third-party-beneficiary status implausible.[7]

The Indemnification Agreement provided for indemnification of public liability arising out of a nuclear incident that involves materials "produced or delivered under this contract," without requiring that such materials continue to be owned or under the control of the government or

---

[7] The government also points to the AEC-Continental bill of sale's provision stating that "there are no prior agreements, understandings, or covenants between the Government and the Purchaser . . . which are not set forth herein." J.A. 1108–09; Government Response Br. at 11, 37. That language, effectively an integration clause, merely precludes either party from relying on prior bids (detailed in the sentence immediately preceding the one quoted). J.A. 1108; *see* Public Redacted Compl. at 5 ¶ 17, 6 ¶ 21.

Case: 23-1826 Document: 39 Page: 34 Filed: 02/10/2025



Mallinckrodt. J.A. 782 (1962 SA No. 124). It also did not limit indemnification to the period of the Mallinckrodt contract; to the contrary, it stated that "[t]he obligations of the Commission . . . shall be unaffected . . . by the completion, termination or expiration of this contract." J.A. 783 (1962 SA No. 124). And the government made that drafting choice even while it was actively trying to sell the nuclear materials to private companies and had included provisions in the Mallinckrodt contract that explicitly contemplated sale of materials to third parties. Public Redacted Compl. at 7 ¶ 25; *see*, *e.g.*, J.A. 708 (1955 SA No. 115, Article X ¶ 4), 733 (1955 SA No. 115, Schedule D ¶ 2(a)–(b)).

In these circumstances, the Claims Court erred in denying Cotter third-party-beneficiary status in ruling on the motion to dismiss.

b

Cotter also sufficiently alleged facts that plausibly support an inference that the government breached the contract. The Claims Court and the government seem to make two different contentions about deficiencies on Cotter's part that preclude any assertion of a breach even at this stage—first, that Cotter never made a pre-suit demand for indemnity to the government, and second, that Cotter did not satisfy certain contractual notification-of-litigation requirements. *Claims Court Opinion*, at 151–52; Government Response Br. at 56–61. At least for purposes of the motion to dismiss here, we reject those arguments.

The government identifies nothing in the contract, or in any applicable statutory or decisional law, that supports its first point. The contract does not include a pre-suit-demand requirement, or a similar exhaustion requirement to request and obtain a contracting officer's decision, as a precondition to suing on (what we here must assume is) the indemnity duty owed to Cotter. *See* J.A. 780–84 (1962 SA No. 124). Nor does the government identify any applicable law that imposes such a requirement. *Compare*, *e.g.*, 28

U.S.C. § 2675 (Federal Tort Claims Act); 41 U.S.C. § 7103(a)(3) (Contract Disputes Act). Nor, further, does it identify a basis for dismissing a suit for breach because of a lack of such a pre-suit demand when it is clear (based on the Department of Energy's letter to the Missouri court and the government's position here) that any demand would have been futile.

The government also has not persuasively shown that any contract provision required more notice of the public-liability litigation (the *McClurg* litigation) than it received in this matter, or persuasively shown that the indemnity obligation disappears when such notice is deficient, even when it is clear that additional notice would not have changed the government's refusal to indemnify. The record indicates that, consistent with the Indemnification Agreement, J.A. 782–83 (1962 SA No. 124, citing J.A. 711–12, 1955 SA No. 115, Article XIV on Litigation and Claims), the government received notice of the *McClurg* claims before the present action was filed. Settlement Order at 1–2; DOE Letter at 1–2; Public Redacted Compl. at 10 ¶ 38, 12 ¶¶ 46–47. Moreover, several provisions of the Indemnification Agreement and the AEC-Mallinckrodt contract affirmatively suggest that failures-of-notice formalities do not negate the indemnity obligation. J.A. 783 (1962 SA No. 124, stating: "The obligations of the [AEC] under this article shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract."), 691–92 (1955 SA No. 115, Article V ¶ 2(j), stating that "failure to comply with the requirements . . . relative to the reporting of an action or claim or the furnishing of copies of papers" did not preclude reimbursement by the government of the settlements, losses, and expenses related to those claims; and stating that "the refusal of the [AEC] to authorize or approve the defense or settlement of any claim or action against the Contractor . . . shall not preclude a later determination of whether or not any settlement of such claim or action by the Contractor or the

expense of defending such claim or action . . . or any final judgment, award or allowance as a result of any such action or claim" can be considered an allowable expense that the government must pay).

On the arguments and record presented to us, we conclude that Cotter adequately alleged a breach of contract.

## III

For the foregoing reasons, we reverse the Claims Court's decision and remand the case.

Costs awarded to Cotter.

**REVERSED AND REMANDED**